UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**MISSOURI PRIMATE FOUNDATION, et al.,**

          Plaintiffs and Counterclaim
          Defendants;

    v.

**PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC., et al.,**

          Defendants and
          Counterclaim Plaintiffs.

**Case No. 4:16-cv-02163**

## ANSWER TO COUNT I AND COUNTERCLAIM
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Defendants People for the Ethical Treatment of Animals, Inc. ("PETA") and Angela Scott (collectively, "Defendants" or "Counterclaim Plaintiffs"), by and through their undersigned counsel, and pursuant to Federal Rules of Civil Procedure 8 and 13(a) respectfully submit their answer to Count I and counterclaim to Plaintiffs' Complaint [ECF #1] as follows:

## ANSWER TO COUNT I

1.    Defendants admit that Missouri Primate Foundation ("MPF") is a nonprofit Missouri corporation located at 12338 State Rd. CC, Festus, Missouri, 63028, that Connie Braun Casey is the President of MPF, and that Jane Does 1 and 2 have yet to be named. Defendants are without sufficient information to admit or deny the remaining allegations contained in Paragraph 1 of the Complaint.

2. Defendants admit that PETA is an animal rights group, admit that Angela Scott is a private citizen residing in Maryland who was previously a volunteer at MPF, and deny the remaining allegations in Paragraph 2 of the Complaint.

3. Defendants deny the allegations contained in Paragraph 3 of the Complaint. Defendants further state that the November 2, 2016, letter attached to the Complaint as Exhibit A speaks for itself. Defendants have not "threatened" to file any lawsuit against Plaintiffs, but complied with the citizen-suit provision of the Endangered Species Act ("ESA"), which requires that citizen plaintiffs provide written notice of violations to the alleged violator prior to commencing an action. Defendants did not allege that Plaintiffs' mere possession of the chimpanzees violates the ESA.

4. Defendants admit the allegations in Paragraph 4 of the Complaint.

5. Defendants deny the allegations in Paragraph 5 of the Complaint.

6. Defendants deny the allegations in Paragraph 6 of the Complaint.

7. Paragraph 7 contains a legal conclusion to which no response is required. To the extent any further response is required, Defendants state that the text of 16 U.S.C. § 1540(g)(5) speaks for itself and deny the remaining allegations in Paragraph 7 of the Complaint.

## COUNT I: DECLARATORY JUDGMENT

8. Defendants admit the allegations in Paragraph 8 of the Complaint.

9. Defendants admit the allegations in Paragraph 9 of the Complaint.

10. Defendants admit the allegations in Paragraph 10 of the Complaint.

11. Defendants admit the allegations in Paragraph 11 of the Complaint.

12. Defendants admit the allegations in Paragraph 12 of the Complaint.

13. The November 2, 2016, letter attached to the Complaint as Exhibit A speaks for itself, and Defendants deny the remaining allegations in Paragraph 13 of the Complaint.

14. Defendants deny the allegations in Paragraph 14 of the Complaint.

15.     Defendants are without sufficient information to admit or deny the allegations in Paragraph 15 of the Complaint and further state, upon information and belief, that Joey was held at MPF at the time of the notice.

16.     Defendants are without sufficient information to admit or deny the allegations in Paragraph 16 of the Complaint and further state, upon information and belief, that there were sixteen chimpanzees at MPF at the time of the notice.

17.     Defendants admit the allegations in Paragraph 17 of the Complaint and further state, upon information and belief, that each and every one of the named chimpanzees was at MPF at the time of the notice.

## AFFIRMATIVE DEFENSES

1.      Plaintiffs' claim is barred because Plaintiffs have not complied with the citizen-suit provision of the ESA, which requires that citizen plaintiffs provide written notice and wait sixty days prior to commencing an action.

2.      Plaintiffs have failed to state a claim upon which relief can be granted.

3.      Plaintiffs' claim is barred by the doctrine of unclean hands.

4.      The Court lacks jurisdiction over Plaintiffs' claim, including for the reasons set forth in Defendants' pending Motion to Dismiss [ECF No. 11], which is incorporated herein by reference.

5.      Defendants reserve the right to raise additional affirmative defenses they may learn of through discovery or otherwise revealed during the pendency of this action.

## COUNTERCLAIM

1.      This is a citizen suit, brought pursuant to Section 11(g)(1)(A) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g)(1)(A), to address ongoing violations of the ESA and its implementing regulations arising out of the operation of Missouri Primate Foundation ("MPF"), located in Festus, Missouri.

2.     MPF is a facility that holds numerous species of animals, including endangered chimpanzees.

3.     Chimpanzees are highly social and exceptionally intelligent animals who, in their natural environment, engage in a wide range of complex social relations with other members of their species. In fact, their behavioral and cognitive abilities are similar to those of humans. They have the capacity for empathy and self-recognition; experience pleasure, grief, depression, and boredom; and engage in cooperation, altruism, deception, and cultural transmission of learned behavior. They require social interaction with other members of their species, physical and psychological enrichment, sufficient space and environmental complexity to engage in species-typical behaviors, and a sanitary and safe environment in order to thrive. The failure to provide captive chimpanzees with these necessities disrupts their normal behavioral patterns and can cause them to suffer physical and psychological harm and injury.

4.     Counterclaim Plaintiffs bring suit against MPF; MPF's principal Connie Braun Casey; Jane Doe 2, owner of the chimpanzee known as Chloe who is held at the facility; and Andrew Sawyer, owner of the chimpanzee known as Joey who was held at the facility and is believed to have been transferred to an unknown location following receipt of Counterclaim Plaintiffs' notice of intent to sue (collectively "Counterclaim Defendants") for "taking" chimpanzees in violation of the ESA and its implementing regulations. Specifically, Counterclaim Defendants MPF and Casey hold the chimpanzees in barren and unsanitary enclosures in which they are inhumanely deprived of the social contact, physical space, and environmental enrichment necessary to engage in species-typical behaviors such as foraging, nest-building, climbing, play, tool use, and socializing that are crucial to their well-being. They are denied an adequate diet and regular veterinary care. As a result, the chimpanzees exhibit physical and behavioral evidence of distress and psychological harm. Counterclaim Defendant Jane Doe 2 has knowingly placed Chloe in these conditions for years and indefinitely into the future. Counterclaim Defendant Sawyer had knowingly

placed Joey in these conditions and in solitary confinement for years. These practices "harm" and "harass" the chimpanzees in violation of the ESA's "take" prohibition by causing them psychological harm, preventing them from carrying out their natural behaviors, and exposing them to a significant risk of physical illness and injury.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction pursuant to Section 11(g) of the ESA, 16 U.S.C. § 1540(g), and 28 U.S.C. § 1331.

6.  Counterclaim Plaintiffs have complied with the pre-suit notice provisions of the ESA. Pursuant to Section 11(g)(2)(A)(i), 16 U.S.C. § 1540(g)(2)(A)(i), on November 2, 2016, Counterclaim Plaintiffs mailed to Counterclaim Defendants MPF, Casey, and Sawyer, the Secretary of the Interior, and the Director of the U.S. Fish and Wildlife Service ("FWS") a notice of violation and intent to file suit [ECF #1-1; "Notice"], attached hereto as Exhibit A. Each recipient received the Notice on or before November 12, 2016.

7.  The Secretary of the Interior has not commenced an action against Counterclaim Defendants to impose a penalty pursuant to the ESA or its implementing regulations, and the United States has not commenced a criminal prosecution against Counterclaim Defendants to redress a violation of the ESA or its implementing regulations. *See* 16 U.S.C § 1540(g)(2)(A)(ii)–(iii).

8.  Venue is appropriate in the Eastern District of Missouri, pursuant to Section 11(g)(3)(A) of the ESA, *id.* § 1540(g)(3)(A), because the violations of the ESA set forth herein occurred, and continue to occur, within this judicial district.

# PARTIES

## Counterclaim Plaintiff PETA

9. Counterclaim Plaintiff PETA is a Virginia non-stock corporation and animal protection charity pursuant to Section 501(c)(3) of the Internal Revenue Code, with its headquarters located in Norfolk, Virginia.

10. PETA is dedicated to protecting animals from abuse, neglect, and cruelty. To achieve its mission, PETA uses public education, cruelty investigations, research, animal rescue, celebrity involvement, and protest campaigns. It brings this suit on its own behalf to protect its organizational interests and resources.

11. By unlawfully harming and harassing endangered chimpanzees, Counterclaim Defendants frustrate PETA's mission of ending the abuse and neglect of exotic animals used for entertainment, kept as pets, and left to languish at substandard facilities when they outgrew their utility. As a result, PETA has been forced to divert resources to counteract Counterclaim Defendants' unlawful activities. PETA has been forced to divert these resources from its other animal rescue, cruelty investigation, advocacy, and education projects.

12. Specifically, PETA has been and will continue to be required to expend resources educating the public about the unlawful and inhumane conditions in which the chimpanzees are kept at MPF, investigating and documenting the conditions under which the chimpanzees are held, submitting complaints to authorities regarding these conditions, informing the public that these conditions cause them to suffer greatly, and urging the Counterclaim Defendants to relinquish possession of the chimpanzees and allow them to be relocated to a sanctuary accredited by the Global Federation of Animal Sanctuaries (GFAS), an international certification body for animal sanctuaries, rescue centers and rehabilitation centers with standards that ensure humane animal care and appropriate management. PETA has been and will continue to be required to expend these resources

as a direct result of the unlawful and inhumane conditions in which the Counterclaim Defendants hold the chimpanzees. These efforts and the resulting expenditures would not be necessary but for Counterclaim Defendants' unlawful taking of endangered chimpanzees.

13. If Counterclaim Plaintiffs prevail in this action, PETA's injuries will be redressed because the Counterclaim Defendants will no longer be able to maintain chimpanzees in unlawful conditions. PETA will no longer have to expend resources educating the public about or seeking to improve the unlawful and inhumane conditions in which the chimpanzees are kept because Counterclaim Defendants would only be able to maintain them by providing them with an appropriate living space, a sanitary environment, adequate and appropriate enrichment, safe and appropriate shelter, an adequate diet, regular veterinary care, and compatible companions; or, if Counterclaim Defendants are unable to comply with the ESA by providing the chimpanzees with these basic necessities, by ensuring that they are transferred to an appropriate GFAS-accredited sanctuary, where they can experience conditions that are consistent with their biological and other needs.

14. The resources PETA spends investigating, documenting, and educating the public that the conditions under which the chimpanzees are presently kept are unlawful and inhumane, and urging the Counterclaim Defendants to release the chimpanzees from these conditions, could then be directed to other PETA projects, including efforts to protect other chimpanzees and animals of other species, in furtherance of PETA's overall mission.

### Counterclaim Plaintiff Angela Scott

15. Counterclaim Plaintiff Angela Scott lives in Gaithersburg, Maryland, and is a former volunteer at MPF. Over the course of her volunteer work, Ms. Scott developed an aesthetic and emotional connection with many of the chimpanzees and, as a result, has been injured and adversely affected by Counterclaim Defendants' harm and harassment of them.

16.     Ms. Scott has felt a strong connection to animals for her entire life. Prior to volunteering at MPF, Ms. Scott worked at a research laboratory in Maryland, where she was a caretaker for chimpanzees. She felt such an attachment to the chimpanzees that when her employment there ended, she felt compelled to relocate to Missouri specifically to volunteer at MPF.

17.     Ms. Scott volunteered at MPF on-and-off, at times full-time or living at the facility, over a six-year period from 2001-2007. She assisted Counterclaim Defendant Casey with primary care responsibilities for the chimpanzees then at the facility, including general husbandry, feeding, watering, and cleaning. Through her many years working with and around chimpanzees, Ms. Scott has learned to recognize signs that these animals are suffering, such as abnormal behaviors.

18.     During her time at the facility, Ms. Scott developed a strong relationship with and personal emotional attachment to the particular chimpanzees. She observed them engage in behaviors that she believed to be abnormal and caused by conditions that were woefully inadequate to meet their needs.

19.     Ms. Scott worked at the facility without pay because she believed that any funds that would be given to her should instead be used to improve the chimpanzees' care and conditions.

20.     From the time that Ms. Scott stopped volunteering in 2007 until sending the Notice in this matter, she continued to stay in touch with Counterclaim Defendant Casey, who requested that she return to work at the facility on at least three occasions, regarding the welfare of the chimpanzees.

21.     Ms. Scott did not return to the facility until 2016 because, in part, she experiences ongoing aesthetic harm and emotional anguish when she sees the chimpanzees kept in the inhumane conditions that she witnessed during her work there. Ms. Scott sustained further aesthetic injury as a result of witnessing the poor conditions in which the chimpanzees continue to be held during two visits to the facility in 2016.

22. Ms. Scott has been forced to choose between visiting the chimpanzees at MPF and suffering additional anguish from seeing them held in these conditions, or refraining from visiting these individuals with whom she established a close relationship to avoid that anguish—both of which cause her additional aesthetic injury.

23. Ms. Scott strongly desires to see the chimpanzees again and will visit them if they are relocated to a safe, sanitary, and humane environment where they are provided with appropriate space, enrichment, and companionship.

24. If Counterclaim Plaintiffs prevail in this action, Ms. Scott's injuries will be redressed because Counterclaim Defendants will no longer be able to maintain chimpanzees in unlawful conditions and she would be able to view the chimpanzees in humane conditions—in an appropriate living space and sanitary environment with adequate and appropriate enrichment, shelter, and food, regular veterinary care, and compatible companions—that do not cause her to suffer an aesthetic injury.

**Counterclaim Defendants**

25. Counterclaim Defendant MPF, is a nonprofit corporation organized under the laws of Missouri, with its headquarters in Festus, Missouri.

26. Counterclaim Defendant Connie Casey is a resident of Festus, Missouri. Ms. Casey is the president of MPF and operates the facility. Ms. Casey is responsible for feeding the chimpanzees, sanitation of the enclosures, and husbandry, with limited assistance from part-time volunteers whom she supervises, and for participating in United States Department of Agriculture ("USDA") inspections of MPF.

27. Counterclaim Defendant Andrew Sawyer is, upon information and belief, a resident of Clark County, Nevada, and the owner of chimpanzee Joey, who is or was held at MPF.

28. Counterclaim Defendant Jane Doe 2 is, upon information and belief, the owner of chimpanzee Chloe, who is held at MPF.

## STATUTORY BACKGROUND

29. The ESA defines an "endangered species" as "any species which is in danger of extinction." 16 U.S.C. § 1532(6).

30. Section 9 of the ESA prohibits the "take" of any endangered species. *Id.* § 1538(a)(1)(B).

31. The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" includes an act which "kills or injures" an endangered animal. 50 C.F.R. § 17.3. The term "harass" includes an "intentional or negligent act or omission which creates the likelihood of injury [to an endangered animal] by annoying [her] to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*

32. Under the ESA, it is unlawful to possess any endangered species that has been unlawfully taken in violation of Section 9(a)(1)(B). 16 U.S.C. § 1538(a)(1)(D).

33. All chimpanzees, including those held in captivity, are listed as endangered. 50 C.F.R. § 17.11(h); 80 Fed. Reg. 34500-01 (June 16, 2015).

34. The ESA grants the Secretary of the Interior limited authority to issue a permit for an act, including a take, that is otherwise prohibited. 16 U.S.C. § 1539(a)(1).

35. The ESA allows citizens to bring suit to enjoin "any person … who is alleged to be in violation" of the "take" provisions of the statute. *Id.* § 1540(g)(1)(A).

## GENERAL ALLEGATIONS

36. Counterclaim Defendants Casey and MPF confine many species of wildlife, including endangered chimpanzees and gibbons, baboons, macaques, and capuchins.

Counterclaim Defendants Sawyer and Jane Doe 2 each own a chimpanzee who they confine or confined at MPF.

37.    Counterclaim Defendants Casey and MPF do not possess a permit from the Secretary of the Interior to take endangered chimpanzees under 16 U.S.C. § 1539(a)(1)(A).

38.    Historically, Counterclaim Defendant MPF was open for public tours, and MPF and Counterclaim Defendant Casey bred chimpanzees for sale and use in the entertainment industry and as pets and used young chimpanzees for party entertainment under the moniker "Chimparty," with the tagline "A Chimp For Every Occasion." Most notoriously, Travis, the chimpanzee who, in 2009, ripped off the face and hands of a Connecticut woman, was born at MPF and sold as a pet. Although the chimpanzees are no longer used for party entertainment, chimpanzees remain warehoused at the facility.

39.    Reportedly, MPF does not have any employees and the daily care of these endangered animals falls to Casey, who lacks the financial resources to care for these animals, and few inadequately trained and relatively inexperienced volunteers.

40.    The Internal Revenue Service has assessed a federal tax lien against Counterclaim Defendant Casey in the amount of $131,817.58.

41.    The Missouri Department of Revenue has assessed a state tax lien against Counterclaim Defendant Casey in the amount of $22,576.46.

42.    Counterclaim Defendants Casey and MPF lack the facilities, stability, support, knowledge, expertise, and funds necessary to care for chimpanzees by providing appropriate enrichment, nesting materials, sanitation, diet, veterinary care, medication, maintenance, and monitoring.

43.    The USDA, which administers the Animal Welfare Act (AWA), a separate federal law that establishes the minimum animal-care and handling standards for both endangered and non-endangered captive animals used by regulated entities such as MPF and Casey, conducted an extensive review of the scientific primatology literature and concluded that "a minimally acceptable program of environment enhancement" must

contain (1) social grouping, (2) structure and substrate, (3) foraging opportunities, and (4) manipulanda (objects that can be moved, used, or altered by hand), which "are critical to environments that adequately promote the psychological well-being of nonhuman primates," and should give consideration stimulating all five senses and providing novelty and control over aspects of the environment. USDA, Final Report on Environmental Enhancement to Promote the Psychological Well-Being of Nonhuman Primates § III (1999) ["USDA Report"]. The conditions of the chimpanzees at MPF fail to adequately fulfill any of these critical needs.

### The Chimpanzees

44. At the time of the Notice, there were sixteen chimpanzees held at MPF.

45. Upon information and belief, prompted by and in response to the Notice, five chimpanzees were removed from the facility.

46. Upon information and belief, on or around December 22, 2016, after receiving the Notice but prior to Counterclaim Defendants filing their affirmative claims in this lawsuit, MPF transferred three chimpanzees—Kirby, Daisy, and KK—to another facility.[1]

47. Upon information and belief, on or around February 2, 2017, Jane Doe 1, the owner of chimpanzee Allie who has since dropped her claim, transferred ownership of Allie to an GFAS-accredited sanctuary and possession of Allie from MPF to the sanctuary.

48. Upon information and belief, at some time after receiving the Notice and before February 2, 2017, Counterclaim Defendant Sawyer removed chimpanzee Joey from MPF, where Joey was being held indefinitely, and transferred him to an unknown location.

49. Joey is about twelve years old. He was born at a Texas facility and sold to

---

[1] These transfers were potentially unlawful, as the ESA would prohibit transfer of the chimpanzees to a zoo or other exhibitor through interstate transactions, absent a permit issued only for limited purposes, which does not include private ownership or public display at facilities such as roadside zoos. *See, e.g.*, *Elephant Justice Project v. Woodland Park Zoological Soc'y, Inc.*, No. C15-0451-JCC (W.D. Wash. Apr. 7, 2015).

Counterclaim Defendant Sawyer's ex-wife to be used as a pet and exhibited to the public. Joey was brought to MPF in 2013 after Sawyer and/or his ex-wife illegally imported and possessed Joey in their home in Arizona and Sawyer was denied a permit to hold Joey in Nevada. At MPF, Joey was singly-housed and being boarded indefinitely.

50.     Connor is approximately twenty-one years old. He was born at MPF and used in movies, including *MVP: Most Valuable Primate* (Keystone Family Pictures 2000) and *Spy Mate* (Keystone Family Pictures 2003), and for greeting card photo shoots. Connor appears on cards sold by Hallmark and American Greetings, among others, but reportedly has not been used for a photo shoot since he was eight years old, when he bit the former co-owner of MPF, overturned tables, and tried to attack three other people on set.

51.     Tonka is approximately twenty-two years old. He was brought to MPF around 2003 after being used in film and television. He appeared in films including *George of the Jungle* (Walt Disney Pictures 1997), *Babe: Pig in the City* (Kennedy Miller Productions 1998), and *Buddy* (Jim Henson Pictures 1997) starring Alan Cumming, who developed a close relationship with Tonka after spending each day with him over the months of filming. By the time filming was complete, Tonka would groom and play with Cumming in a manner Cumming thought was similar to how Tonka would interact with other chimpanzees. Cumming found it hard to part with Tonka at the end of filming and is deeply troubled by the conditions in which Tonka is currently held.

52.     Mikayla is eight years old. She was born at MPF and was previously used by Counterclaim Defendants MPF and Casey as entertainment for parties. Tonka is her father.

53.     Chloe also is eight years old. She was born at MPF and was used by Counterclaim Defendants MPF and Casey for parties. She is believed to be owned by Counterclaim Defendant Jane Doe 2, but has been boarded at MPF for many years. Tonka is her father.

54.     Candy is likely in her late twenties and has been at MPF since she was born. She had at least two children, Coby and Cooper, who were taken from her as infants, sold, and returned to MPF several years later.

55.     Coby is likely around twenty years old. He was born at MPF, sold for use as a performer, and returned to the facility when he was eight years old.

56.     Cooper is approximately thirteen years old. He was born at MPF, sold as a "pet," and later returned to the facility.

57.     Kerry is around eleven years old. He was born at MPF, sold as a "pet," and later returned to the facility.

58.     Crystal is approximately ten or eleven years old. She was born at MPF.

59.     Kimmy is around fifty years old. She reportedly has no teeth and was forced to perform in a circus and was used as a breeder before being sent to MPF.

60.     The final chimpanzee living at MPF, Tammy, is approximately thirty-two years old.

61.     Tammy was bought by MPF at ten years old and has been used as a breeder. Reportedly, each of her babies was taken from her when they were only days old to be sold as "pets" or for use in entertainment, after which she would make a high-pitched scream, throw items about her cage apparently looking for the babies, and curl up with a blanket wrapped around her with no appetite for days. Lisa Marie, who is believed to be one of Tammy's babies, was taken from her mother and shipped to an Elvis impersonator in Chicago when she was barely a month old. She was used in the performer's shows and taken to schools, parks, and nursing homes. When Lisa Marie wasn't being hauled around, she was often relegated to a tiny cage in a cramped basement and forced to wear a collar with a padlock on it. In 2015, thanks to a generous PETA patron, Lisa Marie was finally rescued and transferred to a GFAS-accredited sanctuary, where she is thriving in a large chimpanzee family.

**Counterclaim Defendants Take the Chimpanzees by Failing to Meet Their Fundamental Social, Physical, and Psychological Needs**

*Failure to Provide Necessary Social Contact*

62.　Counterclaim Defendants harm and harass the chimpanzees by depriving them of the social interactions typical of their species and necessary for their well-being. Counterclaim Defendants isolated Joey from any other chimpanzees, isolate Chloe and Mikayla from other chimpanzees, isolate Tonka and Tammy from other chimpanzees, and isolate Candy and Connor from other chimpanzees.

63.　Counterclaim Defendant Casey is responsible for handling and determining the groupings of the chimpanzees at MPF. Upon information and belief, Counterclaim Defendant Sawyer removed only Joey from the facility.

64.　In nature, chimpanzees live in complex social groups in which they engage in cooperation, altruism, deception, and cultural learning. They lead active, stimulating lives and form deep and lasting social bonds, which are critical to their long-term health and psychological well-being. They live in fission-fusion societies, which consist of a large multi-male, multi-female, multi-generational community of individuals who regularly associate with one another and smaller temporary subgroups that fluidly merge and split depending on the activity and situation. These dynamic and strategic interactions create coalitions and politics.

65.　They have sophisticated methods of communication—through vocalizations, body language, facial expressions, and gestures that carry referential meaning. A community's repertoire of gestures is learned through cultural transmission and amounts to a gestural dialect.

66.　Chimpanzees also engage in social grooming in a dynamic and complex network related to kinship and the social-political dynamic of community. Grooming, a tactile manner of contact and communication used to build, maintain, and strengthen relationships

between individuals, is a fundamental aspect of chimpanzee psychological and physical health.

67.     Appropriate social groups provide more than just social company, but also "environmental novelty, multi-sensory stimulation, something to manipulate, and opportunities for cognitive challenge and control." USDA Report § IV.A.10.  Accordingly, "[a]ppropriate social enhancement is one of the most versatile and option-laden forms of enhancement we can provide" to chimpanzees. *Id.*

68.     Chimpanzees who are not reared with their mothers, do not have large social groups, or are otherwise deprived of species-appropriate exposure to other chimpanzees before they reach adulthood have impaired learning skills and behavioral deficiencies and are significantly less likely to engage in species-typical behaviors. The failure to develop social skills can doom them to a life of inadequate socialization and debilitating psychological distress. It can also have a negative effect on their endocrine system and make them more susceptible to stress and anxiety.

69.     Indefinitely holding chimpanzees in groups of two to three, without full contact with others, is considered by experts to be well below acceptable management protocols, and should be done only as a last resort to account for documented serious medical or social problems, and never as a matter of convenience.

70.     The USDA has acknowledged that "[s]ocial interactions are considered to be one of the most important factors influencing the psychological well-being of most nonhuman primates." USDA Report § IV.A.1. It specifically recognizes that "even one or two conspecifics are not sufficient to meet the extraordinary social needs of chimps in stimulus-restricted environments." *Id.* § IV.A.6.

71.     The Association of Zoos and Aquariums (AZA) is the premier zoological accrediting body in the United States and accredits all major U.S. zoos. The AZA's Chimpanzee Care Manual recommends groups of at least three adult males and five mature females and their dependent offspring, and cautions that "[c]himpanzees should never be

housed alone for any extended period of time unless it is deemed to be necessary for the physical or psychological well-being of that individual." AZA, Chimpanzee (*Pan troglodytes*) Care Manual 26 (2010) ["AZA Manual"]. A facility that holds groups of fewer than four individuals are deemed subject to extra attention by the accrediting body and are required to develop an action plan to quickly correct it.

72. Even though the chimpanzees held by Counterclaim Defendants are members of a highly social endangered species, and several are pre-adulthood, they are held in inadequate social groups.

73. Counterclaim Defendant Sawyer apparently boarded Joey at MPF indefinitely to be confined in isolation. Until he was removed from the facility following receipt of the Notice, Counterclaim Defendants Sawyer, Casey, and MPF denied Joey companionship of a single other chimpanzee, and he likely continues to be without conspecifics at the unknown location at which he is held by Sawyer. Particularly during these formative sub-adult years of a chimpanzee's life, long-term solitary confinement is extremely distressing and causes severe psychological harm and emotional trauma.

74. Counterclaim Defendant Jane Doe 2 apparently boards Chloe at MPF indefinitely to be confined with only Mikayla. Upon information and belief, chimpanzees Tammy and Tonka, and Candy and Connor, are held only in pairs.[2]

---

[2] It would not remedy the violations for Counterclaim Defendants to simply decide to house the chimpanzees together. Because of the unpredictability of the chimpanzees' response to each other—particularly because many, if not all, of them were taken from their mothers when they were infants and may not have learned appropriate social behaviors—any introductions must be done by experts with the experience, knowledge, and resources to carry out such introductions safely in an appropriate environment. Counterclaim Defendants lack the fundamental training and expertise to manage such an introduction, as well as the facilities required to safely conduct an introduction and experienced staff necessary to supervise the chimpanzees round-the-clock before, during, and for an extended period after their introduction to ensure that they are not harmed.

*Failure to Provide Necessary Spacious and Complex Environments*

75.    Counterclaim Defendants harm and harass the chimpanzees by depriving them of necessary space and failing to provide them species-appropriate psychological and environmental enhancement or stimulation. The chimpanzees at MPF are confined in cramped, virtually barren enclosures.

76.    Counterclaim Defendant Casey is responsible for the housing and providing enrichment to the chimpanzees at MPF. Counterclaim Defendants Sawyer and Jane Doe 2 are each responsible for allowing Joey and Chloe, respectively, to be housed in these conditions at MPF. The chimpanzees are not provided with the sufficient space and opportunity to climb, brachiate (swing using only the arms), forage, and engage in other natural chimpanzee behaviors.

77.    A wild chimpanzee's home range can spread from six to up to 333 square kilometers, and chimpanzees travel widely, up to eight kilometers daily.

78.    Captive chimpanzees' "habitat and living conditions [must be] species appropriate" and replicate as closely as possible chimpanzees' natural habitat to address their physiological and psychological needs, including "adequate space, both vertical and horizontal, and appropriate space, in terms of diversity and complexity." GFAS, Standards for Great Ape Sanctuaries 4 (2010) ["GFAS Standards"].

79.    The AZA Manual makes spatial recommendations that call for enclosure sizes that, on information and belief, far exceed the size of the enclosures at MPF. Groups of five or fewer individuals should be provided with accessible indoor and outdoor space of at least 2000 square feet, and useable vertical heights of over 20 feet. AZA Manual at 15. For each individual after five, primary enclosures should be an additional 1000 square feet larger. *Id.* In addition to these minimum dimensions for their primary enclosures, chimpanzees should also be provided with a minimum of 100 square feet per individual, with ceiling heights of at least 15 feet, for temporary holding areas in which the

chimpanzees are held only while sleeping or for temporary separation for husbandry, cleaning, and medical procedures. This is the absolute minimum amount of space that should be provided, and "provision of space far exceeding these guidelines" is recommended. *Id.*

80.     Consistent with chimpanzees' complex social nature, the enclosures must be large enough to allow different groups to form, allow for "social interactions that are characteristic of the species, and help to promote psychological well-being." AZA Manual at 15. It is important for chimpanzees to have the ability to "choose [their] own interindividual distance to conspecifics" and to "have enough space to be able to seclude themselves to a certain extent." *Id.* at 16. The inability to seek privacy from other conspecifics can lead to stress, anxiety, and risk of injury.

81.     Counterclaim Defendants hold the chimpanzees in enclosures far smaller than those recommended by the AZA and in cages that lack sufficient space, both horizontally and vertically, and features to allow them to express the physical behaviors and engage in species-typical interactions required for their physical and psychological well-being.

82.     Chimpanzees are a highly intelligent and active species who require novel and complex environments to thrive in captivity. Those held in inadequate social groups require additional enrichment to attempt to compensate for the lack of social stimulation that is of utmost importance to their well-being.

83.     As recognized by the USDA, "[u]se of legal cage size [pursuant to the AWA] will not always meet an animal's behavioral requirements." USDA Report § IV.C. Rather, "[t]he social, developmental, and physical environment are interdependent in enhancing psychological well-being" of primates, and the components of the animal's physical environment "should combine to create opportunities for species-typical resting, exploration, play, and foraging, as well as social interaction and adjustments." *Id.*

84.     Likewise, the AZA Manual states that "[t]he space offered to the chimpanzees should promote species appropriate behavior, physical/mental development, social

interactions, environmental complexity, psychological wellbeing, behavioral enrichment, observation, … and the opportunity for the chimpanzees to have as much control over their environment as possible." AZA Manual at 12.

85. Chimpanzees require environments "that mimic the complexity and variety of experiences that wild chimpanzees have [to] greatly aid the promotion of species-appropriate behaviors and development." *Id.* at 13. "The ability to engage in climbing, swinging on limbs and vines, arboreal play, and probing for treats may be essential to the normal physical development of infant and juvenile chimpanzees," and is vital to the psychological well-being of chimpanzees of all ages. *Id.* at 12;

86. An appropriate environmental enrichment program therefore includes "structural enrichment," such as climbing structures, hammocks, and appropriate substrate to promote species-typical climbing, swinging, and perching behaviors for privacy and resting; "object enrichment," such as straw, branches, and hay, to promote species-typical nesting and tool-use; "food enrichment" by varying food choices and the use of puzzles to promote species-typical foraging behaviors; and "social enrichment" as appropriate to address the social needs of chimpanzees who are isolated or in small groups. GFAS Standards at 13, 36, 38-39; *see also* AZA Manual at 12-13.

87. Particularly for indoor enclosures, providing enrichment is crucial. The enclosures "need to be able to accommodate a variety of enrichment items, and to allow for frequent rotation of these items to maintain a high degree of novelty that helps to promote psychological well-being." AZA Manual at 13; *see also* GFAS Standards at 4. These should be items that require tool use and other intellectual engagement, such as cognitive foraging via food puzzles and constructed termite mounds.

88. A lack of appropriate enrichment can have a detrimental and irreversible psychological impact and has been shown to increase social aggression and abnormal behaviors.

89.     Access to outdoor environments is also a critical element of long-term care of chimpanzees. A lack of outdoor access and exposure to the sun can result in vitamin D deficiency, which causes physiological problems such as poor calcium absorption, which in turn can lead to rickets and other metabolic bone diseases characterized by poor bone strength and retarded bone growth, and has caused the death of chimpanzees in captivity. A lack of outdoor access has also been linked to the exhibition of abnormal behaviors.

90.     Nesting is an important aspect of chimpanzee behavior, as they construct a tree nest made of branches and leaves to sleep in at night in the wild. To accommodate this species-typical behavior, it is essential to provide chimpanzees with items like branches, straw, shredded paper, and blankets, which allows them to simulate a natural nest and promotes species-appropriate behavior.

91.     Chimpanzees must have the opportunity to forage, which they spend 50-60% of their waking time doing in the wild. Foraging is behaviorally enriching and physically and psychologically stimulating.

92.     At MPF, the chimpanzees are deprived of appropriate enrichment. The lack of complexity in their physical environment falls well below an appropriate and generally accepted standard of care and deprives them of the ability to engage in virtually any species-specific behaviors. They do not have meaningful climbing opportunities, or sufficient material or elevated platforms to nest at night. They cannot run, brachiate, range, forage, or engage in species-typical play behavior. They do not receive appropriate enrichment to even attempt to compensate for the lack of social contact and physical space—some of the enclosures fail to include any enrichment items and, upon information and belief, those that are not entirely barren do not feature any novel species-appropriate forms of enrichment.

93.     Upon information and belief, Chloe and Mikayla are held in a converted bedroom enclosure made with metal bars and fencing. There are sawdust shavings on the hard floor and no adequate enrichment—there are ropes, a barrel, a small wooden table, and a large vertical metal spring in the center of the floor and no novel items are provided. The walls of their cage have been painted with simple depictions of grass and other greenery. *See* Figs. 1-2. They have no access to any other area of the facility from this room.



*Fig. 1. Converted Bedroom Enclosure (2014)*



*Fig. 2. Converted Bedroom Enclosure (2016)*

94.    Upon information and belief, in the converted basement of the home, there are at least two other groups of chimpanzees separated in the cages—Tonka and Tammy, and Connor and Candy. The floor of the cages is unfinished and the chimpanzees are given sawdust shavings as bedding. The cages feature the same metal bars as the enclosure in which Chloe and Mikayla are held. They contain only barrels and some old plastic toys, and no novel items are provided. *See* Figs. 3-4. Their only outdoor access is a small area off of the room similar in size to a dog run and tunnel that runs above it.



*Fig. 3. Basement Cages*



*Fig. 4. Basement Cages*

95.     Joey was held in isolation in this area of the home before he was believed to be taken by Counterclaim Defendant Sawyer following the Notice. Joey's small enclosure similarly consisted of cement flooring, rudimentary paintings of chimpanzees and foliage on the walls, empty barrels, a blanket, a ladder, and a few toys. A television was kept on immediately outside of the door to his enclosure.

96.     Upon information and belief, in an addition to the home (the "pink room"), the remainder of the chimpanzees are separated in cages on either side of the room. The cages in the pink room are narrow and the chimpanzees are reportedly given no bedding or enrichment because toys and other items could potentially clog the drains in the room. The cages lack meaningful opportunities to climb or brachiate, limited to only chain-link walls and a few bars, and do not enable the chimpanzees to rest at height. *See* Fig. 5.



*Fig. 5. Pink Room*

97.     "The most salient factor in structuring a captive primate's environment is the tendency to use vertical space," USDA Report § IV.C.6, yet many of the chimpanzees are

held in enclosures in rooms with a ceiling only as high as the average home, depriving them of any meaningful opportunity to climb.

98.     While the facility has an outdoor enclosure, upon information and belief, it is accessible only from the pink room; only the chimpanzees held in the pink room are allowed access, and even they are not allowed access at all times or at all during the winter months.

*The Chimpanzees Are Actually Injured and Are Likely to Be Further Injured by Being Deprived of Adequate Social Groups, Space, and Enrichment*

99.     Chimpanzees housed in small enclosures with concrete floors and inadequate enrichment, and denied the opportunity to engage in species-typical behaviors, are at risk of physical harm as a result of deteriorated cardiovascular and musculoskeletal health and conspecific aggression, and often suffer from acute and chronic psychopathologies such as stress, anxiety, and depression.

100.    At MPF, the chimpanzees have been observed engaging in abnormal behaviors often associated with inadequate social contact, space, and enrichment, such as rocking back and forth and hair loss from plucking or over-grooming—which in turn may reduce their ability to thermoregulate in extreme temperatures and may predispose them to skin infections. Other chimpanzees formerly held at the facility were observed engaging in eye-poking and other self-injurious behaviors also associated with a poor proximate environment.

101.    Counterclaim Defendants MPF and Casey have also been cited by the USDA for failing to follow an environmental enhancement plan to address the chimpanzees' social and psychological needs, and warned about their "repeated failure to provide a plan addressing the special needs of a non-human primate that shows signs of being in psychological distress through behavior and appearance."

102.   Following several repeat citations for failing to provide adequate enrichment to other primates showing signs of distress, a USDA inspector observed that two chimpanzees had "excessive generalized hair loss throughout their entire coat," and cited Counterclaim Defendants MPF and Casey, noting that: "Excessive grooming resulting in hair loss is often a sign of distress and could be due to a lack of mental stimulation of socialization. Animals who pluck hairs may need additional environmental enhancement to promote their psychological well-being and prevent them from self-mutilating."[3]

103.   The stress of the chimpanzees' conditions is likely exacerbated by the many dogs living at the facility who, when the chimpanzees are in tunnels or enclosures visible from the outside, jump and bark at them incessantly. Loud noise has been shown to cause abnormal behavior and physiological effects in primates; chimpanzees specifically are more sensitive than humans to higher frequency sounds, and dog barks have high-level frequency components.

104.   Several of the chimpanzees who are held always, or virtually always, indoors have also appeared to have pale skin, which is an indication of inadequate exposure to natural sunlight and therefore possible vitamin D deficiency in captive chimpanzees.

105.   Counterclaim Defendants MPF and Casey continue to deny the chimpanzees an environment in which they can express a wide range of species-typical natural behaviors, including resting, exploration, play, foraging, and social interaction and adjustments. Depriving the chimpanzees of the social interaction, space, psychological stimulation, and sunlight fundamental to their physical, social, and psychological well-being causes the

_____

[3] While Casey and MPF have not since been cited for lack of an enrichment plan, citations are completely discretionary and their absence does not indicate compliance. Indeed, the USDA has been reprimanded by its own Office of the Inspector General for its failure to adequately enforce the AWA and specifically for inconsistent inspection practices, which makes the many citations, letter of information, and official warning Casey and MPF have received even more concerning. Additionally, the USDA does not inspect for or enforce the ESA, which provides greater and different protections than the AWA's bare minimum standards.

chimpanzees serious physical and psychological injury and constitutes a take in violation of the ESA. Counterclaim Defendants Sawyer and Jane Doe 2 are similarly subject to liability for permitting Joey and Chloe, respectively, to be held in these conditions.

### Counterclaim Defendants Take the Chimpanzees by Confining Them to a Dangerous and Unsanitary Environment

106. Counterclaim Defendants hold the chimpanzees in unsafe and unsanitary conditions that harm and harass them by putting their health and welfare at risk.

107. Counterclaim Defendant Casey is responsible for maintaining the enclosures at MPF in good repair and in a safe and sanitary manner.

108. The USDA regulations require facilities to remove excreta and food waste from inside each indoor enclosure daily "to prevent an excessive accumulation of feces and food waste, to prevent the nonhuman primates from becoming soiled, and to reduce disease hazards, insects, pests, and odors." 9 C.F.R. § 3.84(a). The enclosures must also be sanitized at least once every two weeks "to prevent an excessive accumulation of dirt, debris, waste, food waste, excreta, or disease hazard." *Id.* § 3.84(b)(2).

109. The USDA regulations also require that indoor enclosures "must be sufficiently ventilated at all times when nonhuman primates are present to provide for their health and well-being and to minimize odors, drafts, ammonia levels, and moisture condensation." *Id.* § 3.76(b).

110. Likewise, the GFAS standards require proper sanitation "to reduce pathogen transmission." GFAS Standards at 14. Specifically, "proper sanitation" includes that facilities: remove animal waste "as often as necessary to prevent contamination…, to minimize disease hazards and to reduce odors," *id.* at 14; remove and replace soiled bedding material if odorous, daily, or as needed to prevent buildup, *id.* at 15; remove soiled enrichment items daily, *id.*; sanitize hard surfaces regularly, *id.* at 15; have an effective

insect and rodent control program supervised by a veterinarian, *id.* at 21; among other sanitation requirements.

111. The GFAS standards also provide that "[p]roper ventilation of indoor enclosures is critical." *Id.* at 17.

112. The USDA has issued Counterclaim Defendants Casey and MPF the following citations—just since 2013—that demonstrate that safety and sanitation are chronic, ongoing problems that place the chimpanzees at serious risk of contracting disease:

- "Many of the enrichment items in the enclosures had an accumulation of black-brown build-up on them," water receptacles "had an excessive build-up of slimey [sic] brown-green algae-like material in them," there was bedding material caked on the bars, and there were cobwebs, "an excessive amount of rodent droppings," hundreds of flies in the pink room, and "general dirt/dust/debris" throughout the enclosures. Several feeders "had a build-up of dark material on them."

- "There was a strong, foul odor of generalized waste and excreta upon entering the pink room. The ammonia levels were noticeably high and irritated the nasal passageways of the inspectors." The enclosures had bedding caked on the bars, there were cobwebs and "dirt/dust/debris" throughout, and items in the enclosures "had an accumulation of black-brown build-up on them," a repeat violation. Several feeders "had a build-up of dark material on them" and attracted flies.

- "There were several enclosures which had not been cleaned properly," a repeat violation, including items "with a build-up of black-brown grime," a urine-stained concrete floor in Joey's enclosure, the walls of the pink room had "brown organic material smeared on them" and there was a rag hanging in the enclosure "which was soiled black-brown with fecal materials."

- "There was a strong odor of both feces and ammonia upon entering the pink room," "an excessive amount of flies" in the pink room, cockroaches around a chimpanzee enclosure, and flies in a food storage container. The enclosures also "were not

cleaned properly or at appropriate frequencies," a repeat violation. Specifically, at least two of the tunnels connecting the enclosures had trash and waste accumulating in them, Joey's enclosure had a build-up of what appeared to be deteriorating food waste, there was "a build-up of black grimy material and/or organic waste material" around the bars in the pink room, and a pipe in the pink room was covered in what appeared to be flyspeck and flies.

- The enclosures "ha[d] not been cleaned and sanitized properly or at appropriate frequencies," a repeat violation, including "a build-up of black grimy material and/or organic waste material" around the bars in the pink and blue rooms. Now a repeat violation, "There was a strong ammonia odor upon entering the pink room."

- An enclosure "containing two chimpanzees had food waste that had accumulated" and had a "moldy appearance." Counterclaim Defendant Casey told inspectors that the food waste had not been picked up for three days. This was a repeat violation.

- There was excessive "food waste and excreta on the floors … in nearly all the enclosures," a repeat violation, and "numerous cockroaches … throughout most of the facility—both in and outside of animal enclosures." There were so many dead cockroaches throughout the facility such that Counterclaim Defendant Casey "has to sweep twice daily," and "still too many live ones" for the pest control program to be considered effective.

113. The USDA sent Counterclaim Defendant Casey a warning letter, which documented the recurrent violations identified from 2011 to 2014, for failing to clean surfaces and food receptacles, remove animal and food wastes, and provide sufficient ventilation to minimize odors and ammonia levels.

114. In February 2015, as a result of continuing violations, the USDA issued an Official Warning to Counterclaim Defendant Casey for failing to adequately clean the facilities and inadequate ventilation in the pink room. Official Warnings are the primary

enforcement tool used by the USDA in enforcing the AWA, and such enforcement actions are taken in only the most serious of cases.

115. Notwithstanding these repeat citations and enforcement actions, the conditions persisted during Ms. Scott's visits to the facility in 2016. Several of the enclosures were littered with debris, flies and roaches remained common throughout the facility, there was excessive food waste and trash in the enclosures, feces build-up on barrels in the enclosures and encrusted on the chimpanzees' feet, and the strong ammonia stench from excessive urine and inadequate ventilation made it difficult to breathe in the pink room.

116. The failure to maintain a clean living environment, and allowing buildup of feces, urine, and food waste, creates a likelihood of disease transmission, irritated airways, and a greater risk of parasites, respiratory infection (to which they are particularly susceptible), impaired lung function, lung disease, injury to the skin and eyes, and other infection.

117. The enclosures with missing and peeling paint cannot be adequately cleaned and disinfected.

118. There is a serious risk of ingesting peeling paint and wrappers from packaged foods left in the enclosures. Ingestion of foreign objects presents a choking hazard and may cause gastro-intestinal distress, intestinal obstruction, and damage to the stomach mucosa by foreign objection. Additionally, paint ingestion can lead to conditions such as kidney disease, anemia, hypertension, impaired lung function, neurological diseases, and diminished learning capacity.

119. Counterclaim Defendants MPF and Casey's ongoing failure to provide the chimpanzees with a sanitary environment likely causes the chimpanzees physical injury, is likely to cause further physical injury, and constitutes a prohibited take in violation of the ESA. Counterclaim Defendants Sawyer and Jane Doe 2 are similarly subject to liability for permitting Joey and Chloe, respectively, to be held in these conditions.

**Counterclaim Defendants Take the Chimpanzees by Restricting Them to a
Dangerously Unhealthy Diet**

120. In addition to the failure to provide enriching foraging opportunities even though "[f]oraging and eating account for the largest proportion of a chimpanzee's daytime activity in the wild" and "[s]eeking, processing, and ingesting food are vital components of chimpanzee daily life," AZA Manual at 30-31, Counterclaim Defendants provide the chimpanzees with an insufficient diet that puts their physical health at risk.

121. Counterclaim Defendant Casey is responsible for feeding the chimpanzees at MPF.

122. "In the wild, chimpanzees primarily eat fruit, but their diets also include leaves, pith, seeds, flowers, insects, and meat." AZA Manual at 29. In captive facilities, a balanced diet includes a mixture of vegetables, leafy greens, fruits, and nutritionally complete dry food composing the base of the diet, with additional protein sources provided and browse plants (e.g., alfalfa, bamboo, cattails, grape vines, timothy hay) when possible. *Id.* at 30; GFAS Standards at 25.

123. The food must be handled, prepared, and presented in a safe and appropriate manner "to retain nutritional value, freshness, and freedom from spoilage, invasive species or other forms of contamination, "and chimpanzees should not be given "food that is spoiled or otherwise contaminated." GFAS Standards at 26-27.

124. Upon information and belief, the chimpanzees at MPF are regularly fed commercial chow, expired fruit donated from grocery stores, and bread products, and are sometimes given fast food and unhealthy snacks such as Cheetos.

125. Particularly when coupled with the inability to adequately exercise in small enclosures, such a diet is associated with significant health concerns. Commercial chow is often high in carbohydrates in the forms of starch and sugar, and in calories. Bread is high in refined carbohydrates. Since cultivated fruits contain a much higher sugar content than wild fruits, the fruit obtained from grocery stores is higher in carbohydrates than the fruit

found in chimpanzees' natural environment. For this reason, the primary components of an appropriate diet that consists of these items must be vegetables, leafy greens, and browse.

126.  An inadequate diet can contribute to an overgrowth of parasites, accelerate the progression of degenerative diseases like arthritis, exacerbate other existing health problems, and lead to obesity, which "is a substantial risk factor for cardiac disease," liver, kidney, and joint problems, and diabetes.

127.  In addition to the inadequacy of a diet consisting of virtually exclusively commercial fruit, commercial chow, and bread, expired produce likely has reduced nutrients and introduces additional bacteria that may cause intestinal problems and decreased immune system function.

128.  Depriving the chimpanzees of an appropriate diet fundamental to their physical well-being likely causes them physical injury, is likely to cause further physical injury, and constitutes a take in violation of the ESA. Counterclaim Defendants Sawyer and Jane Doe 2 are similarly subject to liability for permitting Joey and Chloe, respectively, to be fed an inappropriate diet.

**Counterclaim Defendants Take the Chimpanzees by Failing to Provide Them with Adequate Preventative and Emergency Veterinary Care**

129.  Upon information and belief, the chimpanzees receive only minimal veterinary care. Counterclaim Defendants Casey and MPF do not provide regular preventative veterinary care, including observations, or taking fecal, urine, and blood samples, to identify illnesses or health problems before they become urgent, and they have struggled to obtain care for urgent issues during business hours.

130.  Upon information and belief, the chimpanzees have not been trained to voluntarily participate in veterinary examinations, which means that the veterinary care provided sporadically causes the chimpanzees significant distress.

131. Captive facilities require a "veterinary medical program, including long term preventative medical protocols and disease surveillance and containment procedures, that is developed and carried out under the supervision of a licensed veterinarian" who is aware of individual issues with the chimpanzees at the facility, with veterinary care available at all times. GFAS Standards at 28.

132. The AZA Manual stresses that a strong preventative medicine program is critical to chimpanzee health. This program must include: daily observations and reports to veterinarians of how the chimpanzee relates to conspecifics, appetite, eliminations, and any signs of injury or disease; routine physical and dental examinations within a dedicated space at the facility; vaccinations pursuant to separate protocols for juveniles and adults; at least biennial parasite monitoring and control; and more. AZA Manual at 38-39; *see also* GFAS Standards at 29.

133. Counterclaim Defendants Casey and MPF's failure to provide the chimpanzees with adequate veterinary care likely causes them physical injury, is likely to cause further physical injury, and constitutes a prohibited take in violation of the ESA. Counterclaim Defendants Sawyer and Jane Doe 2 are similarly subject to liability for permitting Joey and Chloe, respectively, to be held without receiving appropriate veterinary care.

## CLAIMS FOR RELIEF

### COUNT I

### Unlawful Take of Endangered Chimpanzees

134. Counterclaim Plaintiffs restate and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

135. Counterclaim Defendants' ongoing practice of holding the chimpanzees in barren and unsanitary enclosures in which they are deprived of the social contact, physical space, and environmental enrichment necessary to engage in species-typical behaviors, of an

adequate diet, and of regular veterinary care violates the "take" prohibition of Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B).

136. Pursuant to 16 U.S.C. § 1540(g)(1)(A), this Court has the authority to issue an injunction prohibiting Counterclaim Defendants from further violating 16 U.S.C. § 1538(a)(1)(B), and ordering them to relinquish possession of the chimpanzees to an accredited sanctuary.

**WHEREFORE**, Counterclaim Plaintiffs respectfully request that the Court grant the following relief:

a. Enter a declaratory judgment that Counterclaim Defendants' treatment of endangered chimpanzees violates the ESA's prohibition on the "take" of an endangered species set forth in 16 U.S.C. § 1538(a)(1)(B) and corresponding regulations;

b. Enjoin Counterclaim Defendants pursuant to 16 U.S.C. § 1540(g)(1)(A) from continuing to violate the ESA and its implementing regulations with respect to endangered chimpanzees;

c. Enjoin Counterclaim Defendants from owning or possessing any endangered chimpanzees in the future;

d. Appoint a special master or guardian ad litem to determine the most appropriate placement for the forfeited chimpanzees, consistent with their best interests, at wildlife sanctuaries that are accredited by the Global Federation of Animal Sanctuaries and that will provide animals with appropriately sized naturalistic habitats, adequate socialization, and expert care;

e. Award Counterclaim Plaintiffs their reasonable attorneys' and expert fees and costs for this action; and

f. Grant such other and further relief as the Court deems just and proper.

# COUNT TWO

## Unlawful Possession of Taken Chimpanzees

137.  The allegations set forth in the preceding paragraphs are realleged and incorporated by reference.

138.  Counterclaim Defendants' continued possession of the chimpanzees in its custody, who have been taken as set forth above, constitutes a violation of 16 U.S.C. § 1538(a)(1)(D).

139.  Pursuant to 16 U.S.C. § 1540(g)(1)(A), this Court has the authority to issue an injunction prohibiting Counterclaim Defendants from further violating 16 U.S.C. § 1538(a)(1)(D), and ordering them to relinquish possession of the chimpanzees to an accredited sanctuary.

**WHEREFORE**, Counterclaim Plaintiffs respectfully request that the Court grant the following relief:

a.  Enter a declaratory judgment that Counterclaim Defendants have violated and continue to violate 16 U.S.C. § 1538(a)(1)(D) and corresponding regulations by possessing endangered chimpanzees who have been unlawfully taken by Counterclaim Defendants;

b.  Enjoin Counterclaim Defendants pursuant to 16 U.S.C. § 1540(g)(1)(A) from continuing to violate the ESA and its implementing regulations with respect to endangered chimpanzees;

c.  Enjoin Counterclaim Defendants from owning or possessing any endangered chimpanzees in the future;

d.  Appoint a special master or guardian ad litem to determine the most appropriate placement for the forfeited chimpanzees, consistent with their best interests, at wildlife sanctuaries that are accredited by the Global Federation of Animal Sanctuaries and that

will provide animals with appropriately sized naturalistic habitats, adequate socialization, and expert care;

e. Award Counterclaim Plaintiffs their reasonable attorneys' and expert fees and costs for this action; and

f. Grant such other and further relief as the Court deems just and proper.


Date: June 23, 2017                           Respectfully submitted,

By: /s/ Jared S. Goodman
    JARED S. GOODMAN (#1011876DC)
    (Admitted *pro hac vice*)
    PETA Foundation
    2154 W. Sunset Blvd.
    Los Angeles, CA 90032
    323.210.2266
    Fax No: 213.484.1648
    jaredg@petaf.org

    POLSINELLI PC
    JAMES P. MARTIN (#50170)
    MARISSA L. CURRAN (#61943)
    100 S. Fourth Street, Suite 1000
    St. Louis, MO 63102
    314.889.8000
    Fax No: 314.231.1776
    jmartin@polsinelli.com

    *Attorneys for Defendants/*
    *Counterclaim Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on **June 23, 2017**, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, by which notification of such filing was electronically sent and served to the following:

Kurtis B. Reeg and Lynn Lehnert
8000 Maryland, Suite 640
St. Louis, MO 63105
(314) 446-3350
Fax No. (314) 446-3360
kreeg@goldbergsegalla.com
llehnert@goldbergsegalla.com

*Attorneys for Plaintiffs/*
*Counterclaim Defendants*

/s/ Jared S. Goodman