UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**MISSOURI PRIMATE FOUNDATION, et al.,**

                *Plaintiffs and Counterclaim Defendants;*

    v.

**PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC., et al.,**

                *Defendants and
Counterclaim Plaintiffs.*

**Case No. 4:16-cv-02163**

## COUNTERCLAIM PLAINTIFFS' OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS

### I.     Introduction

Captive chimpanzees are endangered under the Endangered Species Act (ESA). 50 C.F.R. § 17.11(h); 80 Fed. Reg. 34499 (June 16, 2015).

Defendants and Counterclaim Plaintiffs People for the Ethical Treatment of Animals, Inc., and Angela Scott (collectively "Counterclaimants") filed a Counterclaim detailing precisely how Counterclaim Defendants are taking chimpanzees in violation of the ESA. Answer to Count I and Counterclaim for Declaratory and Injunctive Relief ["Counterclaim"; ECF No. 23]. Specifically, Counterclaimants allege that Counterclaim Defendants take the chimpanzees by failing to meet their fundamental social, physical, and psychological needs [*id.* at ¶¶ 62-105]; confining them to a dangerous and unsanitary environment [*id.* at ¶¶ 106-19]; restricting them to a dangerously unhealthy diet [*id.* at ¶¶ 120-28]; and failing to provide them with adequate preventative and emergency veterinary care [*id.* at ¶¶ 129-33]. Counterclaimants have explained that these actions cause the chimpanzees serious physical and psychological injury [*e.g.*, *id.* at ¶¶ 105, 119, 128, 133], and that Counterclaim Defendants have otherwise failed to comply with

even minimal animal-husbandry requirements [*e.g.*, *id.* at ¶¶ 43, 112-115]. Counterclaim Defendants therefore "'harm' and 'harass' the chimpanzees in violation of the ESA's 'take' prohibition by causing them psychological harm, preventing them from carrying out their natural behaviors, and exposing them to a significant risk of physical illness and injury." [*Id*. at 5 ¶ 4.]

## II. Argument

### A. The Counterclaim Falls Squarely Within the ESA

Counterclaim Defendants' motion to dismiss the Counterclaim is based primarily on their argument that Counterclaimants "cannot state a claim to pursue enforcement of alleged violations of the Animal Welfare Act." Plaintiffs/Counterclaim Defendants' Motion to Dismiss at 1 [ECF No. 29]; *see also* Memo. in Support of Plaintiffs/Counterclaim Defendants' Motion to Dismiss at 3-9 ["Br."; ECF No. 30]. Yet Counterclaimants do not seek to enforce the Animal Welfare Act (AWA) or its standards or sue pursuant to that statute. Rather, their authorized citizen suit is brought specifically to enforce the ESA's take prohibition. As detailed further below, contrary to Counterclaim Defendants' assertion that "[n]o authority supports an ESA Section 9 'taking' claim involving animals in captivity pursuant to a USDA APHIS [United States Department of Agriculture's Animal and Plant Health Inspection Service] license issued under the AWA," Br. at 4, Congress and the United States Fish and Wildlife Service (FWS) have made abundantly clear, as recently recognized by other district courts, that the ESA protects captive endangered animals from an unauthorized take, including harassment and harm, whether or not the alleged violator is a licensed entity.

### 1. The ESA's language and legislative history demonstrate that Section 9's take prohibition applies to all captive endangered animals.

In adopting the ESA, "Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978). The statute is, as a result, "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

Under the ESA, it is unlawful to "take" an endangered species, 16 U.S.C.

§ 1538(a)(1)(B), or to "possess" any endangered species that has been unlawfully taken, *id.* § 1538(a)(1)(D). "Take" is defined to include "harm" and "harass," neither of which is defined by statute. *Id.* § 1532(19). As the Supreme Court explained in *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, these terms must therefore be construed in a way that effectuates the "broad purpose of the ESA." 515 U.S. 687, 698 (1995); *see also* S. Rep. No. 307, 93rd Cong., 1st Sess., p. 7 (1973) ("[T]ake" should be defined "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife."). Further, they must be construed such that the "take" prohibition remains applicable to both wild and captive endangered animals. *See, e.g.*, 63 Fed. Reg. 48634-02, 48636 (Sept. 11, 1998) ("take" was defined by Congress to apply to endangered or threatened wildlife "whether wild or captive"); 80 Fed. Reg. 7380-01, 7388 (Feb. 10, 2015) ("Section 9(a)(1)(A)-(G) of the ESA applies to endangered species regardless of their captive status").

In 2015, the FWS issued a final rule ending the "split-listing" of chimpanzees, under which wild chimpanzees were listed as endangered and protected by the "take" prohibition, while captive chimpanzees were not. 80 Fed. Reg. 34500-01, 34500 (June 16, 2015). The FWS concluded after a detailed review of "the language, purpose, operation of key provisions, and the legislative history of the Act," *id.* at 34520, "that the Act does not allow for captive chimpanzees to be assigned separate legal status from their wild counterparts on the basis of their captive state," *id.* at 34500, and that captive animals are therefore protected by take prohibition, *id.* at 34522.[1] The FWS's interpretation is consistent with the plain language and legislative history of the ESA. Although the bill at one time defined "wildlife" to include only "any *wild* member of the animal kingdom," H.R. Rep. No. 93 412, at 30 (1973) (emphasis added), this "wild" limitation was specifically removed before the bill was passed. *See* 16 U.S.C. § 1532(8) (defining "wildlife" to include "any member of the animal kingdom").

---

[1] The National Marine Fisheries Service, which administers the ESA with respect to certain marine animals, has similarly concluded that "captive members of a listed species are also subject to the relevant provisions of section 9 of the ESA as warranted." 80 Fed. Reg. at 7385.

Rather, where Congress intended to exempt captive animals from specific protections of the ESA, it did so explicitly. As the FWS recognized, "Certain provisions in sections 9 and 10 of the Act show that Congress anticipated that captive animals would have the same legal status," and therefore the same protections, "as their wild counterparts by providing certain exceptions for animals held in captivity." 80 Fed. Reg. at 34502; *see, e.g.*, 16 U.S.C. § 1538(b)(2)(A) (exempting legally held captive raptors from the "take" prohibition); *see also* Pub. L. 103-238, § 12 (Apr. 30, 1994) (amending the Marine Mammal Protection Act, 16 U.S.C. § 1362, to redefine "harassment" to apply only to animals "in the wild"). Congress provided no such exception with respect to "takes" of any other captive animals. "This demonstrates that Congress … intended that such [captive] specimens would be protected under the Act, with these activities generally regulated by permit." 80 Fed. Reg. at 34502.

2. **The FWS's administration of the ESA demonstrates that Section 9's take prohibition applies to all captive endangered animals.**

The FWS has expressly rejected Counterclaim Defendants' conclusion that "take" prohibitions do not apply to animals held in USDA-licensed facilities and made clear that even when several other statutes, policies, and guidelines—*including the AWA*—regulate captive endangered animals, the ESA "take" prohibition remains applicable. When the FWS eliminated the split-listing of chimpanzees as inconsistent with the Act's language and purpose, it addressed public comments that listing the captive members as endangered would impact "essential biomedical research" and that the captive members were "currently well-regulated under other Federal statutes, including the [AWA], the Public Health Service Act, and the Chimp Act of 2000, as well as other Federal policies and guidelines." 80 Fed. Reg. at 34516. The FWS specifically responded that, notwithstanding these other laws and policies, "research involving chimpanzees that could cause harm to the animal (*i.e.*, 'take') will require a take permit under the Act." *Id.*; *see also* 44 Fed. Reg. 30044, 30044 (May 23, 1979) ("The Service has consistently maintained that the Act applies to both wild and captive populations of a species.").

Mere captivity of an endangered animal does not, by itself, constitute a take. Whether a

take has occurred depends on the circumstances of that captivity and whether it harms or harasses the animal. "Harm" is defined by the FWS as "an act which actually kills or injures wildlife," including "by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. "Harass" is defined to include an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.* The FWS exempts from the definition of "harass"—but *not* from the definition of "harm"[2]—"generally accepted … animal husbandry practices that meet or exceed the minimum standards for facilities and care under the [AWA] … when such practices … are not likely to result in injury to the wildlife." *Id.*[3]

The FWS has made clear that notwithstanding this exemption, "[s]ince captive animals can be subjected to improper husbandry as well as to harm and other taking activities, the Service considers it prudent to maintain such protections, consistent with Congressional intent." 63 Fed. Reg. at 48636. "Obviously, maintaining animals in inadequate, unsafe or unsanitary conditions, feeding an improper or unhealthful diet, and physical mistreatment constitute harassment because such conditions might create the likelihood of injury or sickness of an animal." 58 Fed. Reg. 32632, 32637 (June 11, 1993); *see also* 63 Fed. Reg. at 48638 ("The Act continues to afford protection to listed species that are not being treated in a humane manner.").

---

[2] "The definition of harm contains no similar exclusion." *Graham v. San Antonio Zoological Soc'y*, No. SA-15-CV-1054-XR, 2017 WL 2533531, at *20 (W.D. Tex. June 8, 2017). Counterclaim Defendant argues that a single reference to "or 'taking'" in the seven-page final rule announcing the amended definition of "harass" evidenced the agency's "inten[t] to exclude such animals not just from 'harass' but from 'take' generally." Br. at 8. This identical argument was recently rejected by *Graham* as "taking the FWS' language out of context." 2017 WL 2533531, at *27.

[3] While Counterclaim Defendants purport to rely on this exemption, *see* Br. at 3, 4, 8, they fail to acknowledge its requirement that the practice "not [be] likely to result in injury," 50 C.F.R. § 17.3; *see, e.g.*, 63 Fed. Reg. 48634-02; *id.* at 48638 ("the definition of 'harass' … is modified to exclude normal animal husbandry practices *that are not likely to result in injury* such as humane and healthful care when applied to captive wildlife" (emphasis added)).

The FWS's exemption therefore does not—and could not[4]—remove conduct toward captive animals from "harm" or "harass" under the ESA's "take" prohibition. Instead, a fact-finder must evaluate whether a challenged practice that otherwise would constitute harassment is: (1) generally accepted; (2) an animal husbandry practice; (3) compliant with the AWA standards; and (4) not likely to result in injury.

## B. The AWA Does Not Supersede Application of the ESA to Captive Animals

Despite Counterclaim Defendants' repeated assertions to the contrary, this action does not arise under the AWA, but under the ESA, and the Counterclaimants do not seek to enforce the AWA standards.[5] These are different statutes, with different standards and different enforcement mechanisms, and they do not conflict.

### 1. The AWA and ESA are complementary and do not conflict.

The AWA, 7 U.S.C. §§ 2131-2159, was passed in 1966 to ensure humane treatment of dogs and cats used in medical research. 112 Cong. Rec. 13,256 (1966). In 1970, Congress amended the statute to cover animals used in exhibitions. Pub. L. No. 91-579, § 2, 84 Stat. 1560 (1970); 7 U.S.C. § 2131(1). The AWA's implementing regulations, 9 C.F.R. §§ 1.1–4.11, set forth "*minimum* requirements … for handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, adequate veterinary care, and separation by species" of any captive animal covered by the law without regard to its endangered or non-

---

[4] The FWS rejected the suggestion that it could limit "harass" to apply only to animals in the wild, noting that the statute defined "take" to apply to all listed wildlife, "whether wild or captive," and that the definition with regard to captive wildlife can be "clarified," but "cannot be changed administratively." 63 Fed. Reg. at 48636.

[5] For this reason, Counterclaim Defendants' argument that courts have dismissed claims "seeking to enforce AWA standards because lack of a citizen suit provision in that statute," Br. at 5, is inapposite. Counterclaimants reference USDA documents only to demonstrate the needs of and generally accepted standard of care for captive chimpanzees and show that Counterclaim Defendants cannot invoke the "generally accepted husbandry practices" exemption found in the definition of "harass." *See* 50 C.F.R. § 17.3

endangered status. 7 U.S.C. § 2143 (emphasis added).[6] The AWA and its regulations do not set forth heightened standards for ESA-listed animals, and do not even mention species endangerment.

The ESA, on the other hand, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tenn. Valley*, 437 U.S. at 180, and is intended to afford endangered animals the highest of priorities, *id.* at 185. This protection thus goes well beyond the minimum standards applicable to animals under the AWA, and provides *additional* protections to a small subset of animals held in regulated facilities who are "endangered." 63 Fed. Reg. at 48638; *cf.* 44 Fed. Reg. 54002, 54002 (Sept. 17, 1979) (noting that compliance with AWA standards are a factor in determining eligibility for an ESA permit but "should not be used as the sole criteria").

While the ESA and AWA both address treatment of animals in captivity, "[w]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Nebraska Pub. Power Dist. v. 100.95 Acres of Land in Thurston Cty., Hiram Grant*, 719 F.2d 956, 958 (8th Cir. 1983) (quoting *Morton v. Mancari,* 417 U.S. 535, 551 (1974)). Indeed, "it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other." *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2238 (2014).

The Supreme Court recently addressed circumstances analogous to this case in *POM Wonderful*, which "concern[ed] the intersection and complementarity of" the Lanham Act and the Federal Food, Drug, and Cosmetic Act ("FDCA"). *Id.* at 2333. Coca-Cola contended that POM's Lanham Act claim was precluded because the juice label at issue was proper under the

---

[6] Even according to the USDA's Office of Inspector General, these "minimum requirements" are inadequately enforced. *See* Counterclaim ¶ 102 n.3; *see, e.g.*, USDA, OIG Audit Report No. 33601-0001-41: APHIS Oversight and Research Facilities (2014) (agency "did not follow its own criteria in closing at least 59 cases that involved grave (e.g., animal deaths) or repeat welfare violations" and issued deeply discounted penalties).

FDCA and its regulations, which more specifically regulate the misbranding of juice blends in precisely the manner at issue in the case. *Id.* at 2333-35.

The Ninth Circuit affirmed partial summary judgment for Coca-Cola on the grounds that Congress entrusted matters of juice beverage labeling to the FDA, which had promulgated comprehensive regulations and had not taken action against Coca–Cola's label. *Id.* at 1136. The Supreme Court unanimously reversed for reasons directly analogous to this case: (1) "neither the Lanham Act nor the FDCA, in express terms, forbids or limits Lanham Act claims challenging labels that are regulated by the FDCA," *id.* at 2237; (2) "If Congress had concluded … that Lanham Act suits could interfere with the FDCA, it might well have enacted a provision addressing the issue during these 70 years" the statutes co-existed, *id.* at 2237; (3) it is of no significance that the FDCA and its regulations address food and beverage labeling with more specificity than the Lanham Act because "[they] are complementary and have separate scopes and purposes," can be implemented in full at the same time, *id.* at 2240, and each has its own enforcement mechanism, *id.* at 2238; (4) "The centralization of FDCA enforcement authority in the Federal Government does not indicate that Congress intended to foreclose private enforcement of other federal statutes," *id.* at 2239; (5) FDCA's specific regulations did not preclude Lanham Act claims because they were not "a ceiling on the regulation of food and beverage labeling," *id.* at 2240; (6) the lawsuit is not "undermining an agency judgment" because "the FDA does not have authority to enforce the Lanham Act," *id.* at 2241; and (7) the Court declined "to preclude private parties from availing themselves of a well-established federal remedy because an agency enacted regulations that touch on similar subject matter but do not purport to displace that remedy or even implement the statute that is its source." *Id.*

The Court's reasoning applies equally here. Neither the ESA nor the AWA forbids or limits ESA claims challenging conditions that are also regulated by the AWA, despite the fact that these statutes have co-existed for more than 40 years. If Congress had concluded that ESA suits could interfere with the AWA, it could have enacted a provision in that time. Its failure to do so is "powerful evidence that Congress did not intend [USDA] oversight to be the exclusive

8

means" of ensuring humane conditions for endangered animals. *See id.* at 2237. In fact, the AWA is even more permissive than the FDCA—whereas the latter expressly preempts some state laws, *id.* at 2238, Congress unquestionably intended the AWA to be a floor rather than a ceiling. 7 U.S.C. § 2143(a)(8). The ESA and AWA complement each other, each with their own scope, purpose, and enforcement mechanisms—the AWA is enforced exclusively by the government, while the ESA allows for private enforcement. The laws can be implemented in full at the same time—it is possible to comply with both statutes, which offer different levels of protection, but not conflicting requirements. And finally, the USDA has no authority to enforce the ESA with respect to captive animals, and Counterclaimants are not precluded from "availing themselves of a well-established federal remedy" because the AWA regulations—which "do not purport to displace that remedy or even implement the statute"—separately regulate those animals.

### 2. Sections 7 and 11 of the ESA have no bearing on this case.

In an effort to limit the ESA as applied to captive endangered animals, Counterclaim Defendants argue that "as to animals in captivity, the ESA applies [only] administratively" because: (1) section 7 of the ESA, which requires other agencies to consult with the FWS to ensure that its actions are unlikely to jeopardize endangered species, means that the FWS can only administer the ESA with respect to captive animals by consulting with USDA, and (2) section 11 of the ESA, which states that the Act must not be "construed as superseding or limiting" the USDA's administration of the AWA, "precludes the statute's generalized application to USDA-licensed possession of animals." Br. at 6-7.

Counterclaim Defendants do not cite to, and Counterclaimants are unaware of, a single court opinion, regulation, agency pronouncement, or any other source that supports their argument that, notwithstanding the language of the Act, the Supreme Court's interpretation of its scope, and the FWS's administration of its provisions discussed above, these two sections must be interpreted in a manner that implicitly strips an entire class of endangered and threatened animals (i.e., captive animals held in licensed facilities) of the full protections of the ESA.

First, with regard to section 7 consultation, in the FWS's proposed rule to eliminate the chimpanzee split-listing and extend endangered protections to captive chimpanzees, the agency specifically found that consultation alone cannot effectively protect captive members of a species: "the section 7 consultation process is not well suited to analysis of adverse impacts posed to a purely captive-held group of specimens given that such specimens are maintained under controlled, artificial conditions." 78 Fed. Reg. at 35207. Additionally, the requirement that USDA must ensure that its own activities do not jeopardize endangered species cannot supplant the enforcement of the ESA by the FWS or an authorized citizen suit because the FWS cannot lawfully cede to USDA its authority to enforce the take prohibition or otherwise administer the ESA with respect to animals. *See* 16 U.S.C. § 1540(a) (delegating to the "Secretary" the authority to enforce the ESA and seek civil penalties); *id.* § 1532(15) (defining "Secretary" as "the Secretary of the Interior or the Secretary of Commerce [with respect to certain marine mammal species] … except that with respect to the enforcement of the provisions … which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture."); *Union Pac. R.R. Co.*, No. 16-3307, 2017 WL 2961424, at *3 (8th Cir. July 12, 2017) ("Agency action taken without statutory authority must be set aside. 5 U.S.C. § 706(2)(C)").

Second, section 11 has no bearing on this matter because enforcement of the take prohibition does not "limit" or "supersede" the USDA's functions in administering the AWA. Br. at 6. As discussed in Section II.B.1 above, there is no conflict between the statutes, the regulatory requirements, or their enforcement mechanisms, and both laws can be implemented and enforced in full at the same time. A finding of take because an endangered animal has been harmed or harassed would not limit the USDA's function in administering the AWA and its regulations by licensing or inspecting facilities for *AWA* compliance.

### C. Courts of other districts have rejected several of the same arguments made by Counterclaim Defendants.

Several other district courts have acknowledged that the ESA take prohibition applies to

captive endangered animals held by AWA-licensed entities. In *Kuehl v. Sellner*, 161 F. Supp. 3d 678, 709 (N.D. Iowa 2016), for example, the citizen plaintiffs alleged that lemurs and tigers held at Iowa's Cricket Hollow Zoo were being subject to "take" in violation of the ESA. Following a bench trial, the court held that maintaining lemurs without appropriate companionship (for which the defendants had not been cited by the USDA), without appropriate environmental enrichment, and without sanitary enclosures "constitutes 'harassment' within the 'taking' provision of the [ESA]," *id.* at 713; and that failing to provide tigers with appropriate veterinary care and adequate sanitation constituted harm and harassment, respectively, *id*. at 718.

While Counterclaim Defendants cite *Graham v. San Antonio Zoological Soc'y* for the undisputed proposition that "[t]he AWA, unlike the ESA, does not have a citizen suit provision," Br. at 4, they fail to note that the *Graham* court specifically rejected the primary argument on which Counterclaim Defendants rely here. The court found that the zoo's argument that the AWA exclusively governs the treatment of endangered animals in captivity at USDA licensed facilities, to the exclusion of the ESA, fails as a matter of law. *Graham*, 2017 WL 2533531, at *1. The court also rejected the zoo's argument that "when APHIS determines that there is no AWA violation, there is no ESA take liability—as a matter of law." *Id.* at *24. Instead, the court reasoned that in order for the "generally accepted husbandry practice" exclusion in the definition of "harass" to apply,

> there must first be a determination that an exhibitor's husbandry practices satisfy the AWA requirements…. [USDA] determinations of past and present violations (or a lack thereof) are certainly evidence of this finding, but are neither necessary to support nor sufficient to warrant such a finding. Thus, the regulatory definition of "harass," by excluding animal husbandry practices that comply with the AWA, does not permit a finding of no liability simply because of a previous determination of no AWA violation; instead, it substitutes the compliance standards of the AWA as the substantive standard for whether an ESA violation has occurred, and requires such a determination to be made through the typical adversarial process.

*Id.* at *25. Accordingly, the case is proceeding to trial to determine whether the zoo is harming and harassing an elephant by providing an enclosure with an inappropriate substrate and inadequate shelter from the sun. *Id.* at *31.

For all of these reasons, the AWA and USDA regulation of exhibitors does not preclude the ESA's application to "harm" and "harass[ment]" of captive endangered animals.

### A. Counterclaimants have pleaded an actionable harm.

Counterclaim Defendants argue that Counterclaimants' "allegations of a 'take' by 'harm' fail … because they do not allege an actual physical injury or death." Br. at 8-9.[7] A review of the Counterclaim reveals that Counterclaimants indeed allege harm via actual injury.

First, "harm" is defined as "an act which actually kills or injures wildlife," including "by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. The regulatory definition does not specify that the injury must be physical, and "[i]n the absence of statutory definitions, [courts] turn to the ordinary meaning of the statutory terms as derived from a dictionary and consider the context of the statute in which the language appears." *City of Jefferson City, Mo. v. Cingular Wireless, LLC*, 531 F.3d 595, 606 (8th Cir. 2008) (citing *Missouri ex rel. Burns v. Whittington*, 219 S.W.3d 224, 225 (Mo.2007) (en banc)). Merriam-Webster Online Dictionary defines "harm" as "physical or mental damage," and defines "injury" as "an act that damages or hurts," neither of which limits an injury to a physical or bodily injury. *See also Kuehl*, 161 F. Supp. 3d at 711–12 (failure to provide "'environmental enhancement adequate to promote psychological well-being' for the lemurs significantly disrupts their normal behavioral patterns and, therefore, constitutes 'harassment' and 'taking' within the meaning of the Endangered Species Act."). Accordingly, a mental *or* psychological injury may constitute "harm."

Second, contrary to Counterclaim Defendants' assertion, both physical and psychological harm are alleged in the Counterclaim. *See, e.g.*, Counterclaim ¶¶ 3, 4, 62, 73, 75, 99, 106, 128,

---

[7] Counterclaim Defendants also argue that there is no actionable harm because such a finding "would necessarily limit the functions of the USDA" and because the exemption to the definition of "harass" applies to all forms of "take." These arguments are both addressed above. *See* Sections II.B.2 (section 11 does not preclude application of the ESA to licensed facilities) and II.A.2 (the regulatory definition of "harm" does not contain the exemption as the definition of "harass").

133. Counterclaimants make these allegations amidst detailed description of the facts at issue in this case which, accepted as true, sufficiently support their claim and would entitle them to relief. *See, e.g.*, *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

## B. Counterclaimants' Claims Against Sawyer Are Not Moot

While concentrating their amorphous arguments on a non-party to the case and ignoring the fact that Counterclaim Defendant Sawyer first sued Counterclaimants for a finding related to the very issues they raise, Counterclaim Defendants nonetheless argue that Counterclaimants' claims against Sawyer are moot.

A case will become "moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quotation and internal quotation marks omitted). "'[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.'" *Id*. at 307-08 (quoting *Ellis v. Railway Clerks,* 466 U.S. 435, 442 (1984)).

Count I of the Counterclaim asserts that Counterclaim Defendants hold chimpanzees in conditions that constitute a take in violation of the ESA. Counterclaim at ¶¶ 134-36. Counterclaimants have alleged, *inter alia*, that Counterclaim Defendants MPF, Casey, and Sawyer have denied chimpanzee Joey the companionship of other chimpanzees, constituting a take in violation of the ESA. *See, e.g.*, *Kuehl*, 161 F. Supp. 3d at 710-11 (finding relative isolation of social nonhuman primates to constitute take in violation of ESA). Counterclaimants have detailed the harms that chimpanzees suffer by being kept in social isolation and have expressly alleged that "[u]ntil he was removed from the facility following receipt of the Notice, Counterclaim Defendants Sawyer, Casey, and MPF denied Joey companionship of a single other chimpanzee, and he likely continues to be without conspecifics at the unknown location at which

he is held by Sawyer." Counterclaim at ¶ 73. This is all that is required to survive a motion to dismiss. *See, e.g.*, *Graham v. San Antonio Zoological Soc'y*, No. 5:15-cv-01054-XR, ECF No. 16 (Jan. 27, 2016) (denying defendant's motion to dismiss because "[p]laintiffs plainly and clearly allege facts that state that the Zoo has deprived Lucky of companionship with other Asian elephants") (attached as Exhibit 1).

Count II of the Counterclaim also asserts that Counterclaim Defendants violate the ESA by possessing chimpanzees who have been unlawfully taken, Counterclaim at ¶¶ 137-39, and details the conditions that have amounted to an unlawful take, *id.* at ¶¶ 49, 62, 73, 76, 95, 105, 112. Moreover, Sawyer himself sued Counterclaimants for a declaratory judgment regarding the treatment of Joey. If this Court finds that Sawyer is committing a take or possesses an unlawfully taken chimpanzee, the Court has a wide range of remedies available, including enjoining the unlawful conduct and placing Joey in an accredited sanctuary. Thus, effectual relief can be granted to Counterclaimants if they prevail, the parties have a concrete interest in the outcome of the litigation, and the case is not moot.

Furthermore, even if Sawyer were no longer holding Joey in isolation or otherwise violating the ESA, "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox*, 567 U.S. at 307 (citation omitted); *see also Jager v. Douglas County Sch. Dist.*, 862 F.2d 824, 833 (11th Cir. 1989) (finding voluntary cessation of conduct before complaint was filed did not render case moot). A party claiming mootness faces a heavy burden to meet the stringent mootness test and must "show[] that 'the challenged conduct cannot reasonably be expected to start up again.'" *Ctr. for Special Needs Admin., Inc., v. Olson*, 676 F.3d 688, 697 (8th Cir. 2012) (quoting *Lankford v. Sherman,* 451 F.3d 496, 503 (8th

Cir.2006)). Otherwise, "courts would be compelled to leave [t]he defendant … free to return to his old ways." *Id.* (quotation and internal quotation marks omitted). That is precisely the impermissible outcome that could result here were the court to dismiss the Counterclaim against Sawyer; he would be free to confine Joey in apparent violation of the ESA at one facility then remove him to another when that conduct is challenged, free to return him after the matter is dismissed as moot.[8] Plaintiff has failed to show that the alleged ESA violations cannot reasonably be expected to recur. Accordingly, the Counterclaim against Sawyer is not moot.

Finally, Counterclaim Defendants attempt to obfuscate the analysis by discussing Jane Doe 1 in conjunction with Sawyer notwithstanding the stark differences in their circumstances. Despite Counterclaim Defendants' referring to Jane Doe 1 as a "Plaintiff" or "Counterclaim Defendant," Br. at 9, 10, she is neither. Jane Doe 1 dismissed her claims on February 9, 2017 [ECF No. 8], and Counterclaimants did not assert counterclaims against her, *see* Counterclaim at ¶¶ 25-28. Further, Jane Doe 1 transferred chimpanzee Allie to a sanctuary accredited by the Global Federation of Animal Sanctuaries (GFAS); in its November 2, 2016, Notice of Intent, Counterclaimants specifically stated that they would not pursue ESA litigation concerning the chimpanzees at issue in this case if they were placed in a GFAS-accredited sanctuary [ECF 1-1 at 1], and it is Counterclaimants' exact request for relief. Jane Doe 1 has taken that precise action; Sawyer has not.

## IV. Conclusion

For the foregoing reasons, Counterclaim Defendants' motion to dismiss should be denied.

---

[8] Further, Sawyer's act of removing and hiding Joey despite suing Counterclaimants for a finding that the conditions in which Joey was or is held do not violate the ESA may amount to spoliation. *See, e.g.*, Black's Law Dictionary 1437 (8th ed. 2004) (defining "spoliation" as "[t]he intentional destruction, mutilation, alteration, or concealment of evidence . . .").

Date:   August 7, 2017                    Respectfully submitted,

By: /s/ Jared S. Goodman
    JARED S. GOODMAN (#1011876DC)
    (Admitted *pro hac vice*)
    PETA Foundation
    2154 W. Sunset Blvd.
    Los Angeles, CA 90032
    323.210.2266
    Fax No: 213.484.1648
    jaredg@petaf.org

    POLSINELLI PC
    JAMES P. MARTIN (#50170)
    MARISSA L. CURRAN (#61943)
    KELLY J. MUENSTERMAN (#66968)
    100 S. Fourth Street, Suite 1000
    St. Louis, MO 63102
    314.889.8000
    Fax No: 314.231.1776
    jmartin@polsinelli.com

    *Attorneys for Defendants/*
    *Counterclaim Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on **August 7, 2017**, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, by which notification of such filing was electronically sent and served to the following:

Kurtis B. Reeg and Lynn Lehnert
8000 Maryland, Suite 640
St. Louis, MO 63105
(314) 446-3350
Fax No. (314) 446-3360
kreeg@goldbergsegalla.com
llehnert@goldbergsegalla.com

*Attorneys for Plaintiffs/*
*Counterclaim Defendants*

/s/ Jared S. Goodman