# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| MISSOURI PRIMATE FOUNDATION, et al., | ) ) ) |
| Plaintiffs and Counterclaim Defendants, | ) ) ) ) |
| v. | ) ) Case No. 4:16-cv-02163 |
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., et al., | ) ) ) ) |
| Defendants and Counterclaim Plaintiffs. | ) ) ) |

## DECLARATION OF JARED GOODMAN

Pursuant to 28 U.S.C. § 1746, I, Jared Goodman, declare the following to be true and correct to the best of my knowledge and belief:

1. I am counsel for Counterclaim Plaintiffs People for the Ethical Treatment of Animals, Inc. and Angela Scott (together, "Plaintiffs"). I make this declaration based upon my personal knowledge.

2. On October 29, 2018, I attended the duly noticed deposition of Counterclaim Defendant Connie Braun Casey ("Casey"), taken by my co-counsel, Martina Bernstein. During the examination, we learned that Casey had yet to produce numerous documents responsive to Plaintiffs' February 23, 2018, discovery requests. [ECF #123-3.] Attached hereto as Exhibit A is a true and correct copy of the relevant pages of the transcript of Casey's deposition.

3. On November 15 at noon, my co-counsel Martina Bernstein and I conferred by telephone with Casey's counsel Victor Essen about outstanding discovery and the resumption of Casey's deposition. In response to our request for a date for the deposition, Mr. Essen stated that

he would wait to provide a date for the deposition until after the outstanding discovery had been produced.

4. Subsequently, Casey produced, among other things, approximately 100 pages of emails and 250 photographs, on or about December 5, and approximately 300 pages of emails, on or about December 19, in addition to other documents.

5. On December 19 at 1:00 p.m., after Casey had produced over seven hundred pages of documents, my co-counsel Martina Bernstein and I again conferred by telephone with Casey's counsel Victor Essen about the resumption of Casey's deposition. We again requested a date for Casey's follow-up deposition about the matters as to which Plaintiffs lacked an opportunity to depose her previously. Mr. Essen again refused to provide a date—unless we agreed to limit the deposition to just one hour.

6. While we agreed with Mr. Essen that the deposition would be strictly limited to documents that had not been produced before October 29, we explained that we could not commit to concluding the deposition in only one hour, given the extent and material nature of Casey's belated production. Mr. Essen re-iterated that he would only agree to a follow-up deposition if we would agree to limit it to one hour.

I declare under the penalty of perjury that the foregoing is true and correct.

January 2, 2019

Los Angeles, CA                                            */s/ Jared Goodman*
                                                          Jared Goodman

# Exhibit A

```
 1             UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF MISSOURI
 3
 4  MISSOURI PRIMATE FOUNDATION, et al.,
 5              Plaintiff,
 6      vs.                              Case No.
 7  PEOPLE FOR THE ETHICAL TREATMENT    4:16-cv-02163-CDP
 8  OF ANIMALS, INC., et al.,
 9              Defendant.
10  _____
11
12
13
14      Videotaped Deposition of CONNIE BRAUN CASEY,
15  taken on behalf of the Defendant, at the offices of
16  Rynearson, Suess, Schnurbusch & Champion, LLC, 500
17  N. Broadway, Suite 1550, in the City of St. Louis,
18  State of Missouri, on the 29th day of October, 2018,
19  before Kristine A. Toennies, RMR, CRR, CRC, CCR
20  (MO), CSR (IL & IA), and Notary Public.
21
22
23
24  JOB No. 3027726
25  PAGES 1 - 338
```

Page 1

1   A   My records are kept in my USDA folder.
2   Q   You have a USDA folder?
3   A   Uh-huh.
4   Q   Other than your USDA folder, do you keep any
5   other records anywhere, photographs, videos,
6   e-mails?
7   A   My phone, maybe a camera, but I haven't used
8   my camera for years.
9   Q   Is that the smart phone that you're
10  referring to?  Do you receive e-mails on that phone?
11  A   Yes, I can.
12  Q   So do you receive e-mails relating to the
13  chimpanzees at your phone?
14  A   I -- very seldom do I have e-mails relating
15  to the chimpanzees.
16  Q   But you do receive e-mails relating to the
17  chimpanzees at your phone?
18  A   I've had this phone about a year, so yeah.
19  Q   And before then did you have a different
20  phone?
21  A   Yes.
22  Q   And you got e-mails on that phone?
23  A   No.
24  Q   Who is taking care of the chimpanzees today?
25  A   Actually, my daughter is there and Tonia is

Page 11

1     A    Just what I could pull up on my records.
2     Q    Right. Did you produce all of those to us?
3     A    No.
4     Q    You have others?
5     A    No, I don't think I have them.
6     Q    Did you look?
7     A    Yes, I've looked.
8     Q    Where did you look?
9     A    In my -- in my book where I've kind of kept
10 stuff down.
11     Q    The folder, is that the folder that -- the
12 USDA folder that you --
13     A    No.
14     Q    Oh, you have a separate book?
15     A    Not really. It's just I jotted stuff down
16 on some papers. I don't know where they're at.
17     Q    The notebook that you brought with you
18 today, what's in there?
19     A    This is my enrichment.
20     Q    Your enrichment what?
21     A    Enrichment for the chimps.
22     Q    Was all of that produced? Did you give that
23 to your attorneys to produce to us?
24     A    The original book was -- you've got the
25 original book. This was the new one, and it was up

1  here, but I don't know that it got printed up.
2     Q   What do you mean the new one?  What are the
3  dates?
4     A   The date on this one starts January 2017.
5     Q   And why did you not provide that?
6     A   It got changed as the attorneys changed.
7  The one I had -- because I write in this stuff every
8  week.
9     Q   Right.  The question is why was that not
10 produced to us?  Did you not give that to your
11 attorneys?
12    A   At one point it was up here, and then I
13 brought this one up today because --
14    Q   What is the this one?  What are you holding
15 in your hands?  What is that?
16    A   My little note --
17    Q   Your calendar?
18    A   Yeah.
19    Q   You did not provide that to your attorneys
20 either?
21    A   I didn't this one because --
22    Q   You did not?
23    A   I was keeping this one updated.  This one
24 here I think was up here for a while, but it might
25 not have gotten printed up.

1  and they did X-rays, and it showed that she had a
2  lot of fluid built up.
3      Q   When did Kimmy start to have lesions on her
4  foot?
5      A   She had previously a couple years ago had
6  injured her foot, and she was treated then, and she
7  had -- I'm trying to think.  It was probably six
8  weeks -- I don't know if I've got it in here or not.
9  We were treating her for a foot injury where the
10 skin was pulled off, but Kimmy was a picker, so
11 every time it would start to heal, she would peel
12 the skin back off again.  And we first started
13 treating her for her foot on August the -- it looks
14 like the 14th.
15     Q   2018?
16     A   Yes.
17     Q   You're referring to a calendar that you
18 have?
19     A   Yes.
20     Q   Did you keep a calendar like this for the
21 previous year?
22     A   Yeah, but sometimes I don't write everything
23 down.
24     Q   Right, but you kept a calendar like this,
25 similar to this for the previous year?

1      A    Uh-huh.
2      Q    Yes?
3      A    Yes, ma'am.
4      Q    Where is that calendar?
5      A    I don't know.
6      Q    Do you have it?
7      A    I don't know.
8      Q    Did you look for it?
9      A    I looked through my records and I didn't see
10  the calendar.
11     Q    Did you throw it out?  Do you recall what
12  happened to it?
13     A    I don't know.
14     Q    Is there a reason why we weren't provided
15  copies of this calendar that you're having in front
16  of you?
17     A    I guess it just -- because I write in it
18  every day, and so I guess there just wasn't -- it
19  wasn't up here to get it printed.
20     Q    So you say Kimmy was a picker.  For how long
21  was she a picker?
22     A    Kimmy has been a picker all of her -- I got
23  her in 1986, and she was 30-something years old when
24  I got her, and she's always -- if she had a little
25  spot, she would pick at it.

1    Q   No, any e-mails that you might have sent or
2   received via the Connie2Me@aol.com account, you did
3   not search?
4    A   No.
5    Q   The ConnieBraunCasey@gmail.com account, did
6   you search that for communications that may be
7   required to be produced in this case?
8    A   Yes, I have.
9    Q   When did you do that search?
10   A   I -- I look on my Gmail account at least
11  every other day.
12   Q   When did you search for your past e-mails to
13  determine whether there were communications that
14  needed to be produced?
15   A   The only e-mails I have on there basically
16  is from my attorneys.
17   Q   When did you search --
18   A   When did I?  Okay.
19   Q   I have to finish.  When did you search for
20  your past e-mails to determine whether there were
21  communications that needed to be produced?
22   A   Probably two weeks ago.
23   Q   When you searched, did you find the e-mail
24  where your lawyers, your previous lawyers sent you
25  that statement that we --

| | |
|---|---|
| 1 | A Yes. |
| 2 | Q -- discussed? And did you find it? |
| 3 | A Yes. |
| 4 | Q So you have an e-mail where your attorneys |
| 5 | attached the statement that they forwarded to the |
| 6 | press? |
| 7 | A Yes. |
| 8 | Q Why was the statement not produced to us? |
| 9 | A I don't know. I figured you probably had |
| 10 | it. |
| 11 | Q You figured? |
| 12 | A Uh-huh, yeah. I mean, it was put in here |
| 13 | and edited. |
| 14 | Q Right, but the unedited statement, where |
| 15 | would we have gotten it? Did you provide it to your |
| 16 | lawyers? |
| 17 | A No. |
| 18 | Q The ConnieBraunCasey@gmail.com account, did |
| 19 | you use it at any time to communicate with |
| 20 | Dr. Pernikoff at any time? |
| 21 | A Yes. |
| 22 | Q Why were your e-mail communications to |
| 23 | Dr. Pernikoff not produced? |
| 24 | A I don't know. |
| 25 | Q The ConnieBraunCasey@gmail.com account, did |

```
 1  you use it at any time to communicate with
 2  representatives of the DeYoung Zoo?
 3      A   I don't think so.
 4      Q   But you're not sure?
 5      A   I'm not a hundred percent sure.
 6      Q   And you did not review your e-mail
 7  account --
 8      A   I did review --
 9      Q   I need to finish.  You did not review your
10  e-mail account to find out whether or not you had
11  e-mail communications to representatives from the
12  DeYoung Zoo; is that right?
13      A   I reviewed my e-mail account a couple weeks
14  ago, and I did not see anything in there to DeYoung
15  Zoo.
16      Q   How far back did you review your e-mails?
17      A   As far back as my phone would let me go.
18      Q   How far back does your phone let you go?
19      A   I don't know.  It goes back so -- probably
20  five months until you -- it quits working.
21      Q   So you have access to about five months of
22  e-mails?  And what happened to the previous e-mails?
23      A   I don't know.  I guess I have to -- I
24  probably have to go log on to somebody's computer to
25  pull stuff out.
```

1        A    No, I have not.
2        Q    Okay.  Do you have photographs or videos of
3   any of the chimpanzees?
4        A    Do I?
5        Q    Yes.
6        A    Well, of course.
7        Q    How many?
8        A    Thousands probably over the years.
9        Q    Where are they stored?
10       A    Where?  Hell, I've got tons of 8-track
11  videos and tons of pictures.
12       Q    And where are they kept?
13       A    Some of them is printed out; some of them is
14  not.  Some of them is in my camera that I don't even
15  know where it's at.  Some of them is in my phone.
16       Q    You didn't produce any of those?
17       A    You have a bunch of pictures that I sent.
18       Q    Oh, we do?
19       A    Yes, you do.  They're -- well, I seen them
20  somewhere that they were turned over to you, I think
21  probably either with Reeg or with Dan or Mr. Clark.
22       Q    Did you give your lawyers all the
23  photographs you have in your camera?
24       A    I don't even know where my camera is.  I
25  haven't used my camera for years.

1   Q   Did you search for your camera?
2   A   Yes, I have.
3   Q   You don't know where you kept your camera?
4   A   No, I don't.
5   Q   You can't find your camera?
6   A   I haven't -- no, I don't know where it's at.
7   Q   How hard did you look?
8   A   Hard enough.
9   Q   So you have pictures on your camera, but you
10  have no idea where your camera is; is that right?
11  A   I haven't used my camera for probably four
12  years.
13  Q   Right, the question is you have pictures on
14  your camera, but you do not know where your camera
15  is located?
16  A   Unsure.
17  Q   You don't know where your camera is located?
18  A   No, I don't.
19  Q   Okay.  You have 8-track videos, but you have
20  not produced those, have you?
21  A   No.  I probably have 500 8-track things
22  because I've been doing chimps for over 50 years.
23  Q   Right.  You have not produced those?
24  A   No.  Why should I produce something 50 --
25  hell, I don't even have an 8-track to watch them

1  anymore.
2  Q   You did not produce them is the question?
3  A   No.
4  Q   And you mentioned tons of pictures.  Did you
5  give those -- did you give all the pictures to your
6  attorneys --
7  A   No.
8  Q   -- to make copies to produce those?
9  A   No.  But you know, how do you -- how do I
10 produce pictures that's been taken over 50 years?
11 Q   Do you know what APHIS Form 7002 is?
12 A   I would have to look at the number.
13 Q   Do you know that we requested it
14 specifically?
15 A   It's in here somewhere.
16 Q   Right.  You're aware we requested certain
17 forms?
18 A   Yes.
19 Q   And what happened to those?  Why did we not
20 get those?
21 A   You got them.  As far as I know, you got
22 them.
23 Q   For the last three years dated 2018, 2017
24 and 2016?  Do you have those for 2018, 2017 --
25 A   Let me see what the file looks like.

1 this building.
2     Q   Is that the plan?
3     A   That's the plan.
4     Q   Okay. Is there a reason you didn't do it
5 earlier? Do you have to think about that?
6     A   You know what I have to think about? This
7 is so dam stressful. I love these animals with all
8 my heart, and I would like to tell you to go to hell
9 right now, but I won't. And I apologize for even
10 thinking I want to tell you that because I am not
11 that kind of person, but I am so stressed out, and I
12 love these chimps with all my heart, and you guys
13 are driving me crazy.
14     Q   Do you need to take a minute?
15     MS. BERNSTEIN: Let's go off the record.
16     THE WITNESS: I need you guys just to
17 disappear and leave me and my chimps alone.
18     MS. CHAMPION: All right, Connie, let me
19 make a record real quick while you're taking a
20 minute. If you want to leave, make sure you take
21 your video thing off or audio thing off.
22     Victor brought in some documents a while ago
23 that we have for you, so I'm going to make a record
24 on providing you with these so you have them.
25     Okay, so we have USDA records that were

```
 1   provided to Connie and to --
 2           MS. BERNSTEIN:  Well, this is not the time
 3   to throw them across the table.
 4           MS. CHAMPION:  Well, I don't mean to throw
 5   them across the table.  I'm trying to hand them to
 6   you, and you sat and looked at me and didn't take
 7   them.
 8           MS. BERNSTEIN:  No, just put them aside for
 9   now and make your record as to what you are going to
10   be producing.
11           MS. CHAMPION:  Okay.  And then we'll
12   supplement these too, but I didn't want you not to
13   have them today because these are the ones we just
14   received in the e-mail.
15           And then secondly, I don't know what this
16   is, but it's a document that she's provided that has
17   notes on it from Mitchell's, Jim Devereux.
18           THE WITNESS:  Oh, that's -- that ain't
19   nothing.
20           MS. CHAMPION:  Let's give it to them anyway
21   because it came in with some other things.
22           Then we've got copies of the calendar that
23   she brought with her today which weren't previously
24   provided from January 2017, and we have -- what's
25   this?  Your purple notebook?  Is that the purple
```

```
 1  head give you the complete list.
 2          MS. CHAMPION:  Okay.
 3          MS. BERNSTEIN:  I will just refer you to
 4  e-mails I sent repeatedly asking for those things.
 5          MS. CHAMPION:  Okay.  I'll look at that
 6  again, but I think we've answered since then as to
 7  what we have.
 8          Anyway, my point is simply this.  I
 9  understand that you still need e-mails and photos,
10  and to the extent that there are follow-up regarding
11  the things that are going to be subsequently
12  provided to you, assuming that there are these
13  things, obviously you'll need to do your follow-up
14  on those, but we would object to anything that goes
15  beyond anything you haven't already seen.  And I
16  understand as well that you've asked her certain
17  questions about some of the records we've produced,
18  so you had a chance to look at some of it.
19          MS. BERNSTEIN:  No, no.  What I asked were
20  about documents that were previously produced that
21  were re-produced today.
22          MS. CHAMPION:  Yeah, I think most of what
23  we've produced to you today was re-produced.
24          MR. GOODMAN:  No.
25          MS. BERNSTEIN:  No.
```

1  that we haven't gotten obviously.  We didn't even
2  get any time for Dr. Pernikoff's deposition, which
3  apparently now is becoming critical because there's
4  completely different testimony about certain things,
5  so we would appreciate to get those records and to
6  have a date when we can resume for purposes of
7  including all the stuff that should have been
8  produced that was not.  Other than that, I'm
9  suspending the deposition at this point.
10         MS. CHAMPION:  Sounds good.
11         MS. BERNSTEIN:  Reserving all the rights.
12         MS. CHAMPION:  And we would also reserve our
13 right to object, but we'll talk about that further.
14         MS. BERNSTEIN:  Of course.  We're off the
15 record.
16         THE VIDEOGRAPHER:  We're going off the
17 record.  This concludes today's testimony given by
18 Connie Braun Casey.  The time is 5:42.
19             (Deposition adjourned.)