```
1              UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF MISSOURI
3

4   MISSOURI PRIMATE            )
    FOUNDATION, ET AL.,         )
5                               )
           Plaintiffs,          )
6                               )
    vs.                         )Civil Action No.
7                               )
    PEOPLE FOR THE ETHICAL      )4:16-cv-02163-CDP
8   TREATMENT OF ANIMALS,       )
    INC., ET AL.,               )
9                               )
           Defendants.          )
10
```

DEPOSITION OF DR. DOUGLAS PERNIKOFF

TAKEN ON BEHALF OF THE DEFENDANTS

JUNE 27, 2018

EXHIBIT D

### Page 5

```
 1   ALSO PRESENT:
 2       ALARIS
 3       711 North 11th Street
 4       St. Louis, Missouri  63101
 5       (314) 644-2191
 6       1-800-280-DEPO
 7       by:  Ms. Tara Schwake, CRR, RPR, CCR, CSR
 8       transcripts@alarislitigation.us
```

### Page 6

 1    IT IS HEREBY STIPULATED AND AGREED by
 2 and between Counsel for Plaintiffs and Counsel for
 3 Defendants that this deposition may be taken by
 4 Tara Schwake, Notary Public and Certified Realtime
 5 Reporter, thereafter transcribed into typewriting,
 6 with the signature of the witness being expressly
 7 waived.
 8         DR. DOUGLAS PERNIKOFF,
 9 of lawful age, having been produced, sworn, and
10 examined on the part of Defendants, testified as
11 follows:
12              * * * * *
13    (Deposition commenced at 9:27 a.m.)
14             EXAMINATION
15 QUESTIONS BY MS. BERNSTEIN:
16    Q   Good morning, sir.
17    A   Hi.
18    Q   Are you presently employed?
19    A   Yes.
20    Q   And where are you employed?
21    A   The Clarkson-Wilson Veterinary Clinic
22 in Chesterfield.
23    Q   And what does that business do?
24    A   It's a veterinary, all service
25 veterinary clinic.

### Page 7

 1    Q   And how long have you worked there?
 2    A   Twenty-four years.
 3    Q   What are your responsibilities?
 4    A   I am the owner and I am also a
 5 general practitioner and I play vet every day.
 6    Q   Are you familiar with the Missouri
 7 Primate Foundation?
 8    A   I am.
 9    Q   And at some point did you become a
10 member of the governing board?
11    A   When I was just graduating, I met
12 them about 36 years ago, and they asked me to be on
13 their board and at that time I was very excited to
14 be involved, especially with exotic species.
15    Q   Who asked you to be on the board of
16 the Missouri Primate Foundation?
17    A   I think it was, if I remember, it was
18 probably Connie and her husband at that time was --
19 what's his name?
20    Q   Is it Mike?
21    A   Mike Casey.
22    Q   Connie and Mike Casey?
23    A   Yeah.
24    Q   And did Connie and Mike Casey tell
25 you why they wanted you to join the Missouri

### Page 8

 1 Primate Foundation board?
 2    A   Not particularly. I assume because
 3 of my interest in exotic animals.
 4    Q   Did you have any discussions with
 5 them about what was expected of you as a board
 6 member?
 7    A   No.
 8    Q   Do you know when Missouri Primate
 9 Foundation was incorporated?
10    A   I do not.
11    Q   Do you have any records relating
12 specifically to your service as a board member?
13    A   There was zero activity.
14    Q   And when you say "there was zero
15 activity," what do you mean?
16    A   I didn't even remember that I was on
17 the board recently until it was presented to me.
18 So I think it was just like a perfunctory title
19 they wanted to have maybe because of my interest in
20 exotics.
21    Q   When you say it was recently brought
22 back to your attention, who -- who brought it to
23 your attention?
24    A   I think it was Kurt Reeg, who was
25 serving at one point as Connie's attorney and he

Page 9

1  said, "Well, you're on the board." I go, "I am?"
2  So I had to dismiss myself from the board right
3  away.
4      Q    Oh. So you dismissed yourself from
5  the board?
6      A    I had my lawyer send them a note
7  dismissing myself formally.
8      Q    And do you know when that was done?
9      A    I would -- no, I don't have an exact
10 date. I can certainly get you that.
11     Q    Do you have a approximate date
12 perhaps with reference to the pending lawsuit? Was
13 it after --
14     A    Well, it had to be after
15 communication was made, but I know it was before
16 the formal lawsuit, okay? So I just know there was
17 discussion that PETA was interested in, you know,
18 getting these chimps.
19     Q    So is your understanding that before
20 litigation was filed by anybody, you were aware
21 that PETA was interested in getting chimpanzees
22 from the Missouri Primate Foundation transferred?
23     A    Well, I just knew that they were
24 interested in whatever they would do, you know, to
25 discuss that. I don't know what the specifics

Page 10

1  were. I assume that means moving the chimps.
2      Q    And who told you that? Who did you
3  have these conversations with?
4      A    Well, I think it was when Kurt Reeg
5  -- I can't recollect but I think it was when Kurt
6  Reeg explained that I was a board representative
7  and I said, well, I don't want to be a board
8  representative, we haven't done anything.
9      Q    So you told Mr. Reeg that you didn't
10 want to be on the board and you hadn't --
11     A    I had my attorney just send a note
12 dismissing my position.
13         MR. BALDWIN: I don't think that was
14 me. That might have been before my time but I can
15 look.
16     Q    (BY MS. BERNSTEIN) That would be
17 great just so we can have the date pinned down, but
18 certainly Mr. Reeg and Ms. Casey should have a
19 record of that; is that a fair assumption?
20     A    Yes.
21     Q    When you first agreed to serve on the
22 board, did you understand you would hold certain
23 fiduciary obligations to Missouri Primate
24 Foundation?
25     A    I was 30 years old. I was a new

Page 11

1  graduate. I was excited to be part of anything
2  that was exotic and that's all I knew. I wasn't
3  sophisticated as a business person or anything like
4  that.
5      Q    May I ask how old you are presently?
6      A    Sixty-five. You got to finish before
7  I die, this deposition.
8      Q    You and me both. I might go before
9  you.
10     A    I don't think so.
11     Q    All right. That should have been off
12 the record.
13     A    Whatever.
14     Q    And in all the 30 years, if I
15 understand you correctly, you never -- there was
16 never any activity that you were called upon to act
17 in your capacity as a board member?
18     A    Correct. Actually more like 36
19 years.
20     Q    Would it be fair to say that you --
21 are you aware of any safeguards that were put in
22 place that would have prevented Miss Casey from
23 exercising sole and complete control over Missouri
24 Primate Foundation?
25     A    I -- I am not sure I even understand

Page 12

1  that but I mean, I don't know, no.
2      Q    So as far as you know, Miss Casey
3  could have done whatever she wanted to with the
4  Missouri Primate Foundation?
5      A    I -- it's not -- it's not in my
6  wheelbase. I wouldn't have any idea what the
7  purpose of the board is.
8      Q    So it would be fair to say that Miss
9  Casey never sought the board's consent or input
10 about how to spend the funds of the organization,
11 for example?
12     A    Correct.
13     Q    And she never sought the board's
14 consent or input about her decision, or the
15 decision of Missouri Primate Foundation to sue
16 PETA?
17         MR. BALDWIN: Can I at least be with
18 the understanding that he was aware of? Or to his
19 knowledge?
20         MS. BERNSTEIN: Of course. Of
21 course.
22     Q    (BY MS. BERNSTEIN) I'm asking only
23 your personal knowledge. You were not aware that
24 Miss Casey ever sought the board's consent or input
25 into whether or not to actually sue PETA?

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

**Page 13**

1  A   Exactly.
2  Q   But you're aware that Missouri
3  Primate Foundation did sue PETA?
4  A   I am aware.
5  Q   And do you know whether that was
6  before or after you dismissed yourself from the
7  board?
8  A   I feel pretty -- I don't know for
9  sure but I feel pretty certain it was after I had
10  already dismissed myself from the board.
11  Q   Do you know who decided whether
12  Missouri Primate Foundation should be dissolved?
13  A   Nope.
14  Q   Perhaps to shortcut that, are you
15  aware of the current status of whether or not
16  Missouri Primate Foundation currently is
17  functioning as a corporation?
18  A   I was told, and I believe it was Mr.
19  Batten, her current attorney, said something to the
20  effect that Connie had let the corporate standing
21  pass, unintentionally, and at that point they said,
22  well, there's no reason to pursue it at this point
23  to reinstate it.
24  Q   You refer to "Mr. Batten." Was that
25  Daniel Batten?

**Page 14**

1  A   Yes.
2  Q   And how many times, roughly, have you
3  spoken to him?
4  A   Probably two times.
5  Q   And the first time, when did you
6  speak to him first?
7  A   I actually --
8      MR. BATTEN:  And I'm going to object
9  to the question, that seeks privileged information.
10     MS. BERNSTEIN:  Okay.  I -- I will
11  need a foundation for that.  Are you saying you are
12  in an attorney-client relationship with Dr.
13  Pernikoff?
14     MR. BATTEN:  No, I am not.
15     MS. BERNSTEIN:  So what is the basis
16  of your privilege?
17     MR. BATTEN:  I'm asserting privilege
18  in that any communications with Dr. Pernikoff
19  regarding Miss Casey or this case are privileged
20  communications as a consultant involved in this
21  case.  His assistance was necessary and his
22  involvement was necessary in order to be able to
23  provide Miss Casey with the appropriate knowledge
24  and understanding that Dr. Pernikoff has as a
25  veterinarian in furtherance thereof.

**Page 15**

1  Q   (BY MS. BERNSTEIN)  Dr. Pernikoff,
2  have you been hired as a non-testifying consultant
3  in this case?
4  A   I don't believe so.
5  Q   Right.  You certainly would know if
6  somebody hired you and said, can you be a
7  non-testifying expert in this case?
8  A   Yes.  I assume so.
9  Q   Have you been hired to testify as a
10  -- as an expert in this case?
11  A   No.  I was told that I might be able
12  to provide expert witness if it ever went to trial.
13  Q   Right.  Right.  But at this point you
14  have not been retained by Mr. Batten or Ms. Casey
15  to serve in a consulting capacity with respect to
16  this litigation; is that right?
17  A   Correct.
18  Q   Okay.  Can you tell me what you
19  discussed with Mr. Batten during your first phone
20  call?
21     MR. BATTEN:  Again I'm going to
22  object that the question calls for privileged
23  communication.
24     MS. BERNSTEIN:  Sure.
25  Q   (BY MS. BERNSTEIN)  You can answer.

**Page 16**

1  A   I'm confused.
2  Q   Yes.  Yes.  He can raise objections
3  and, as he might throughout, and a court might
4  later decide whether your testimony is admissible.
5  It's procedural.  Unless your lawyer tells you not
6  to answer a question --
7      MR. BALDWIN:  I'm not in a position
8  to do that right now.
9      MS. BERNSTEIN:  Right.
10  A   So yes, I actually met the attorney,
11  Mr. Batten, down at the center, the first visit.
12  Q   (BY MS. BERNSTEIN)  Okay.  At
13  Missouri Primate Foundation?
14  A   Yes.  And we walked around and kinda
15  introduced him to the physical space and the
16  critters.
17  Q   Do you know approximately when that
18  was?  Was it a month ago, two months ago?
19  A   As long as I guess he's been
20  involved, yeah.
21  Q   Okay.  So it was your understanding
22  he had just become involved in the case?
23  A   He had just, yeah, it was the first
24  time he was going to see them at the center.
25  Q   And when you walked around, did

### Page 25

1  your objection?
2      MR. BATTEN: No, I am not.
3      Q  (BY MS. BERNSTEIN) Did – did you
4  have any communications or conversations with Mr.
5  Batten at that time?
6      A  No.
7      Q  Did you have any communications with
8  Connie at that time?
9      A  No.
10     Q  So you went there and you were told
11 you have no business being in there and that was
12 the extent of it?
13     A  Right.
14     Q  Okay. And have you had any other
15 conversations with Mr. Batten or any other lawyers
16 for – for Miss Casey?
17     A  No.
18     MR. BATTEN: Object that the question
19 seeks confidential and privileged communications.
20     MS. BERNSTEIN: So it is your
21 position that a question that merely wants to know
22 whether there was a conversation, that in itself is
23 privileged?
24     MR. BATTEN: That's what I'm
25 asserting.

### Page 26

1      MS. BERNSTEIN: All righty.
2      Q  (BY MS. BERNSTEIN) Dr. Pernikoff,
3  you are represented by counsel here today?
4      A  Yes.
5      Q  Do you have information how Miss
6  Casey used Missouri Primate Foundation's funds and
7  whether she may have used them for her own personal
8  benefit?
9      A  I do not.
10     Q  Do you know if Missouri Primate
11 Foundation has or had any assets?
12     A  I do not.
13     Q  Do you know how the organization was
14 capitalized, if at all?
15     A  I mean, I don't know specifically.
16     Q  Have you ever seen or asked to see
17 any documentation relating to Missouri Primate
18 Foundation's finances?
19     A  No.
20     Q  Do you know who the other members of
21 the board were during the time that you served on
22 Missouri Primate Foundation's governing board?
23     A  I do not.
24     MR. BALDWIN: I'm going to object to
25 the use of the term "serve." The time during which

### Page 27

1  he apparently was on the board, I don't know that
2  he ever did any --
3      MS. BERNSTEIN: Okay.
4      MR. BALDWIN: Okay.
5      MS. BERNSTEIN: Fair enough. I did
6  not mean to imply that you served. Point well
7  taken.
8      Q  (BY MS. BERNSTEIN) So your purported
9  role as a member of the Missouri Primate
10 Foundation's governing board was, for all intents
11 and purposes, non-existent?
12     A  In my, yeah, in my opinion, yes.
13     Q  And sitting here today you do not
14 even know exactly during what time span that took
15 place?
16     A  Right.
17     Q  Because it really didn't take place;
18 right?
19     A  You know, again, I wasn't involved in
20 any.
21     Q  At some point were you asked to be,
22 and perhaps for purposes of this deposition, when I
23 refer to "MPF," I mean Missouri Primate Foundation,
24 whether or not it existed in an official corporate
25 form or not. Sort of the business of the

### Page 28

1  foundation I will refer to as MPF.
2      A  Okay.
3      Q  Thank you. At some point were you
4  asked to become MPF's attending veterinarian?
5      A  Never formally.
6      Q  You -- there was never a formal
7  arrangement between you and MPF or any of MPF's
8  representatives to be the attending veterinarian
9  for the chimpanzees; is that correct?
10     A  Correct. There was none.
11     Q  Were you ever asked to sign a written
12 program of veterinary care of the chimpanzees?
13     A  You mean through the MPF?
14     Q  Or any other entity who owned or
15 controls MPF?
16     A  No.
17     Q  Did you ever – just to be clear, are
18 you aware that the -- that there are certain Animal
19 Welfare Act regulations governing how the
20 chimpanzees at MPF must be cared for?
21     A  That's kind of a vague question. I
22 mean, I understand that there has to be good
23 husbandry and good welfare.
24     Q  Do you understand that a written
25 program of veterinary care may be required to be