# Exhibit A

1           UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF MISSOURI

3

4  MISSOURI PRIMATE FOUNDATION, et al.,

5

6          Plaintiff,

7

8  vs.                 No. 4:16-cv-02163-CDP

9

10  PEOPLE FOR THE ETHICAL TREATMENT

11  OF ANIMALS, INC., et al.,

12

13          Defendant.

14

15    Deposition via videoconference of THOMAS JONES,

16  DVM, taken on behalf of the Defendant, at the

17  offices of Polsinelli, 100 S. Fourth Street, Suite

18  1000, in the City of St. Louis, State of Missouri,

19  on the 28th day of January, 2019, before Kristine A.

20  Toennies, RMR, CRR, CRC, CCR (MO), CSR (IL & IA),

21  and Notary Public.

22

23

24

25  PAGES 1 - 358

Veritext Legal Solutions
866 299-5127

```
 1    APPEARANCES OF COUNSEL:

 2

 3      FOR THE PLAINTIFF:

 4         Mr. Victor H. Essen

 5         Rynearson, Suess, Schnurbusch & Champion

 6         500 N. Broadway, Suite 1550

 7         St. Louis, MO  63102

 8         (314) 421-4430

 9         vessen@rssclaw.com

10

11      FOR THE DEFENDANT (appearing via videoconference):

12         Ms. Martina Bernstein

13         PETA Foundation

14         1536 16th St. N.W.

15         Washington, D.C.  20036

16         (202) 483-2190

17         martinab@petaf.org

18

19      FOR THE DEPONENT:

20         Mr. Brandon T. Moonier

21         Thurman Law Firm

22         301 Main Street

23         Hillsboro, MO  63050

24         (636) 797-2601

25         moonier@thurmanlaw.com
```

Veritext Legal Solutions
866 299-5127

```
 1              MR. MOONIER:  M-O-O-N-I-E-R.

 2              MS. BERNSTEIN:  Thank you.

 3       Q    (By Ms. Bernstein) Dr. Jones, are you

 4   presently employed?

 5       A    Yes.

 6       Q    Where are you employed?

 7       A    Jones Animal Health Clinic.

 8       Q    Where is that?

 9       A    In Crystal City, Missouri.

10       Q    And how long have you been so employed?

11       A    21 years.

12       Q    I'm sorry?

13       A    21 years.

14       Q    21?

15       A    Yes.

16       Q    Before then what did you do?

17       A    I worked for another veterinary clinic.

18       Q    What was the name of that clinic?

19       A    Twin City Animal Hospital.

20       Q    At your present employment, what are your

21   primary responsibilities?

22       A    Owner-operator, veterinarian.

23       Q    Do you have any experience or training in

24   diagnosing and treating primates?

25       A    Only through veterinary school.
```

Veritext Legal Solutions
866 299-5127

1    Q   Would it be fair to say that most veterinary

2  graduates have received very little, if any,

3  training in the area of primate medicine?

4        MR. MOONIER:  I would object based on

5  speculation.

6        MR. ESSEN:  I also object as leading, but

7  subject to that, go ahead.

8    Q   (By Ms. Bernstein) You may answer.

9    A   We get the basics.

10   Q   And what do the basics consist of?

11   A   Primarily health, welfare.

12   Q   How many hours?

13   A   I don't know that I can answer that question

14  because that was 25 years ago.

15   Q   Is it fair to say you don't remember much

16  about that experience in veterinary school?

17        MR. MOONIER:  I would object.  That assumes

18  facts not in evidence, and it's asking him to

19  speculate, but you can answer.

20   A   I remember a lot about veterinary school,

21  but I cannot recall how many hours I spent on every

22  single subject.

23   Q   (By Ms. Bernstein) Right.  I'm not asking

24  you about -- to recall every single subject.  I'm

25  asking you with respect to what you recall about the

Veritext Legal Solutions
866 299-5127

```
 1    amount, the hours of training you spent in
 2    veterinary school being trained in the area of
 3    primate medicine?
 4        A   I would have to guess.  It would be anywhere
 5    from 10 to 20 hours.
 6        Q   And why would you have to guess?  Why don't
 7    you have a clearer recollection?
 8        A   Because it was 25 years ago.
 9        Q   And how many of those 10 to 20 hours of
10    training that you received 25 years ago was devoted
11    to the more specialized area of chimpanzee medicine?
12        A   Again, I would have to guess.  Approximately
13    five to ten.  It was lumped into a category of lab
14    animal medicine.
15            MR. ESSEN:  Martina, somebody was coming
16    into the room I assume for the purpose of taking
17    Dr. Jones' documents and copying them or scanning
18    them for you, so do you want to do that now or --
19            MS. BERNSTEIN:  Yes, now is fine.
20            MR. ESSEN:  Let me go try to track that
21    person down now.
22            MS. BERNSTEIN:  Sorry for the interruption.
23    I appreciate your patience.
24            (Discussion off the record.)
25        Q   (By Ms. Bernstein) Dr. Jones, since you
```

Veritext Legal Solutions
866 299-5127

```
 1   graduated from veterinary school, how many

 2   chimpanzees have you treated over the years?  Or

 3   perhaps I want to be a bit more clear.  How many

 4   chimpanzees have been your patients?

 5        A    Specifically my patients?

 6        Q    Yes, yes, that you would consider to be your

 7   patients.

 8        A    None.

 9        Q    How many?

10        A    Zero.

11        Q    I'm sorry?

12        A    Zero.

13        Q    Expanding to the broader term primates, how

14   many primate patients have you had since you

15   graduated veterinary school?

16        A    That were my primary patients?

17        Q    That you would consider to be your patients.

18        A    Zero.

19        Q    Are you familiar with the term

20   veterinarian-client-patient relationship?

21        A    I am.

22        Q    And with respect to that phrase, what does

23   the word client refer to?

24            MR. ESSEN:  I just object as calling for a

25   legal conclusion.  Subject to that, go ahead.
```

Veritext Legal Solutions
866 299-5127

1          MR. MOONIER:  Victor beat me to it, so I'll

2     join that objection.

3          A    That you have a relationship with the

4     owner/client.

5          Q    (By Ms. Bernstein) And what does that

6     relationship entail?  When do you know that the

7     owner is your client?

8          MR. ESSEN:  Same objection, but subject to

9     that, go ahead.

10         MR. MOONIER:  I'll join.

11         A    When they come in and fill out a record and

12    sign the documents that say they want to come to my

13    clinic.

14         Q    (By Ms. Bernstein) So there is a document

15    that needs to be signed --

16         A    Yes.

17         Q    -- for there to be a client-veterinarian

18    relationship?

19         A    I need a record --

20         Q    Such --

21         A    I'm sorry?

22         Q    I'm sorry.

23         A    I said in my clinic we require them to fill

24    out a record.  Does the document have to exist in

25    order to have a client-patient relationship?  In

Veritext Legal Solutions
866 299-5127

```
1    some form or fashion, yes.
2         Q    And in the phrase
3    veterinarian-client-patient relationship, what does
4    the term patient refer to?
5              MR. MOONIER:  Same objection.  Calling for a
6    legal conclusion.
7              MR. ESSEN:  I'll join.
8         A    That the patient would be the client's
9    animals, whatever they may be.
10        Q    (By Ms. Bernstein) And you've never been --
11   you've never had any chimpanzee patients in the
12   context of a veterinarian-client-patient
13   relationship?
14        A    As a primary caregiver, no.
15        Q    What is the distinction between a primary
16   caregiver patient and any other type of relationship
17   to a patient?
18        A    I would consider myself an ancillary
19   caregiver.
20        Q    Have you been an ancillary caregiver --
21   well, first let me ask you this.  What is your
22   understanding of your role as an ancillary
23   caregiver?
24        A    To help and assist.
25        Q    With what?
```

Veritext Legal Solutions
866 299-5127

```
 1      A    The care of the chimps under the guidance of

 2   Dr. Pernikoff.

 3           MR. ESSEN:  We have a person here, I think,

 4   to collect the documents.  Thank you.

 5      Q    (By Ms. Bernstein) Is that a term that is

 6   used in the veterinary profession, ancillary

 7   caregiver?

 8      A    Ancillary, assist; those are two commonly

 9   used terms.  Help.

10      Q    In your role as ancillary caregiver, how

11   many chimpanzee -- how many chimpanzees did you

12   provide ancillary care?

13      A    I can give you a guess.

14      Q    Okay.

15      A    15, maybe 20.

16      Q    15?

17      A    15, maybe 20.

18      Q    And expanding this now to the primate

19   category, how many -- to how many primates have you

20   been providing ancillary care?

21      A    Again, the 15 to 20.

22      Q    And who were these primates or who requested

23   that you provide ancillary care to these primates?

24      A    Connie and Dr. Pernikoff.

25      Q    Would that be Connie Casey?
```

Veritext Legal Solutions
866 299-5127

```
1        Q    (By Ms. Bernstein) Some of them would have
2   to be involved?
3            MR. ESSEN:  Objection.  Foundation.
4        Q    (By Ms. Bernstein) What do you mean some of
5   them would have to be involved?
6            MR. ESSEN:  Objection.  Foundation;
7   speculation.
8            MR. MOONIER:  I join in that objection.
9        A    Now I've lost the question.
10           MR. MOONIER:  Too many lawyers talking.  Can
11  you repeat that?
12       Q    (By Ms. Bernstein) Yes.  What do you mean
13  some of these chimpanzees to whom you provided
14  ancillary care would have to be involved in this
15  business of loaning these chimpanzees for
16  entertainment purposes?
17           MR. ESSEN:  Same objection.
18           MR. MOONIER:  I'll join.
19       A    Only because they -- I know that they were
20  there, and I know things that they did, so they had
21  to utilize some of these chimps.
22       Q    (By Ms. Bernstein) Okay.  Were you also
23  aware Ms. Casey was in the business of breeding
24  primates and selling the babies for profit?
25       A    Yes, ma'am.
```

Veritext Legal Solutions
866 299-5127

1  between Jones Health Animal Clinic and the Missouri
2  Primate Foundation and Ms. Casey.
3      We're way off of what we are here to talk
4  about today, and at some point we need to get back
5  on track because I'm going to start commanding him
6  not to answer some of these questions that he's not
7  here to testify about.  You didn't call him as an
8  individual.  You didn't call him as a veterinarian.
9  You called Jones Animal Health Clinic to testify
10  here today.
11      MS. BERNSTEIN:  Well, let me rephrase the
12  question then, Dr. Jones.
13      Q    (By Ms. Bernstein) Did Dr. Jones -- or did
14  the Jones Animal Health Clinic provide care or
15  ancillary care for chimpanzees who were used for
16  breeding purposes and who basically gave birth to
17  babies at Ms. Casey's facility?
18      MR. ESSEN:  Objection.  Foundation;
19  speculation.
20      MR. MOONIER:  I'll join.
21      A    I would have to assume so, but I -- again, I
22  do not know who bred who, who had babies.  I don't
23  know that.  I only know one.
24      Q    (By Ms. Bernstein) And who would that be?
25      A    I do not remember her name, and the only

Veritext Legal Solutions
866 299-5127

1    reason I know it is --

2        Q    When -- when were you -- just to address

3    counsel's objection, since you are here not

4    testifying in your personal capacity but testifying

5    as to the knowledge of Jones Animal Health Clinic,

6    when I use the term "you," I'm referring to you as

7    the witness testifying on behalf of the Jones Animal

8    Health Clinic.

9            So with that in mind, if you could tell me

10   what you remember about the particular chimpanzee to

11   whom you served as an ancillary caregiver who was

12   used by Ms. Casey for breeding purposes to sell off

13   the babies.

14           MR. ESSEN:   Objection.   Foundation;

15   speculation; compound.

16           MR. MOONIER:   I'll join in that as well.

17       A    Again, I do not remember the name of the

18   female chimp that had the baby.   I don't remember

19   her name.   It's in my records.   She delivered a

20   healthy baby, developed an amniotic air embolus,

21   which is absolutely unpreventable, unforeseeable.

22   You can't do anything about it.   She had significant

23   issues after the delivery, and she had to be

24   euthanized.

25           Again, that's the only chimp that I am --

Veritext Legal Solutions
866 299-5127

1       A    She expired.
2            MR. ESSEN:  Is it possible that was Kimmy?
3            THE WITNESS:  It might be Kimmy.  I thought
4    it was Tammy but it might be Kimmy.
5       Q    (By Ms. Bernstein) Okay, so your records
6    would have the proper name and you can refresh your
7    recollection?
8       A    Yes.
9       Q    We're not holding you to -- it's not a
10   memory test.  So there was a chimpanzee for which
11   Dr. Pernikoff performed surgery, and during the
12   surgery this chimpanzee passed away?
13      A    Yes, ma'am.
14      Q    And that's the last time that you recall
15   having any communications with Dr. Pernikoff?
16      A    Correct.
17      Q    With respect to this chimpanzee who passed
18   away at your clinic, did you perform any acts on her
19   that required a license to practice veterinary
20   medicine in Missouri?
21      A    Did I?
22      Q    Yes.
23      A    No.  Dr. Pernikoff was the veterinarian in
24   charge of the case.
25      Q    You did nothing that required a license to

                          Veritext Legal Solutions
                             866 299-5127

1   practice veterinary medicine in Missouri?

2          MR. ESSEN:  Object to foundation.  Legal

3   conclusion.

4          MR. MOONIER:  I'm going to join that

5   objection.

6          MS. BERNSTEIN:  Let me restate it.

7     Q   (By Ms. Bernstein) With respect to this

8   chimpanzee who passed away during exploratory

9   surgery in your office, did you perform any act that

10  would require a license to practice veterinary

11  medicine in Missouri?

12         MR. ESSEN:  Objection.  Foundation.

13         MR. MOONIER:  I --

14         MR. ESSEN:  And speculation; legal

15  conclusion.

16         MR. MOONIER:  I join those objections.

17    A   I did not.  Dr. Pernikoff was the one

18  performing everything.  They just utilized my

19  facility.

20    Q   (By Ms. Bernstein) And this chimpanzee was

21  in no way your client?

22         MR. ESSEN:  Again, objection.  Foundation;

23  speculation; legal conclusion.  Subject to that, go

24  ahead.

25         MR. MOONIER:  I'll join.

Veritext Legal Solutions
866 299-5127

```
 1        A    No.
 2        Q    (By Ms. Bernstein) Oh, I'm sorry, your
 3   patient?
 4        A    No.
 5             MR. ESSEN:  Same.
 6        Q    (By Ms. Bernstein) So this chimpanzee was
 7   not your patient?  You did nothing other than
 8   provide your facility --
 9        A    Correct.
10        Q    -- for a different veterinarian to perform
11   whatever it is that he performed?
12        A    Correct.
13        Q    Did you create any record, any veterinary
14   record of this particular chimpanzee as to what
15   happened to her or any tests or anything at all?
16        A    I believe I wrote in my record that it
17   occurred, but I did not write in the record of
18   anything that was performed.
19        Q    If you would take a look, please, at what we
20   have marked as Jones Exhibit 1.
21             (Deposition Exhibit Number
22              1 marked for identification.)
23             MS. BERNSTEIN:  Jones Exhibit 1 for the
24   record bears Casey 00967.
25             MR. MOONIER:  We don't have extra copies of
```

Veritext Legal Solutions
866 299-5127

```
 1        MR. ESSEN:  Objection.  Foundation;
 2   speculation.  Calls for a legal conclusion.  Subject
 3   to that, go ahead.
 4        MR. MOONIER:  I'll object as well.  Same
 5   basis.
 6     A   Because I was present and I saw the
 7   condition that Kimmy was in.  I did not provide
 8   care.  My facility provided care.
 9     Q   (By Ms. Bernstein) Right.  You were merely
10   an eyewitness to what happened?
11     A   Correct.
12     Q   And you wrote this letter as an eyewitness
13   as to what you observed?
14     A   Correct.
15     Q   You observed here that Kimmy was having
16   breathing difficulty and becoming worse?
17     A   Correct.
18     Q   So when she came to the clinic, she was
19   already having breathing difficulty?
20     A   Yes, ma'am.
21     Q   For how long had she been having these
22   breathing difficulties?
23     A   I have no idea.
24     Q   Are you aware that Kimmy was treated for a
25   cough in August of this past year?
```

Veritext Legal Solutions
866 299-5127

1     A    At the time of the procedure.

2     Q    Just from looking at the chimpanzee, just

3 from being an eyewitness, that's what you concluded?

4     A    From seeing her abdomen open.

5     Q    I'm sorry?

6     A    From seeing her abdomen open, yes, ma'am.

7     Q    You say, Kimmy's condition was very grave

8 and her prognosis was none.

9          Who reached the conclusion that her

10 prognosis was none?

11     A    Both myself and Dr. Pernikoff after the

12 procedure was done, after she had expired.

13     Q    Well, she died before the procedure was

14 done; right?

15     A    Yes.

16     Q    So obviously there is no prognosis for that

17 chimpanzee?

18     A    There is based on what we saw.

19     Q    Why was an exploratory performed on the

20 abdomen given that her primary symptoms when she

21 came in were breathing difficulty?

22     A    You would have to ask Dr. Pernikoff that.

23     Q    You have no idea why he did that?

24     A    You would have to ask him.

25     Q    Did you agree with the decision based on the

Veritext Legal Solutions
866 299-5127

1  fact that you were an eyewitness?

2      A   I didn't agree or disagree.  I relied on his

3  knowledge.

4      Q   Oh, so you have no opinion?

5      A   As to the care of the animal, no.  Again,

6  they utilized my facility.

7      Q   Sure.  Something that -- you never bothered

8  to mention that in Jones Exhibit 1?

9          MR. ESSEN:  I just object as argumentative.

10          MR. MOONIER:  Argumentative; asked and

11  answered.

12      A   I said we were a consulting clinic that was

13  closer in proximity to Connie Casey's residence.

14  That's why they utilized my facility.

15      Q   (By Ms. Bernstein) Right.  Do you agree,

16  Doctor, that if liver disease is detected early

17  enough, it can often be treated and managed?

18          MR. ESSEN:  Objection.  Foundation;

19  speculation.  Also, it's not going to meet the

20  evidentiary standard.  Subject to that, go ahead.

21          MR. MOONIER:  I would join in those

22  objections.

23      A   I don't even know how to answer that

24  question because you're asking me to hypothetically

25  tell you what liver diseases are treatable and what

Veritext Legal Solutions
866 299-5127

1   mischaracterizes the prior testimony.

2         MR. MOONIER:  That is true.  I join in those

3   objections.

4      A   So you're asking me to speculate on

5   something that I have no knowledge of?

6      Q   (By Ms. Bernstein) The question is when you

7   wrote the sentence, She appeared in good health

8   right up to the end, were you necessarily

9   speculating because you haven't attempted to rule

10  out that she suffered from various ailments?

11        MR. ESSEN:  Objection.  Asked and answered;

12  argumentative.  It's not admissible in its current

13  format, and it mischaracterizes the prior testimony

14  about what he did.

15        MR. MOONIER:  Same -- I'll join in those

16  objections.

17     A   Did I try to diagnose her prior to her

18  admission?  No.  Did I treat her in any capacity

19  prior to her admission?  No.  Did I have any

20  knowledge of her condition prior to admission?  No.

21  So I can't speculate as to how she was.  I can only

22  say what I saw when she was brought in on that day.

23     Q   (By Ms. Bernstein) Right.  And when you saw

24  her on that day, she was severely ill; isn't that

25  right?

Veritext Legal Solutions
866 299-5127

1    Q   If Ms. Casey had brought in Kimmy sooner,
2    her condition could have been treatable and
3    successfully managed; is that possible?
4         MR. ESSEN:  Objection.  Foundation;
5    speculation.  Calls for -- I mean it's an incomplete
6    hypothetical, and it's not going to be admissible in
7    its form.
8         MR. MOONIER:  I'll join in those objections.
9    A   I do not know.
10   Q   (By Ms. Bernstein) One way or the other, you
11   have no opinion?
12   A   Yeah, I don't know.  I mean, I have no way
13   of knowing.
14   Q   Well, isn't part of your job as a
15   veterinarian to counsel a client when you know that
16   the client may not have the sophistication to
17   realize when an animal should be brought in to your
18   clinic?  Isn't that part of your role?
19   A   It is a part of the role, but it's also up
20   to the client.
21   Q   Sure.  But if Ms. Casey for some reason
22   didn't realize how urgent the situation was with
23   Kimmy, wouldn't it be appropriate for you to counsel
24   her to next time perhaps seek intervention sooner?
25   A   In my role as an ancillary caregiver, it

Veritext Legal Solutions
866 299-5127

1  wasn't my position to counsel her because

2  Dr. Pernikoff was her primary physician.

3      Q   So you relied on others to fulfill that role

4  with respect to Kimmy?

5      A   With respect to Kimmy, yes.

6      Q   Based on your experience with previous

7  primates who died at your clinic or shortly after

8  being brought to your clinic, is it your general

9  impression that Ms. Casey waited too long to bring

10 in those animals for treatment that they could not

11 be saved?

12         MR. MOONIER:  I would object.  That calls

13 for a narrative.  There's no specifics with this.

14 It assumes facts not in evidence.  We haven't even

15 talked about any other additional chimpanzees or

16 other primates.  It's asking him to speculate.

17 Calls for a legal conclusion.

18         MR. ESSEN:  I join all of those.  It's also,

19 again, in its current form not going to be

20 admissible.

21      Q   (By Ms. Bernstein) Of those 20 -- or 12 to

22 20 primates for whom you served as an ancillary

23 caregiver that were not brought to you just for a

24 health certificate to be shipped out, how many of

25 those were you able to treat successfully?

Veritext Legal Solutions
866 299-5127

1     A    Again, the number that I treated were under
2   the direction of Dr. Pernikoff.
3     Q    How many of those survived for more than a
4   few days until after they were presented for
5   ancillary caregiving to you?
6     A    I don't have an idea of what that number
7   would be.
8     Q    Can you think of a single one who survived
9   more than a few days after being brought to you or
10  who when you visited the site in order to provide
11  ancillary caregiving?
12    A    I don't have those statistics.  I don't know
13  them.  I don't know who survived.  I'm sorry?
14    Q    None come to mind that survived?
15         MR. MOONIER:  I would object.  That
16  misstates his testimony and it calls for him to
17  speculate.
18    A    That's not what I'm saying.  I'm saying I
19  don't know who died and who lived.
20    Q    (By Ms. Bernstein) You don't?
21    A    Not off the top of my head, no.
22    Q    When is the last time you reviewed the file?
23    A    Probably about two months ago.
24    Q    What did you do to prepare yourself to
25  testify on behalf of Jones Animal Clinic today?

1  right?

2       A   Correct.

3       Q   And when you made that decision, did you

4  take into account that she was breeding and selling

5  off babies of the chimpanzees who she bred?

6           MR. ESSEN:  Objection.  Foundation;

7  speculation.  Assumes facts not in evidence.  It's

8  also vague as to the timeframe.

9           MR. MOONIER:  And it's been asked and

10  answered, and it's irrelevant and not likely to lead

11  to any kind of evidence in this case.  And I join

12  Mr. Essen's objections.

13      Q   (By Ms. Bernstein) Did you ever issue health

14  certificates for the offspring of primates that

15  Ms. Casey bred at her facility?

16      A   Yes, ma'am.

17      Q   And you did so actually dozens of times;

18  isn't that right?

19      A   Correct.

20      Q   So you knew that Casey not only bred

21  chimpanzees but that she ships them off to others?

22      A   Correct.

23      Q   You're aware of that?

24      A   Correct.

25      Q   How old were these chimpanzees or other

Veritext Legal Solutions
866 299-5127

1      Q   (By Ms. Bernstein) So as far as you know,
2  you're not aware of any reports that have raised
3  concerns about separating primate babies from their
4  mothers prematurely?
5      A   No.
6      Q   That's news to you?
7          MR. ESSEN:  Same objection.  It's also vague
8  as to what harm means.
9          MR. MOONIER:  And reports.  I'll join in
10 those objections.
11     Q   (By Ms. Bernstein) Is it news to you that it
12 can be harmful to a baby primate to be separated
13 from his or her mother too early?
14         MR. ESSEN:  Objection.  Asked and answered.
15 It's vague as to what harmful means.  It also lacks
16 foundation; calls for speculation.
17         MR. MOONIER:  I'll join in those objections.
18     A   No.
19     Q   (By Ms. Bernstein) It's not news to you?
20     A   No, I'm not aware of it.
21     Q   Oh, you're not aware of it?
22     A   I'm not aware of the report.
23     Q   You've never heard, for example, in
24 veterinary school that one of the ways that a
25 chimpanzee might be harmed in a lab is if they are

Veritext Legal Solutions
866 299-5127

1 separated too early from their mothers?  That was
2 never discussed in veterinary school?
3     A    I am not a lab animal specialist, ma'am.  I
4 can't comment on that.
5     Q    Right.  I believe, if I remember correctly,
6 you said that the only education, training and
7 experience you had was what you learned in
8 veterinary school, and my question is was that point
9 brought up in veterinary school that a chimpanzee
10 might be harmed if he or she is separated from his
11 mother too soon?
12     A    No.
13     Q    With respect to the chimpanzee named Connor,
14 did you ever perform any acts requiring a license to
15 practice veterinary medicine in Missouri?
16     A    Other than health certificates, not to my
17 knowledge.
18             (Deposition Exhibit Number
19             3 marked for identification.)
20     Q    Can you check -- can you take a look at
21 Exhibit 3, please.
22         MS. BERNSTEIN:  For the record Exhibit 3 is
23 a document Bates numbered Casey 00969 to 970.  It's
24 a two-page document.  The first page is an invoice
25 for the patient Connor.

Veritext Legal Solutions
866 299-5127

1          MR. ESSEN:  Objection.  Foundation;

2     speculation.  Assumes facts not in evidence and is

3     not admissible.

4          MR. MOONIER:  I would add on that it's

5     irrelevant as well, and I join those objections.

6          MS. BERNSTEIN:  Probably not irrelevant to

7     Candy.

8          MR. MOONIER:  We don't know what -- you have

9     not established that she's been diagnosed with

10    anything.  You said is it possible, is it possible,

11    is it possible.  We don't know any of these things.

12         MR. ESSEN:  The issue --

13         MR. MOONIER:  It's completely irrelevant.

14         MR. ESSEN:  The issue is whether it's

15    relevant in a court of law.  You are a lawyer first.

16    Q    (By Ms. Bernstein) If liver disease is

17    untreated, if liver disease is undiagnosed and

18    untreated, could it prove fatal to Candy?

19         MR. ESSEN:  Objection.  Foundation;

20    speculation.  Assumes facts not in evidence.  It's

21    completely inadmissible.  It's argumentative.

22         MR. MOONIER:  Is there anything in the

23    records that suggests this?  Because that's what

24    he's here for.  If you're asking him his opinions as

25    an expert, he's not here as an expert.  He's not

Veritext Legal Solutions
866 299-5127

1  here for that.

2         If I cut my foot and get an infection, could

3  I die from it?  Maybe.  But what does that have to

4  do with the records that we're asking about right

5  now?  Where is it in this record that suggests this?

6         MS. BERNSTEIN:  Are you instructing him not

7  to answer?

8         MR. MOONIER:  No, but at some point we need

9  to move past these speculative questions.  We're not

10  getting anywhere with respect to the information

11  that's in the records.  That's what he's here for.

12         MR. ESSEN:  Which would be consistent with

13  the scope of the designation, but you know,

14  whatever.

15     A    Is it possible for the liver -- it's

16  possible.

17     Q    (By Ms. Bernstein) Yes.  Based on these

18  results, did you advise Ms. Casey to do further

19  testing or to get a differential diagnosis to find

20  out precisely why Candy's urine test is the way it

21  is?

22     A    I did not.

23     Q    Can you tell me why you did not make that

24  recommendation?

25     A    I didn't do it.

Veritext Legal Solutions
866 299-5127

1          MR. MOONIER:  I'd object.  That assumes
 2    facts not in evidence and lack of foundation.
 3          MR. ESSEN:  Join.
 4      A    Again, I don't know how to answer the
 5    question because you're kind of implying that obese
 6    animals have urinary problems, and that's not
 7    necessarily the case.  So the obesity may not even
 8    play a part in any of the urinalysis results, so I
 9    don't know how to answer the question.
10      Q    (By Ms. Bernstein) Diabetes would sometimes
11    one of the -- sometimes an animal or a chimpanzee
12    who's overweight, that might lead to diabetes?
13          MR. ESSEN:  Objection.  Foundation;
14    speculation.  Assumes facts not in evidence.  It's
15    not admissible.
16          MR. MOONIER:  And you're asking for expert
17    opinions here too.  I mean the record that you have
18    in front of you has nothing to do with a weight
19    exam, a height exam, analysis of that.  You're
20    asking for expert opinions here and he's not giving
21    those.
22          MS. BERNSTEIN:  All right.  Can we have a
23    stipulation that Dr. Jones is not qualified to give
24    an expert opinion on the health and welfare of
25    chimpanzees?

                                        Page 128

1  that Ms. Casey neglected her duties as an owner to

2  obtain care for Toni in a more timely manner?

3          MR. ESSEN:  Same objection.  I mean, again,

4  you're asking him to opine on the standard of care

5  for an animal owner, and I'm not even sure there is

6  such a thing.  This is just completely ridiculous.

7  If he were my witness, I would instruct him not to

8  answer.

9          MR. MOONIER:  He's not answering this kind

10  of question.  It would be totally different if we're

11  talking about expert witnesses and things like that,

12  but we're not.  He's not here to answer those kinds

13  of questions.  We're not going down that road.

14          MS. BERNSTEIN:  Are you instructing him not

15  to answer?

16          MR. MOONIER:  He will not answer that

17  question in the form it is presented.

18          MS. BERNSTEIN:  Are you instructing him not

19  to answer?

20          MR. MOONIER:  Your particular question, yes.

21      Q    (By Ms. Bernstein) Are you going to follow

22  your counsel's advice and you will not answer the

23  question that I asked?

24      A    I have to.

25      Q    At the time you euthanized Toni, what was

Veritext Legal Solutions
866 299-5127

1  and answer the question that you previously could

2  not answer because you didn't have the records.

3          I asked you whether you can identify any

4  primates that survived more than a few days after

5  you saw them, in other words, they were either dead

6  or ready to be euthanized, whether any primates you

7  ever saw of Ms. Casey who survived --

8          MR. ESSEN:  I just object as vague --

9      Q   (By Ms. Bernstein) -- for more than a few

10  days?

11          MR. MOONIER:  I object on speculation as

12  well.

13      A   The ones that I did health certificates on

14  certainly survived.

15      Q   (By Ms. Bernstein) How do you know?

16      A   Well, then I don't know any of it then.

17      Q   Well, with respect to -- setting aside now

18  the ones that were ready to be shipped out and you

19  gave them a health certificate, any other primates

20  for which you were the ancillary caregiver that

21  survived for more than a few days after you were

22  called to provide such care?

23      A   To my knowledge, no.

24          (Deposition Exhibit Number

25          7 marked for identification.)

Veritext Legal Solutions
866 299-5127

1    to utilize my pharmacy if at all possible.

2        Q    Well --

3        A    I did not see the animal.

4        Q    But how is it that you could determine that

5    her illness began in February 2016 as opposed to

6    some previous time?

7            MR. ESSEN:  Objection.  Foundation;

8    speculation; vague.

9            MR. MOONIER:  He asked and answered that

10   too.  It's based upon Dr. Pernikoff's knowledge and

11   what he learned from Connie.  We established that.

12       A    That's my answer.

13       Q    (By Ms. Bernstein) So you're saying

14   Dr. Pernikoff told you Toni's illness began in

15   February 2016?  Is that your sworn testimony?

16       A    Yes.

17       Q    Okay.  And then you say, well, she became

18   ill with pneumonia.  How do you know that in

19   February 2016 she became ill with pneumonia as

20   opposed to some other illness?

21       A    Again, Dr. Pernikoff's and Connie Casey's,

22   what they told me.

23       Q    So in this letter you're just writing what

24   the client told you or another veterinarian told

25   you?  You have no knowledge whether that's true or

1  false; is that right?

2      A   Correct.

3      Q   You then say, She was treated with multiple

4  antibiotics:  Amoxicillin, Enrofloxacin, and

5  Rocephin.  Do you see that?

6      A   Yes.

7      Q   I may have mangled the words, but they're

8  written here for somebody who knows how to pronounce

9  them better.

10         Who was the person who treated her with

11  amoxicillin?

12     A   Most likely me.

13     Q   But you have no records of that?

14     A   I would have to look back at my invoices.

15     Q   Please have a look.

16     A   Okay.  I did not dispense the amoxicillin.

17  I did dispense the Enrofloxacin.

18     Q   So who treated her with amoxicillin?

19     A   I would assume Dr. Pernikoff.

20     Q   You're just assuming?  How do you know?

21     A   I have no idea.  I don't know.

22     Q   So you wrote something that she was treated

23  with amoxicillin even though you have no idea if

24  that is true?

25         MR. ESSEN:  Objection.  Foundation;

Veritext Legal Solutions
866 299-5127

1   speculation.  It's also argumentative, and it's not
2   really reflective of a practice of a veterinarian or
3   any other healthcare provider.  Subject to that, go
4   ahead.
5          MR. MOONIER:  I'll join in that objection.
6      A   I'm going on the basis of what they told me.
7      Q   (By Ms. Bernstein) You didn't write down
8   what they told you, did you?
9      A   No.
10     Q   So it could have been Casey who told you?
11     A   It could have been.
12     Q   It could be that she misremembered?
13         MR. ESSEN:  Objection.  Foundation;
14  speculation.
15         MR. MOONIER:  I'll join.
16         MR. ESSEN:  Manned space flight is possible.
17  It's not relevant.
18     Q   (By Ms. Bernstein) So this is pure
19  speculation on your part as to whether or not she
20  was treated with amoxicillin?
21         MR. ESSEN:  Objection.  Foundation;
22  speculation.  It's not pure speculation.  You know,
23  a veterinarian is like any healthcare provider,
24  necessarily going to rely on information that's
25  provided to him by other professionals he's working

                                        Page 155

```
 1      A   Correct.  I have the results.
 2      Q   Right.  The result being that she could --
 3   indicating that she could suffer from any number of
 4   diseases, including diabetes, Cushing's disease,
 5   Addison's disease, kidney failure or liver disease;
 6   is that correct?
 7          MR. ESSEN:  Objection.  Foundation;
 8   speculation.  It's an improper opinion and
 9   inadmissible.
10          MR. MOONIER:  Join.
11      A   Is that possible?  It's possible.
12      Q   (By Ms. Bernstein) Right.  You don't have a
13   treatment -- you don't have an intended treatment
14   plan for Candy; is that right?
15          MR. MOONIER:  I would object to the extent
16   that it seeks for a legal conclusion under the
17   federal law here.  I would object.
18      A   And I don't have a treatment plan because I
19   didn't do it.
20      Q   (By Ms. Bernstein) Right.  You don't have a
21   prognosis because you didn't do that either?
22      A   Not me.  I don't know how to answer the
23   question.
24      Q   Well, you don't have a prognosis in your
25   records for the chimpanzee Toni, but it didn't keep
```

Veritext Legal Solutions
866 299-5127

```
 1       Q    If Angel had not been bred, do you think she
 2   might be alive today?
 3            MR. ESSEN:  Objection.  Foundation;
 4   speculation.  It's a totally inadmissible opinion.
 5       A    I don't even know if Angel ever had babies.
 6       Q    (By Ms. Bernstein) Did you take any records
 7   at all with respect to the procedure that was
 8   performed at your clinic?
 9       A    I did not.
10       Q    Did you play any role at all that -- or did
11   you perform any acts that would require a license of
12   a veterinarian with respect to Angel?
13       A    No.
14            (Deposition Exhibit Numbers
15             11 and 12 marked for identification.)
16       Q    If you would have a look, please, at Exhibit
17   11 and 12 together.  Exhibit 11 bears the Bates
18   number Jones Animal Clinic 8.  Exhibit 12 bears the
19   Bates number Jones Animal Clinic 42.
20       A    Okay.
21       Q    The reason I ask you to look at both is
22   because one is an invoice for a patient whose name
23   is not identified for an ultrasound dated April 30
24   of 2013.
25       A    It's for a chimp named Kelly.
```

Veritext Legal Solutions
866 299-5127

```
1        Q    And that Exhibit 12 is an ultrasonography
2   report dated April 30, 2013, and it identified the
3   patient as Kelly.  Does that lead you to conclude
4   that Exhibit 11, the invoice, was also related to
5   Kelly?
6        A    Yes.
7        Q    For the ultrasound that is reflected in
8   Exhibit 12?
9        A    Yes.
10       Q    Who ordered this ultrasound?
11       A    Dr. Pernikoff.
12       Q    Do you have any records -- do you have any
13  veterinary records relating to Kelly?
14       A    I have the ultrasound report in here.  I
15  don't think I do.
16       Q    You don't?  Do you know why you might not
17  have --
18       A    The procedure was done at my clinic and that
19  was it.
20       Q    I'm sorry?
21       A    The procedure was done at my clinic and that
22  was it.
23       Q    You played no role at all?
24       A    I'm sorry?
25       Q    You played no role at all in treating or
```

Page 180

1    diagnosing Kelly?

2         A    Not to my knowledge.

3         Q    Exhibit 12, which is the ultrasonography

4    report, on the page under Impressions, it states,

5    Cystic structure associated with uterus may be of

6    left ovary or uterine origin, rule out ovarian cyst

7    or cystic nodule within the uterus.

8              Do you see that?

9         A    Yes.

10        Q    So that was an abnormality that was found on

11   the ultrasonogram?

12        A    According to the report.

13        Q    Right.

14        A    I didn't do it.

15        Q    You ordered the report per Dr. Pernikoff?

16        A    They utilized our facility because it was

17   closer, and Dr. Brochtrup is the one that performed

18   the procedure.

19        Q    Right.  He's a veterinarian at the Jones

20   Animal Health Clinic?

21        A    No.

22        Q    How did he come to perform the procedure at

23   your facility?

24        A    She's a veterinary board certified

25   radiologist, and she performs ultrasounds for us at

Veritext Legal Solutions
866 299-5127

1    the facility.

2        Q    And she made a finding that there was an

3    impression of a cystic structure associated with

4    uterus?

5        A    That's what it said.

6        Q    She's the one -- okay.  Was this finding

7    acted upon?

8        A    I do not know.

9        Q    One way or the other?

10       A    No.

11            (Deposition Exhibit Number

12             13 marked for identification.)

13       Q    Well, if you take a look, please, at Exhibit

14   13, a letter dated May 20, 2013, Bates number Casey

15   00347.

16            MR. MOONIER:  Hold on a second.  We have to

17   pass these around whenever you reference them.

18            MS. BERNSTEIN:  Got it.  Just let me know

19   when you're ready.  Are we good to go?

20            THE WITNESS:  Let me --

21            MR. MOONIER:  All of us read it but

22   Dr. Jones.  One second.

23       A    Okay.

24       Q    (By Ms. Bernstein) So in this letter you

25   wrote, On May 17, 2013, I examined a 15-year-old

1    chimpanzee named Kelly for Connie Casey.  Is that

2    true?

3         A    I examined her deceased.

4         Q    Is that called a necropsy?

5         A    Yes.

6         Q    So you only examined her after she was dead?

7         A    Correct.

8         Q    Is there a way of telling that in this

9    letter?  So by the time you were called for some

10   ancillary caregiving, Kelly was already dead?

11        A    Correct.

12        Q    You say the animal had a previous history of

13   anorexia and weight loss.  How did you determine

14   that that was the animal's previous history?

15        A    Based on what Connie told me.

16        Q    Really?  The only reason I'm somewhat

17   surprised is at her deposition she denied that there

18   was a previous history of anorexia.

19        A    It's in the letter.  I have to go with the

20   letter.

21        Q    Right, but how do you know that the

22   information came from Connie Casey?

23        A    Because I can't perform my job without the

24   knowledge and the word of my clients.

25        Q    How do you know that she has the wherewithal

```
 1      Q    Are you familiar with the term preventive
 2   veterinary care?
 3      A    Yes.
 4      Q    What does that refer to?
 5      A    To try and immunize and prevent health
 6   hazards in the future.  Immunizations is one of the
 7   primary ways of doing that.
 8      Q    And as far as you know, you've never seen
 9   any indication that Ms. Casey provided any kind of
10   preventive veterinary care; is that right?
11      A    Other than buying dewormer from me, to my
12   knowledge, no.
13      Q    She bought dewormer from you?
14      A    Yes.
15      Q    For which chimpanzee?
16      A    For the whole house.
17      Q    For what?
18      A    The whole house, to deworm everybody.
19      Q    The whole house?  What does that mean?
20      A    All the chimps.
21      Q    What dewormer did she buy from you?
22      A    It's called Pyrantel Pamoate.
23      Q    Can you spell that?
24      A    P-Y-R-A-N-T-E-L  P-A-M-O-A-T-E.
25      Q    And when did she buy that from you?
```

Veritext Legal Solutions
866 299-5127

1  not even -- you're asking for opinions now of

2  certain types of medical care.

3      A   Would I say -- I don't know.  I mean, you're

4  asking for something that I don't have the answer

5  for.  I mean is that two areas?  Yeah.

6          MR. ESSEN:  Because we're like launching

7  into a new topic here, can we please take a break?

8          MS. BERNSTEIN:  Let me just follow up with

9  this question, and then we can take a break.

10         MR. ESSEN:  Spectacular.

11     Q   (By Ms. Bernstein) With respect to the

12  records that you have produced and setting aside

13  those instances where you were just asked to provide

14  a health certificate for transportation purposes,

15  setting aside the health certificate, is it fair to

16  say that all your records reflect either emergency

17  care or necrosis -- I mean not necrosis -- basically

18  the animal was either presented in a state of

19  emergency or was already dead?

20     A   The majority of the entries, taking health

21  certificates outside, take that out of there, then

22  that would be fair to assume that that's the

23  majority of what we did.

24     Q   Is there any entries in your record --

25         MR. ESSEN:  Can I please use the restroom?

Veritext Legal Solutions
866 299-5127

1      Q   By the time you were asked to provide any
2  ancillary care for Sheena, it was too late to do
3  anything but humanely euthanize her?
4      A   I do not recall.  I'm trying to find
5  evidence of what I did, but I do not recall that.
6  It was ten years ago.
7      Q   You have no notes in your records at all --
8      A   I'm looking for them.
9      Q   -- relating to Sheena?
10     A   I'm looking for them.
11     Q   Thank you.
12     A   If I have records, I don't know where
13 they're at.
14     Q   Does that mean you did not prepare such a
15 record?
16         MR. MOONIER:  I would object.  That
17 mischaracterizes his testimony.
18     A   I euthanized her.  That's all I know.
19     Q   (By Ms. Bernstein) Right, because you have
20 no records reflecting what kind of examination you
21 performed or her condition?
22     A   Correct.
23     Q   And you don't know for how long she had been
24 sick before she needed to be euthanized?
25     A   I don't remember her.

Veritext Legal Solutions
866 299-5127

1  patient, the animal, can't provide you that sort of
2  history; right?
3       MS. BERNSTEIN:  Objection.  Overbroad with
4  respect to any animal and lack of foundation.
5       A    Correct.
6       Q    (By Mr. Essen) And it's a reasonable
7  practice for a veterinarian to rely on, at least to
8  a certain extent, the history that is provided by
9  the client, the owner of the animal; correct?
10      MS. BERNSTEIN:  Objection.  When you say
11  reasonable practice, are you now asking him to
12  testify as to the appropriate standards for
13  treatment, or is he now all of a sudden qualified to
14  testify about what is a reasonable practice in
15  treating and testing animals?
16      MR. MOONIER:  He's not been called as an
17  expert witness, or he has not been retained as a
18  nonretained expert witness.
19      MS. BERNSTEIN:  Okay.  But he is qualified
20  to testify as to what a reasonable practice is with
21  regard of treating and testing animals?
22      MR. ESSEN:  I asked him a question.  Is that
23  an objection?  Is that an objection?
24      MS. BERNSTEIN:  Do you have a good faith
25  basis to ask the question as to what a reasonable

Veritext Legal Solutions
866 299-5127

```
 1        MR. ESSEN:  I believe so.

 2        THE WITNESS:  This one may not have --

 3        MS. BERNSTEIN:  Those were included in the

 4   records?

 5        MR. MOONIER:  I'm checking.  We're checking.

 6   Q    (By Mr. Essen) Let me ask you this.  Is that

 7   urinalysis, is it negative?

 8   A    You could probably maybe interpret it as

 9   dilute and maybe, maybe not a little bit of

10   infection.

11   Q    Okay.  Is there necessarily anything that

12   would have needed to be done as a result of that?

13   A    Not necessarily.  Maybe just look at the

14   specific gravity again.

15        MR. MOONIER:  Martina, it was produced.  It

16   is an Idexx laboratory two-page document printed

17   November 17, 2018, at 11:50 a.m.

18        MS. BERNSTEIN:  Wonderful.  Is the patient

19   name on the --

20        MR. MOONIER:  No.  It's patient name Candy.

21   The first page says patient name Candy.  The second

22   page is patient name unknown.

23        MS. BERNSTEIN:  But the second page is also

24   Candy?  How does Dr. Jones know that this refers to

25   a test by Candy --
```

```
 1          MR. MOONIER:  Hold on.

 2          MS. BERNSTEIN:  -- about Candy?

 3          MR. MOONIER:  You'll get a chance to ask

 4   questions.  I guess if Victor wants to ask that

 5   question, he can, or Mr. Essen.

 6          MS. BERNSTEIN:  Well, then I object to

 7   asking him about this.  Lack of foundation as to who

 8   this refers to with respect to the page that says

 9   unknown.

10     Q    (By Mr. Essen) Let me ask you this.  Does

11   this all relate to Candy?

12     A    As I understand it, yes.

13     Q    So it's all the same date, all the same

14   time, right, or close to the same time; right?

15     A    Yes.

16     Q    So again, you don't know what was done in

17   follow-up to this; right?

18     A    No.

19     Q    And you don't have an opinion about what was

20   done in follow-up to this; right?

21     A    I can't have an opinion.

22     Q    Fair enough.  So obviously you couldn't

23   conclude from this that Candy has any kind of

24   condition that is caused by something about her

25   environment at Connie Casey's place; right?
```

Veritext Legal Solutions
866 299-5127

```
 1     A    I wouldn't have an opinion on that.

 2          MS. BERNSTEIN:  Objection.  Lack of

 3   foundation.

 4     Q   (By Mr. Essen) Let me ask you this.  Looking

 5   at Defendant's Exhibit A again, do you believe any

 6   other veterinarian could rely upon this alone to

 7   come up with a conclusion about whether or not any

 8   condition at Connie Casey's facility was causing any

 9   problem to Candy?

10     A    No.

11          MR. MOONIER:  Object on speculation.

12     A    No.

13          MS. BERNSTEIN:  I join that.

14     Q   (By Mr. Essen) Then let's mark that as B.

15          MR. MOONIER:  It's the -- I don't know if

16   you marked this one or not, Martina.  I guess not.

17          MR. ESSEN:  It's in her folder.

18          MR. MOONIER:  It's in your folder.  It's not

19   marked.  It's the -- I'll let Mr. Essen, I guess,

20   identify the document for you.

21          MR. ESSEN:  This is an Idexx Laboratories

22   page that purports to be from Connor on November 30,

23   2018.  It's a urinalysis.

24              (Defendant's Deposition Exhibit Letter

25               B marked for identification.)
```

Page 316

1    what occurred is really kind of beyond what would be
2    possible; correct?
3        A    Correct.
4            MS. BERNSTEIN:   Objection to your
5    characterization of Dr. Jones' conclusions.
6        Q    (By Mr. Essen) At some point we talked about
7    a chimp named Angel; is that right?  Do you recall
8    that?  If you don't, I don't think it's in your
9    records.
10       A    I remember the name but I don't remember the
11   circumstances.
12       Q    Let me ask you this.  If you want to look
13   through your records more carefully, that's fine,
14   but the way I understood it you weren't really
15   involved with Angel's treatment and then did not
16   perform a necropsy report or anything like that with
17   respect to Angel; is that right?
18       A    With respect to Angel, like I said, I
19   remember the name earlier, but I do not remember the
20   circumstances.
21       Q    So you really just can't comment about
22   Angel's care one way or another; is that right?
23       A    Not at this time.
24       Q    All right.  Let me then I guess direct your
25   attention to the August 28, 2012, correspondence