IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION - ST. LOUIS
BEFORE THE HONORABLE CATHERINE D. PERRY
DISTRICT JUDGE


MISSOURI PRIMATE FOUNDATION, et al.,    )
              Plaintiffs/Counterclaim )
              Defendants,             )
vs.                                    )    Case No.
                                       )    4:16-CV-02163-CDP
PEOPLE FOR THE ETHICAL TREATMENT OF    )
ANIMALS, INC., et al.,                 )
                                       )
              Defendants/Counterclaim )
              Plaintiffs.             )

===============================================================

- MOTION FOR CONTEMPT HEARING -

JANUARY 5TH, 2022

===============================================================


APPEARANCES

For Plaintiffs/Counterclaim          For Defendants/Counterclaim
Defendants:                          Plaintiffs:

Tonia R. Haddix                      Jared S. Goodman, Esq.
PRO SE                               PETA FOUNDATION
1234 State Road CC                   2154 W. Sunset Blvd.
Festus, MO 63028                     Los Angeles, CA 90026

ALSO PRESENT:                        James P. Martin, Esq.
Frederick J. Snow, PhD               POLSINELLI, PC
Curtis R. Mills                      100 S. Fourth, Suite 1000
                                     St. Louis, MO 63102


Stenographically Reported by:
LINDA NICHOLS, RDR, CRR
Official Court Reporter
United States District Court
111 South 10th Street, Third Floor
St. Louis, MO 63102

- INDEX -

MOTION FOR CONTEMPT HEARING
JANUARY 5TH, 2022

PROCEEDINGS VIA ZOOM VIDEOCONFERENCE                    p.   2

COUNTERCLAIM PLAINTIFFS EVIDENCE:

        TONIA R. HADDIX

                Direct Examination by Mr. Goodman    p.   5

        FREDERICK J. SNOW, PHD

                Direct Examination by Mr. Goodman    p.  68
                Cross Examination by Ms. Haddix      p.  82

        CURTIS R. MILLS

                Direct Examination by Mr. Goodman    p.  89
                Cross Examination by Ms. Haddix      p. 106

COUNTERCLAIM PLAINTIFFS CLOSING ARGUMENT               p. 110

COUNTERCLAIM DEFENDANTS CLOSING ARGUMENT               p. 117

COUNTERCLAIM PLAINTIFFS FURTHER ARGUMENT               p. 123

COURT'S RULING                                         p. 125

RECESS                                                 p. 130

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 3 of 132 PageID #: 6081
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

2

1          - MOTION FOR CONTEMPT HEARING -

2                JANUARY 5TH, 2022

3    ZOOM VIDEOCONFERENCE PROCEEDINGS

4    COMMENCE AT 9:32 A.M.:

5          THE COURT:  Good morning.  This is Judge Perry.  I'm

6    here in the case of -- well, it's got a long caption but

7    basically this hearing is brought by Counterclaim Plaintiff

8    PETA, P-E-T-A, against Tonia Haddix and it's a Contempt Hearing.

9    The case number is 4:16-CV-2163.

10         We are here for a hearing on contempt and we are doing

11   this by Zoom this morning.  It was scheduled as an in-person

12   hearing and yesterday Ms. Haddix informed us that she had been

13   exposed to COVID and was experiencing some mild cold symptoms

14   and was awaiting results of a COVID test, and I determined that

15   it was not safe, under the situation going on now with the

16   pandemic, to have her come to the building and the parties have

17   agreed that doing this by video is appropriate.

18         There was some discussion about a hybrid hearing but

19   Ms. Haddix chose -- did not want to do it that way.  I, frankly,

20   think these things are better either all in-person or all by

21   video but we can do it, you know, however, so I think this is a

22   good resolution because, given the current status of the Omicron

23   variant and the number of people in the hospital here in the

24   metro area, I just think that, you know, requiring Ms. Haddix to

25   be here is not safe for her or for any of us.  So we are doing

4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

3

1   this by video and we are ready to proceed.

2          I will start by asking the lawyers here to announce

3   themselves for the record.

4          MR. GOODMAN:  Good morning, Your Honor.  It's Jared

5   Goodman on behalf of Counterclaim Plaintiffs.

6          MR. MARTIN:  Your Honor, Jim Martin, also on behalf of

7   Counterclaim Plaintiffs.

8          THE COURT:  And then, Ms. Haddix, would you announce

9   your full name, please?

10          MS. HADDIX:  It's Tonia Renee Haddix.

11          THE COURT:  All right.  And you are representing

12   yourself here in this proceeding, correct?

13          MS. HADDIX:  Yes, ma'am.

14          THE COURT:  Okay.  So, Mr. Goodman, as I set out in the

15   order, you're the one who brought the Motion for Contempt.  And

16   I know the briefs you all filed spent a lot of time arguing

17   about a lot of technical things in terms of, you know, what was

18   sufficient in terms of the notice, but to me the significant --

19   well, so what do you wish to present here today?  And do you

20   want to make any opening statement or are you just ready to

21   proceed with your first witness?

22          MR. GOODMAN:  Thank you, Your Honor.

23          We would like to just proceed with our first witness

24   and leave just maybe ten minutes for summation at the end of

25   evidence presentation.

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 5 of 132 PageID #: 6083
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

4

1       THE COURT:  All right.  That's fine.  And I didn't

2   mention this but you do have two witnesses who I can see on the

3   Zoom screen.  As I understand it, it's Mr. Curtis Mills and

4   Mr. Frederick Snow.  They can introduce themselves.

5       Also, as I was just logging on and heard you all

6   discussing it, another witness is Connie Braun Casey who, at

7   PETA's request, I had ordered to be here because although she's

8   no longer -- I mean the case is closed -- but she is a party to

9   the case and I believe, Mr. Goodman, you wish to call her as a

10  witness, is that correct?

11      MR. GOODMAN:  That's correct.  I also spoke with her

12  former attorney, Victor Essen, yesterday, who confirmed that he

13  called her and spoke with her to give her a heads-up that it's

14  been changed to Zoom and to check her email for a link.

15      THE COURT:  Okay.  And I know my office did send her

16  the link, but since you have other experts here, we can proceed.

17  And then, if necessary, you know, we can take some time to try

18  to contact her when it's time.  But we can go ahead with what we

19  have now because she may log in later.

20      So go ahead, Mr. Goodman.

21      MR. GOODMAN:  You know, we'd actually like to call

22  Ms. Haddix as an adverse witness for the limited purpose of

23  really telling us her side of the story and exactly what

24  happened here.

25      THE COURT:  All right.  Ms. Haddix, the clerk will

1  administer an oath to you here and even though we're on Zoom,

2  this is the same as if we were all here live.

3        MS. HADDIX:  Okay.

4        THE COURT:  So I'll ask the Clerk to swear Ms. Haddix

5  as a witness.

6        DEPUTY CLERK:  Ms. Haddix, please raise your right

7  hand.

8                    (Witness sworn.)

9        DEPUTY CLERK:  Thank you.

10        - COUNTERCLAIM PLAINTIFFS EVIDENCE -

11                  **TONIA R. HADDIX**

12        having been first duly sworn, proceeds to testify via

13  Zoom videoconferencing, as follows:

14                  **DIRECT EXAMINATION**

15  **QUESTIONS BY MR. GOODMAN:**

16  Q.  Good morning, Ms. Haddix.

17  A.  Good morning.

18  Q.  I'm going to begin by asking you some questions about the

19  Consent Decree the parties agreed to in this case.  It was

20  entered into -- it was entered by the Court back on October 2nd,

21  2020.

22        The Consent Decree required you to construct a new

23  outdoor enclosure and night house for the three chimpanzees who

24  would remain in your custody if you complied with the agreement,

25  is that right?

1   A.   That's correct.

2   Q.   And those chimpanzees were Tonka, Mikayla and Crystal?

3   A.   Yes.

4   Q.   And it was your decision to select those three chimpanzees?

5   A.   Yes.

6   Q.   Of the seven chimpanzees, you said you wanted to keep Tonka

7   in your custody because he is, quote, "a people-person chimp."

8   You wanted him to be, quote, "Loved by his own people," and

9   because he has, quote, "Very bonded to myself because we spend

10  hours hanging out."  Does that sound right?

11  A.   Yes, that's correct.

12  Q.   Pursuant to the Consent Decree, you were also required to

13  provide Plaintiffs with monthly updates on, and photographs of

14  the status of construction of your new facility, right?

15  A.   Correct.

16  Q.   On October -- excuse me -- on December 18th, when Plaintiffs

17  had not received the required update, I informed you of your

18  default.

19          On December 22nd, you responded that you will, quote,

20  "Get pics today."  Later that day you sent an email with two

21  images showing a portion of excavated land, and the subject

22  line, "Completely done groundwork and all septic and sewer and

23  water and electric," is that correct?

24  A.   I probably didn't send them.  I probably -- actually,

25  I probably was out of town.  I know I was out of town so

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 8 of 132 PageID #: 6086
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

7

1    somebody else sent them but, yes, they were sent to you, yes.

2    Q.    They were sent at your direction?

3    A.    Sent to my direction?

4    Q.    They were sent, by someone else, at your direction?

5    A.    Yes.

6    Q.    So later that day -- so those photos weren't actually taken

7    that day, were they.

8    A.    No, they were not.

9    Q.    The groundwork that you reported being completely done

10   wasn't actually completed, was it.

11   A.    Yes, it was.

12   Q.    The full excavation of the property was completed?

13   A.    For what needed to be done for the facility, yes.  To have

14   it completely done altogether, no; but to where the facility

15   itself was going and the enclosure, the outdoor enclosure,

16   absolutely.

17   Q.    And the grading was also completed, then?

18   A.    For the enclosure and for the outbuilding.  Not for the

19   house and not for the other stuff but that was going to be added

20   at, you know, another point.

21          The whole thing I was trying to focus on was trying to

22   get the groundwork done just for that facility because of the

23   limited timeframe that I had to complete the task.

24   Q.    Do you recall when that work was completed?

25   A.    To be honest with you, no, I don't, but it was like, I'm

1   gonna say the end of November or the 1st of December.

2   Q.   And what you reported as termed "the water work" on the

3   property, the water work wasn't actually completed, was it.

4   A.   What happened was the water is actually there at the

5   property so, basically, the only thing that needed to be done

6   was the line dug to the actual facility.

7           But we weren't gonna do that until you actually pour

8   the concrete, and the reason why is because I was doing the

9   heated floors, where you have to put all the lines and stuff in

10  the concrete to have heated floors.  And, so basically, until

11  you set exactly where that concrete was going to go and that

12  type stuff, they didn't pipe it to there.  But it was actually

13  put to the property, yes.

14  Q.   It wasn't completed.

15  A.   No, not to the building, no, because there was not a

16  concrete pour.

17  Q.   Sewer work or septic work on that property wasn't completed,

18  either, was it.

19  A.   To the -- again, to the property, yes.

20  Q.   Explain what you mean by "to the property".

21  A.   Where the property begins, the septic and stuff is there.

22  It's ready to be tapped into.  So all you would have to do is

23  run lateral lines to that, which takes half a day to do it.  You

24  just dig a trench and you lay the pipe.  It's plastic PVC piping

25  if you choose to do PVC.

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 10 of 132 PageID #: 6088
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

9

1  Q.   So there are lines.  Were they from the city or county?

2  A.   The County -- well, I don't know if it was city or county

3  but it's there at the end of the property.

4       Just like my property, I have well-water now but I have

5  city water right down at the end of my property at the beginning

6  of the entrance of my gate, so I could tap into there.  All

7  I would have to do is run the lines to their thing, to here, and

8  I could have city water if I choose to but, of course, I have

9  two wells on this property so why would I.

10 Q.   Okay.  So the water work and what you've described as the

11 sewer and septic work, nothing was done on the property itself.

12 You're representing that there were just utility lines that ran

13 up to the border of your property.

14 A.   Right.  That's correct.

15 Q.   And so no electrical work?  I'm sorry.  I don't recall if we

16 went over this.  Electrical work wasn't completed there, either,

17 right?  Just, again, up to the property?

18 A.   No, there was no electrical.

19 Q.   And by the time you sent those photographs in December, you

20 actually weren't even planning to build on that property at all

21 by that time, right?

22 A.   To be honest with you, timeframe-wise I'm not a

23 hundred percent sure, but it was getting close to the point to

24 where I had decided not to but I don't know if that was at that

25 point or if it was just a little bit later on, like a couple

10

1   weeks later.  I'm not a hundred percent certain on that.  That's
2   been too long ago, so I don't recall.
3   Q.   So we've established --
4        THE COURT:  Excuse me a moment, counsel.
5        I realize when I started this hearing I didn't do the
6   normal warning that I always do, that we're supposed to do
7   regarding the fact that we're doing this as a videoconference
8   and to remind you all -- and there was a reminder when you
9   logged in that shows up -- but to remind you all that recording
10  or broadcasting of this proceeding is strictly forbidden, and
11  you may not record it or broadcast it in any way, nor may anyone
12  else who is listening to this.  And so there could be sanctions
13  imposed if you were to violate that.
14       I apologize for interrupting you all.  That's something
15  we usually say at the beginning of every video hearing and
16  I forgot but the clerk has it up on the screen.  I know when you
17  logged in, you had to have seen it.
18       So go ahead, Mr. Goodman.
19       MR. GOODMAN:  Thank you, Your Honor.
20  Q.   (By Mr. Goodman)  Do you recall earlier in this case that
21  Plaintiffs had submitted a declaration from a man named Donnie
22  Ray Hovis, who is the owner of this property that we're
23  discussing?
24  A.   Uh, yes.
25  Q.   And you were planning to purchase the property from him

1    pursuant to a contract that was entered into on or about

2    October 8th, 2020?

3    A.   Yes.

4    Q.   And by December 11th you were notified that unless the

5    remainder of the property was paid for, that the contract would

6    be voided at the end of the year, right?

7    A.   Right.  And at that point I had decided I wasn't building

8    there, so I didn't care.

9    Q.   So by December 11th you had decided that you weren't

10   building there.

11   A.   Right.  Correct.

12   Q.   And this email that you sent on the property indicating that

13   all of the work had been completed that we just went through,

14   just to be clear, that was sent on December 22nd, 2020; 11 days

15   after you received that notice from Mr. Hovis and after which

16   you just testified you were no longer building there.

17   A.   Correct.

18   Q.   Your third status update was then due on January 16th, 2020.

19   Does that sound about right?

20   A.   Yes.

21   Q.   Despite me notifying you that Plaintiffs were in receipt of

22   information that calls into question the veracity of your prior

23   updates, your update was that, "There is nothing new to report,"

24   is that right?

25   A.   That's correct.

1   Q.   And when I followed up to request additional information and

2   the required photographs, you responded, quote, "I am telling

3   you nothing is new, so nothing to report.  I'm only going to

4   repeat this one last time.  I am only to report and give updates

5   and I've done that.  You are not the police, just a member of a

6   terrorist group that I happen to be in agreement with, and I'm

7   obligated to report to you monthly and I've done that."  Is that

8   correct?

9   A.   If you say so, yes.  I don't have the email in front of me.

10  Q.   Would you like me to show you the email or --

11  A.   No.  I said if you say that.  I'm not disputing that.  I'm

12  just saying, if you say that, yeah, I mean that very well could

13  be what I said.

14  Q.   Okay.  Yeah.  If at any point I ask you a question about

15  something you might have said in the past, or quote anything you

16  might have said, we have the documentation for that.  If you'd

17  like the see the email, please feel free to let me know that you

18  don't recall having said something in particular and I'm happy

19  to show you that document.

20  A.   Well, you know, as well as I do, time goes by so you may not

21  remember exactly what you said but you have some kind of

22  proximity.  And that sounds like something I said to you after

23  you had threatened me a couple times with filing motions and

24  stuff and, yes, I got mad and, yes, I probably said that to you.

25  I have no doubt.  So I'm not denying it.

1    Q.   Okay.  I just wanted to make that clear.

2         So just a few days later -- we said that was late

3    January, so just a few days later, on February 1st, 2021, you

4    posted to Facebook that, quote, "The world just lost one of the

5    best chimps of all times.  Very sad day."  Is that right?

6    A.   That's correct.

7    Q.   Do you recall that I contacted you that day to send

8    Plaintiffs' regards and to inquire as to whether it was one of

9    the seven chimpanzees at issue who died?

10   A.   Yes, uh-huh.

11   Q.   Do you recall that you did not respond that day or the

12   following day?

13   A.   I may not have seen the email for a day or two because if

14   I'm traveling, I don't always see that.  And, as you know,

15   I broker exotic animals and I transport them all over the United

16   States.  So at some given points and times, if you're driving

17   12, 15 hours a day, you're not going to be looking at your

18   emails.  So it may not have been that day but if I -- as soon as

19   I seen it I responded to you, I'm sure.

20   Q.   Well, on February 3rd, before you responded to me, you

21   posted about my email to you on your Facebook page, didn't you?

22   A.   I may have.  Again, I don't know.

23   Q.   So I will tell you, you wrote in relevant part, "I just have

24   to laugh at the gall of some people.  If you are all going to

25   play this game as you are, then read our Consent Decree quite

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 15 of 132 PageID #: 6093
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

14

1  carefully.  You all wrote it, so you know what my obligations

2  are and don't expect anything more out of me.  And if you do,

3  you all can go to hell."

4       Does that sound right?

5  A.  Probably, yeah.

6  Q.  So after I followed up, further explaining that it would be

7  material to our agreement any of the seven chimpanzees died, do

8  you recall responding to my email?

9  A.  I'm sure I did.

10  Q.  And you informed me that none of the four chimpanzees,

11  Connor, Candy, Terry or Tammy, died, right?

12  A.  Correct.

13  Q.  But you refused to confirm whether one of Tonka, Crystal or

14  Mikayla died?

15  A.  Right.

16  Q.  You wrote, quote, "As far as you feeling like I owe you any

17  further information, I'm not sure I'm reading the same decree

18  that you are," correct?

19  A.  Sure.

20  Q.  Who is Penny Healzer?

21  A.  Penny is a volunteer that volunteered out at Connie's.

22  Q.  What's your relationship with her?

23  A.  What's whose relationship?

24  Q.  What is your relationship with Ms. Healzer?

25  A.  Well, she volunteered out at Connie's so you became friends

4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

15

1   with her.

2   Q.   And she expressed concern in response to your post that

3   referred to Tonka, didn't she?

4   A.   I'm sure she did.

5   Q.   In fact, none of the seven chimpanzees at issue in this case

6   had died at that time, right?

7   A.   Correct.

8   Q.   So when you posted, on February 1st, that, "The world just

9   lost one of the best chimpanzees of all time," what chimpanzee

10  were you referring to?

11  A.   His name was Ricky.

12  Q.   Ricky?

13  A.   Uh-huh.

14  Q.   And where was Ricky?

15  A.   Ricky belonged to a friend of mine in Missouri.

16  Q.   How long have you known --

17  A.   Huh?

18  Q.   How long did you know Ricky?

19  A.   Probably ten years.

20  Q.   And in a June 1st order, the Court required that you

21  transfer all seven of the chimpanzees at issue in this case to

22  the Center For Great Apes as soon as the sanctuary is able to

23  accept them, right?

24  A.   Correct.

25  Q.   You did several interviews virtually immediately after that

1    order, didn't you?

2    A.   If they contacted me, yes.

3    Q.   In a video interview with Fox News you said, referring to

4    the Plaintiffs, "They're not getting the chimps.  They're not

5    getting them," right?

6    A.   Fox News?  Was that a video interview or did they come out

7    to the facility?

8    Q.   That was -- sorry.  By "video interview" I meant it was

9    recorded on video.

10   A.   Oh.

11   Q.   I believe this was the interview that Mr. Chris Hayes

12   conducted with you at your facility.

13   A.   That's correct.  But did you also quote what I exactly said?

14   Q.   Quote, "They're not getting the chimps.  They're not getting

15   them."

16   A.   That's not my whole statement.  Of course they edited stuff.

17   Q.   You also told the journalist, quote, "Now I've decided I'm

18   keeping all of them just for the principle of the matter because

19   they don't deserve the chimps," right?

20   A.   Yes, but that's not all what I said.  What I said was,

21   "I will do everything legally possible."

22   Q.   I think you've answered the question.

23                    (*Briefly off the record*

24                    *due to technical difficulties*.)

25   Q.   You also told the journalist that the Plaintiffs are, quote,

17

1   "Going to have to bring sheriffs and they're going to have to

2   bring everything they can to effectuate the transfer," right?

3   A.   That's whenever I stated, "Everything legally."  But like

4   I said, for their effects and to get more people to watch it,

5   they stripped out part of the statement that I made about that

6   I would go as high as the Supreme Court, is what I said.

7        So in the broad spectrum of the statement I basically

8   was saying that I'm gonna fight until there is no fight left

9   legally to try to keep those chimps.  And, yes, I did say that.

10  Q.   So you said you're keeping the chimps.

11  A.   Yes.

12  Q.   And you also interviewed with the St. Louis Post Dispatch,

13  right?

14  A.   Yes.

15  Q.   And that reporting indicates that you told the journalist

16  that you had no plans to comply with the Court's order.  No?

17  A.   To comply with the Court's order.  What court order?

18  Q.   This interview occurred very promptly after the Court's

19  June 1st order requiring you to transfer all seven of the

20  chimpanzees to the Center For Great Apes.

21  A.   There, again -- I will say this again.  There was more to

22  that conversation, which was, "I will fight legally.  I will go

23  to the Supreme Court."  So, in other words, the same thing

24  I tried at the end of the day, which was that I was going to

25  keep fighting and fighting and fighting, and going to whatever

1   court it took.  And, yes, I would try to go ahead and get

2   another judge to overturn the decision, to go ahead and be able

3   to keep the chimps.  So, yes, that's exactly what I said and,

4   yes, I meant it.  And, yes, at the end I went to the Supreme

5   Court, didn't I.

6   Q.   When you were asked what would happen if someone showed up

7   to enforce the Court's contempt order, you replied, quote,

8   "I guarantee you right now they don't want to encounter me

9   because it will not end nicely," right?

10  A.   No, that's not what was said, either.  What was said was,

11  "If PETA comes on that property or if PETA shows up, it will not

12  end nicely."  In other words, if I encountered you, there would

13  be some issues.  Yes, I did say that.

14          But not the court order or not the Marshals or nothing

15  like that.  But, yes, you, yes.  I guarantee I will not ever

16  want to meet you out on the street.

17  Q.   On June 1st, just after the Court issued its order, you

18  began to tell media outlets, some of the same outlets that we

19  just discussed, that Tonka died the prior weekend, right?

20  A.   If -- I don't know if I did but if it happened -- if

21  I happened to have spoken to a reporter, it may have been said,

22  yes.  Especially if it was Chris Hayes from Channel 2 News, yes,

23  because Chris used to try to keep up with, you know, the chimps

24  because he came out.  He got to do a personal interview.  He got

25  to meet the chimps and stuff, so he took a personal interest to

1    the chimps, just like I have.

2           And so if he called me to ask if there was any court

3    hearings or if maybe he seen something filed or something like

4    that, yes, I very well could have told him.

5    Q.   So you spoke with, at a minimum, one journalist and told him

6    that Tonka died the weekend prior, right?

7    A.   Yes, if that was Chris Hayes.

8    Q.   You hadn't announced that information before the Court's

9    Order on June 1st, had you?

10   A.   To who?

11   Q.   Anyone.  You hadn't announced it publicly.  You didn't post

12   it to your Facebook page, correct?

13   A.   No, I didn't.

14   Q.   As you had when other animals you cared for had died?

15   A.   No, when Carter passed away, I didn't.  My friend did,

16   because they didn't want me to be inundated with a bunch of

17   people that are well-wishers because they love Carter throughout

18   the country.  The whole situation with Tonka was the same thing.

19   Connie was devastated, I was devastated, and we just didn't want

20   all the people to be contacting us.

21          And as you noticed, I still haven't posted it, period,

22   end of story, because of the situation with the PETA situation

23   and because of fact that Connie couldn't -- Connie was at a

24   vulnerable point and so was I.  She -- you have no idea what

25   that stuff does to her.  You have no clue.  And not only that;

4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

20

1   for myself, too, because that was a big hit.  Especially after

2   you know how much I cared for him and how much I took care of

3   him to try to get him better and he didn't get better.

4                    (*Witness crying.*)

5          MR. GOODMAN:  Ms. Haddix, do you want to take a second?

6          THE WITNESS:  No.

7   Q.   (By Mr. Goodman)  You said that a friend posted about

8   Carter's death on Facebook?

9   A.   Yeah, Vicki Harvey, and it was in his page.  And then later,

10  like two days later, I think, I posted something about, "I can't

11  believe that I'm sitting here and that, you know, we lost him."

12  But yeah.

13  Q.   Okay.  So Vickie Carter you said "posted it to his page".

14  What do you mean by that?

15  A.   Carter had his own page and she's the one who posted it and

16  asked them to please don't contact me because it was just too

17  hard.

18  Q.   I'm going to --

19  A.   So that taught me a valuable lesson about what you post and

20  what you don't if you can't deal with dealing with people.  And

21  I know they mean well.  They all want to know what happened and

22  they all want to wish you good luck or just be there to support

23  you, but every time you have to rehash it, it just is horrible.

24  So who wants to?

25  Q.   I'm going to show you a document right now.  Are you seeing

1  this on your screen?

2  A.   Yeah.

3  Q.   What does this --

4       THE COURT:  Is this going to be an exhibit?

5       MR. GOODMAN:  Not necessarily.

6       THE COURT:  So why are you showing it to her, then?

7  What is it?

8       THE WITNESS:  Yeah, that was, that was --

9       THE COURT:  Hold on.  Hold on, Ms. Haddix.  I need to

10 get an answer from Mr. Goodman.

11      If it's an exhibit, give us an exhibit number and tell

12 us.  And if it's something else, we need to have a record of

13 whatever it is you're flashing up on the screen.  And we don't

14 usually just do that unless there's a reason.  Is this something

15 to refresh recollection or something else?

16      MR. GOODMAN:  This is impeachment.  For impeachment.

17      THE COURT:  Well, you have to mark it as an exhibit,

18 then.  Give me a number.  Call it something.  Mark it as an

19 exhibit and then provide it to the Court after this hearing.

20      MR. GOODMAN:  Yes.  Absolutely.

21      THE COURT:  Because we need to have a record of what is

22 being shown to the witness on the screen.  We don't just flash

23 up documents and say, Look at this piece of paper, and then have

24 no record, ever, of what it was.

25      So what is the exhibit number?

1    MR. GOODMAN:  Yes, of course, Your Honor.  We'll list

2    this as Exhibit Number 1.

3        THE COURT:  All right.  Go ahead.

4    Q.  (By Mr. Goodman)  Ms. Haddix, can you tell me what this

5    document is?

6    A.  Yes, that's the post that I just told you that I posted

7    about Carter's death.

8    Q.  Didn't you just say you didn't post about Carter's death?

9    A.  I said two days later.  Read the date, dumb-ass.

10   January 13th --

11       THE COURT:  Ms. Haddix, Ms. Haddix, we don't speak that

12   way in court.  You are in court.  Don't use profanity.

13       THE WITNESS:  Okay.

14       THE COURT:  Now go ahead and answer the question.

15       THE WITNESS:  Sorry, Your Honor.

16   A.  Basically, if you read the date -- if you only knew when

17   Carter died -- if you're going to do your research, do your

18   research thoroughly.  Carter died January 11th.  This is

19   January 13th.  Did I not just state a few sentences ago that I,

20   two days later, posted something?

21   Q.  (By Mr. Goodman)  Okay.  So two days later you posted this

22   post about Carter, and in this you go through a good bit of

23   detail about what exactly happened with Carter; who was involved

24   with caring for him in terms of friends and veterinarians, and

25   really a detailed account of what occurred, right?

1   A.   That's correct.

2   Q.   You didn't post anything remotely like this about Tonka on

3   May 30th, 2020.

4   A.   No.  Did you not hear what I had said prior to this

5   conversation?  I said that was a lesson learned for me because

6   people kept constantly, constantly texting, calling,

7   Facebooking.  I know they were meaning well.  They were.  But

8   every time you had to repeat the story to them you relive it,

9   and I could not go through that.  I loved Carter --

10          THE COURT:  Ms. Haddix, Ms. Haddix, let me just

11   interrupt you there.  I think this will go a lot better if

12   you'll just answer the questions he asks.

13          I'll just tell you I understand.  I know you said that

14   earlier and then he asked it again.  Lawyers do that because

15   they're summarizing.  They want to make sure that after they've

16   asked you these impeachment questions that your answer is still

17   the same.  They have lots of reason they are doing it.

18          THE WITNESS:  Okay.

19          THE COURT:  If you'll just answer yes or no or answer

20   the question and not, you know, relate back and start telling us

21   exactly what you already told us.  You don't have to do that.

22          THE WITNESS:  Okay.

23          THE COURT:  Just, it'll go faster and it might be

24   easier on you emotionally because it's clear you are emotional

25   about this and we do understand that, okay?

```
1              THE WITNESS:  Okay.  Thank you.
2              THE COURT:  So, Mr. Goodman, go forward.  You got an
3    answer to your question.
4              MR. GOODMAN:  Thank you.
5              THE COURT:  Ask a new one.
6    Q.   (By Mr. Goodman)  On June 2nd I contacted you to inquire
7    about what was done with Tonka's remains, right?
8    A.   Correct.
9    Q.   You didn't respond to that question in replies to me on
10   June 2nd, right?
11   A.   I don't know.  Yeah, okay.  If you say I didn't, I didn't.
12   Q.   On June 3rd I again inquired as to what was done with
13   Tonka's remains, does that sound right?
14   A.   That's correct.
15             THE WITNESS:  You froze.
16             THE COURT:  Yep.
17             THE WITNESS:  There you go.  You're froze.
18             THE COURT:  And, Mr. Martin, you're muted and
19   Mr. Goodman is not -- he's frozen.  Now everybody's frozen.
20             THE WITNESS:  Not me.
21             THE COURT:  Not you.  I can see Mr. Martin moving but
22   Mr. Goodman is still frozen.
23             THE WITNESS:  I'm sorry, Judge, for being ...
24             THE COURT:  It's okay.  Go ahead.  We'll get through
25   this.  Come on.
```

1              (*Briefly off the record*

2              *due to technical difficulties.*)

3          MR. GOODMAN:  I'm very sorry about that.  Are you able

4    to hear me now?

5          THE COURT:  Okay, yeah, we can hear you now, and see

6    you -- well, now we can't.

7          You're breaking up.  When you said that we didn't get

8    full audio.  I don't know where your speaker is since you

9    changed cameras but we need to hear what you're saying.

10         MR. GOODMAN:  I appear to have lost internet access on

11   my laptop, for whatever reason.  But can you hear me

12   sufficiently now, Judge?

13         THE COURT:  Yes.

14         MR. GOODMAN:  Great.

15   Q.  (By Mr. Goodman)  So on June 3rd, again I inquired as to

16   what was done with Tonka's remains, right?

17   A.  Yes.

18   Q.  And you didn't respond to that question when you replied to

19   that inquiry the next day, right?

20   A.  No.  I mean -- no, if you say I didn't, I didn't.

21   Q.  Or in your response when I inquired again on June 4th, does

22   that sound right?

23   A.  If you say -- I guess, yeah.

24   Q.  Only after I asked a fourth time what was done with Tonka's

25   remains on June 9th, a week later, did you respond, "Tonka's

1    ashes are with me," right?

2    A.    Yes.

3    Q.    And then I requested an invoice or some sort of

4    documentation of his cremation?

5    A.    Sure.

6    Q.    And you refused to provide that, didn't you?

7    A.    I didn't have -- I didn't have one.  You asked for one,

8    I didn't have one, so I didn't submit it to you.

9    Q.    You didn't have any sort of documentation of his cremation.

10   A.    No.

11   Q.    Only after the Court ordered that you provide evidence of

12   his death did you have your husband send an email saying that he

13   burned Tonka's body, right?

14   A.    That's correct.

15   Q.    And that was six -- maybe about six weeks later?  Does that

16   seem about right to you?

17   A.    Sure.  If that was the court order, yes, sir.

18   Q.    Last week you filed a motion that was titled as a motion to

19   dismiss, right?

20   A.    Correct.

21   Q.    In that motion you wrote that during a conference call with

22   me and Mr. Martin on December 1st, quote, "Goodman explained

23   that the reason for their belief that Tonka is alive is based on

24   a hearsay rumor that I still had the deceased chimpanzee,"

25   right?

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 28 of 132 PageID #: 6106
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

27

1    A.    Correct.

2    Q.    You then stated, "There were many lengthy Facebook threads

3    that where people joked that I was hiding him in my purse, or

4    that he was in my sock drawer.  I regretfully joined in some of

5    the jokes, believing everyone understood it to be satire."

6    A.    Correct.

7    Q.    Did you mean that you joined in those jokes on the Facebook

8    thread?

9    A.    On the Facebook thread?  No.  Basically, any time I dealt

10   with any of my customers or anybody that would call us, or if

11   I went to someplace where there was exotic people, they would

12   all ask me.  That was the first question they had, was like,

13   Where is Waldo?  And I already explained that to you.  So

14   basically everybody made a joke about it.  It was a big running

15   joke at the exotic auctions that I would go to, or places of

16   that nature, that I run into exotic people.

17   Q.    Okay.  And that's where you would joke with them about it --

18   A.    Yes.

19   Q.    -- when they inquired about it?

20   A.    Yes.  They were joking with me, but yes.

21   Q.    Do you recall from the conference call with us specifically

22   what you were told about Plaintiff's evidence indicating that

23   Tonka is alive?

24   A.    No.

25   Q.    What was the basis for your assertion in your motion that it

1  was based on a hearsay rumor?

2  A.   Um, I don't -- honestly, I don't know what you're asking me,

3  I guess.

4  Q.   When you wrote in your motion that Plaintiffs believe that

5  Tonka was alive because of, quote, "A hearsay rumor," what were

6  you referring to?

7  A.   Oh, it was an article that you had responded to or you had

8  did an interview with on the Daily Beast back in August.

9  Q.   So your testimony is that your belief was that Plaintiffs

10  thought Tonka was alive because of the article in the Daily

11  Beast?

12  A.   Yes, because you said there was a whistleblower that had

13  called you, and basically you just had said that that's where

14  you got your premise that he was alive, was because of the

15  whistleblower back in August.  Like August 9th or something of

16  that nature.

17  Q.   So you acknowledged, on the conference call that you had

18  with me and Mr. Martin, that you've told people that Tonka is

19  alive, right?

20  A.   Yes.  You betcha.

21  Q.   You didn't tell us then that you were joining in jokes about

22  it, right?

23  A.   Yeah, I did.  Well -- yeah, I did.  Or if I didn't, then

24  I didn't.  But I thought I had because I asked you about the

25  Where's Waldo? thing, so I thought I had told you that, yes.

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 30 of 132 PageID #: 6108
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

29

1    Q.    You informed us that you told a lot of people that he's

2    alive, right?

3    A.    Correct.

4    Q.    And you said you did so because you were trying to figure

5    out who the mole was, didn't you?

6    A.    Yes, that's correct.

7    Q.    What mole were you referring to?

8    A.    The whistleblower that you supposedly had from August 9th,

9    that you had posted on the Daily Beast; the article with the

10   Daily Beast.

11   Q.    So it's now your testimony that you were both joining in

12   jokes with people and also trying to figure out who a mole was?

13   A.    Correct.

14   Q.    And you told a lot of people that Tonka was alive.

15   A.    Well, I told not a lot of people but the people that

16   I thought possibly could be the mole, yes.

17   Q.    Would you explain a little bit further as to how you were

18   attempting to identify a, quote, "mole" by informing several

19   people in your circles at these auctions that Tonka was living?

20   A.    Not necessarily were they at auctions.  It might have been

21   in a conversation with somebody that you had via the telephone,

22   or if you ate lunch with them or whatever.  You basically was

23   putting feelers out to that person.  And the person you thought

24   possibly, potentially could be the person, you kind of filled

25   their head full of stuff so that you could see if it rotated

1    back to PETA, and so that I would get a motion or I would get

2    something, you know, to state otherwise; you know, that you guys

3    were aware of stuff, because then that means they're the mole.

4    Q.   So you'd have discussion with someone about Tonka?

5    A.   Correct.

6    Q.   And you'd try to get a sense of --

7    A.   Yeah, especially some people that you know potentially have

8    that personality or that potential of being able to be a mole.

9    Somebody you don't trust; not 100 percent, anyway's.

10   Q.   Who is Aimee Chadwick Wahlers?

11   A.   Aimee Chadwick is a friend of mine.

12   Q.   You spoke about the chimpanzees occasionally with

13   Ms. Wahlers, right?

14   A.   I did because of the fact that, again, she was definitely

15   one of those because of a conversation she and I had back in

16   August that I already knew she was a mole.

17   Q.   What do you mean by that?

18   A.   Just what I said.  We had a conversation.  She allowed me to

19   know that her and Tim Stark had been coercing together, had been

20   talking together, and basically they were -- he was asking her

21   questions and they were feeding back and forth.  So I was not

22   stupid enough not to know that, for them -- we had that at a

23   Mexican restaurant, to be exact, over some Margaritas.  Which

24   I didn't drink the Margaritas; she did.  And so I already knew

25   at that point in time don't trust, so I started feeding a bunch

1    of crap.

2    Q.   What were you saying about Tim Stark?

3    A.   What about Tim Stark?  That she had -- he had contacted her

4    and he was discussing a whole bunch of stuff with her, and they

5    were talking about me in a conversation aside to each other.

6    Q.   And what was the issue with Ms. Wahlers talking with Tim

7    Stark, in your mind?

8    A.   Was there an issue?  I don't have an issue with her talking

9    to them.  It was she had just basically told me, you know, that

10   he was basically in love with me and -- well, obsessed with me

11   is the word you want to use -- and basically because I married

12   Jerry Aswegan, that he was just totally distraught that

13   I married him and he was on a rampage.

14   Q.   So when you said a moment ago --

15   A.   He was the one --

16   Q.   Go ahead.

17   A.   And he was the one that initially started talking smack

18   about he thought he knew where Tonka was, and that Tonka really

19   wasn't dead and that he -- even though, you know, I had told him

20   the truth because he was a friend of mine and I needed somebody

21   to talk to and I know he knows what it feels like to lose

22   something that you love so much, so we -- you know, he used to

23   call and check on me when Tonka died.  So, you know, he told me

24   he understood losing -- what it felt like losing something, and

25   we were friends, and so we had that conversation.

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 33 of 132 PageID #: 6111
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

32

1          Well, again, like I said, he got really possessive.

2    And she's not the first one to say that because Sandra Fairbanks

3    will tell you the same thing; that they've had conversations

4    that he's obsessed with me.  I've had a lot of people tell me

5    that.

6          But he's a loose cannon, as you very well know.  You

7    dealt with him.  So one minute he loves you, and one minute he

8    hates you because he's just angry that you won't, you know,

9    cater to him.  He even sent me text after text where, Oh, I've

10   lost my best friend.  I just want you to call.  I just want you

11   to call.  And I just didn't have time to call.  And so, you

12   know, he got upset because I didn't cater to him, so he started

13   a rumor.

14   Q.   So just circling back -- because that explanation was a bit

15   lengthy but thank you for going into it -- you are asserting now

16   that Tim Stark started a rumor that Tonka was alive?

17   A.   Yes, he sure did.

18   Q.   And it's your assessment that that's where any belief that

19   Tonka was alive started?

20   A.   Yeah.  I believe he's the one that contacted you.  That's my

21   belief.  And so, again, then he had the conversation with Aimee,

22   and then -- that was back in August, right before our birthdays,

23   because mine is August 7th.  Hers is August 11th.  So it was

24   somewhere in-between our two birthdays because we were supposed

25   to go see George Strait in Vegas.

33

1          So I basically started feeding her crap to see if she

2    was in with Tim Stark and if they were -- if he, in fact, was

3    the one person that talked to you.

4    Q.   Forgive me if I'm missing something here.  You've indicated

5    that you believe that Mr. Stark started the rumor, but now

6    you're saying that you fed information to Aimee Chadwick Wahlers

7    for what purpose?

8    A.   Again, because she had had contact with Tim and then she

9    said she wasn't gonna have contact with Tim any more and

10   supposedly she blocked him, so I fed her stuff to see if she

11   really was talking to him and if -- because if you read -- what

12   I understand by the Daily Beast, by that account of what you

13   said, was that the whistleblower was in contact with somebody

14   that was close to the facility.  So I assumed close to me

15   because I'm the only one that was there, so I basically assumed

16   it was Aimee, so I started feeding Aimee a bunch of crap because

17   I assumed Tim was the one that actually was talking to you,

18   because I assumed you guys were trying to make a little bargain

19   with him because you guys are notorious for that.

20   Q.   So, Ms. Haddix, you've been in touch with Ms. Wahlers since

21   then, haven't you?

22   A.   A lot of times, yes.

23   Q.   Since August?  And what is, what's the context of those

24   communications, then?

25   A.   Well, it depends on, it depends on what day, and what the

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 35 of 132 PageID #: 6113
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

34

1  situation is because there are sometimes that we'll go days

2  without talking.  Sometimes we talk every day.  Sometimes we'll

3  go a week, two weeks without talking.

4       It just depends because she has a lot going on in her

5  lire, and I have a lot going on in my life, so it depends on

6  what given point in time in the day or given point in time in

7  the situation, or whatever the need was, as to what the

8  conversation was about.

9  Q.  Uh-huh.  Did you continue to, as you say, provide her with

10  false information after August?

11  A.  Yes.

12  Q.  For what purpose?

13  A.  Again, to see who the mole was.  To see if it was her.

14  Q.  I thought you said you already knew who it was.

15  A.  I drew my own conclusion but that doesn't mean it's a

16  hundred percent.  I needed facts, 100 percent facts; not just my

17  observation.

18  Q.  You were in touch with her as recently as November of the

19  past year?

20  A.  I'm sure, yes.

21  Q.  By text message?

22  A.  Text, telephone calls, yes.

23  Q.  You told Ms. Wahlers in November of 2021 that Tonka was

24  alive, right?

25  A.  No.

1    Q.   No, you didn't assert to her that Tonka was alive at that

2    time?

3    A.   November?  I don't think -- I mean I played that game for

4    the whole time.  This whole time.  So if she asked me a question

5    or if there was something brought up, then, yeah, I'm sure

6    she -- yes, I'm sure.

7    Q.   You mean she asked you a question or something --

8    A.   But I don't know if I specifically said that.

9    Q.   Please, Ms. Haddix, we can't talk over each other because

10   the court reporter is trying to transcribe this.

11        You said if she asked you a question or brought

12   something up, you would have told her that Tonka was alive.

13   What do you mean by that?

14   A.   That's correct.  Well, like if she had said -- I don't know.

15   If she had -- I don't know.  Just if she would say something.

16   I don't think she ever did, so I don't think that conversation

17   ever occurred.  But I'm saying I led her to believe that, if she

18   would bring up something.

19        MR. GOODMAN:  Okay.  Please bear with us for just one

20   moment as we bring up another exhibit.

21        THE WITNESS:  Sure.

22        MR. GOODMAN:  Which of course we will provide to the

23   Court immediately after, Your Honor.

24        I'll mark this as Exhibit 2.

25        THE COURT:  Okay.  Exhibit 2 is an email to Mr. Martin?

1  Is that the exhibit?

2         MR. GOODMAN:  No.  I'm sorry.  He is working to pull up

3  the document now on the screen.  Thank you for your patience.

4  Q.  (By Mr. Goodman)  Are you able to see a document on the

5  screen now that says "Tonia"?  A text?

6  A.  Uh-huh.

7  Q.  Can you tell what this document is?

8  A.  It appears to be a text.

9  Q.  I'll scroll down for you.

10  A.  Or a copy of a text.

11  Q.  Okay.  This appears to be a communication where you were

12  asked, "Why can't you ever talk?"  You responded, "I was at

13  Lowe's," is that right?

14  A.  Uh-huh.

15  Q.  Then the first sentence says, "I've called you for a couple

16  days."  You said, "I was at CY and could not talk.  No signal."

17  And the person responses, "Okay."

18         Does this appear to be a text communication with Aimee

19  Chadwick Wahlers?

20  A.  Right, and I was at a store and I couldn't talk.  I mean

21  I had went to Lowe's and then I had went to this lighting store

22  and stuff and there was no signal, so I couldn't talk.

23  Q.  Okay.  And then --

24  A.  She had tried to call.

25  Q.  Uh-huh.  We see here your next message was that, "Tonka

1   needed groceries."

2   A.   Right.  Which is a capuchin of mine.  I got a new capuchin,

3   a rescue capuchin, and I named that capuchin Tonka.  So I was

4   getting Tonka groceries, yes, and the other capuchins, as well,

5   because I buy groceries for the capuchins weekly, for Connie

6   Casey to feed the capuchins, yes.

7   Q.   When did you get this other capuchin?

8   A.   I got that other capuchin in January.  Like January -- no,

9   that's not true.  Okay.  I'm trying to think.  Tonka died in

10  May, so I got that capuchin -- so it would be July.  July 5th.

11  Q.   July 5th?

12  A.   Huh?

13  Q.   July 5th, you said?

14  A.   Yes.

15  Q.   Of this year?

16  A.   Yes.

17  Q.   You said you were buying groceries?

18       THE COURT:  This year, this year is 2022.

19  A.   Well, 2021.  Yeah, 2021.

20       THE COURT:  Okay.  Thank you.

21  A.   It was the June after Tonka had passed away in May -- July.

22  Sorry.  I got him in July.  Sorry.

23  Q.   (By Mr. Goodman)  And you said that you were buying

24  groceries for more than one capuchin?

25  A.   Yes, I always do.

38

1   Q.   But here you said, "Tonka needed groceries," right?

2   A.   Right.  No, I -- yeah, I said Tonka needed groceries because

3   she -- because the capuchin that I had just got was a rescue.

4   And we used to talk about that capuchin a lot because that

5   capuchin had missing toes, and that capuchin was abused, and he

6   was a very, very aggressive capuchin whenever I got the

7   capuchin.  And the capuchin was just a topic of conversation,

8   something to care-give or something to talk.  You know, we just

9   talked about him a lot.  She has a capuchin herself.

10         MR. GOODMAN:  Let's stop the screen share.

11  Q.   (By Mr. Goodman)  So now let's turn back to the motion that

12  you submitted last week.  In that motion you state that Tonka,

13  quote, "Lived 40 exceedingly happy years," right?

14  A.   Correct.

15  Q.   Which Tonka are you referring to here?

16  A.   Huh?

17  Q.   Which Tonka are you referring to?

18  A.   The chimp Tonka.

19  Q.   What's your basis for asserting that Tonka was 40 years old?

20  A.   Because of what Ms. Casey has told me.

21  Q.   When did Ms. Casey tell you this?

22  A.   Ms. Casey's told me that all along since I came up there.

23  So for five years Ms. Casey's told me that.

24         MR. GOODMAN:  Sorry.  I've got another document that

25  I'd like to pull up.  You know what?  In the meantime let me

1   just get it in front of me and perhaps we can avoid presenting

2   it.

3   Q.   (By Mr. Goodman)  Ms. Haddix, do you remember filing an

4   Answer in this case?

5   A.   Uh, as to what, I guess?

6   Q.   As to --

7            THE COURT:  Are you referring to the pleading?  A

8   pleading in the case?  An Answer?

9            MR. GOODMAN:  That's right, Your Honor.

10           THE COURT:  Okay.  And so the Court can take judicial

11  notice of its files.  There is an Answer on file.

12           So what you're asking is does she remember it?

13           MR. GOODMAN:  Correct.

14           THE COURT:  So this is a specific thing.  It's the

15  response to their counterclaim against you, Ms. Haddix.  Do you

16  remember that specific pleading?

17  A.   No, ma'am, I don't.  Is it something that maybe the attorney

18  actually filed?  I'm not sure what date and time he's talking

19  about.  Does he mean about the whole case or just this specific

20  thing?

21           THE COURT:  Mr. Goodman?

22  Q.   (By Mr. Goodman)  I'll be happy to provide you a little bit

23  more information.  So it was filed back on May 12th, 2020, after

24  you were added as a party to the case.  And just some more

25  context for you.  The Answer is the document where you're

1  responding to every single paragraph allegation in the

2  Counterclaim against you.

3  A.  Oh, okay.  Okay.  I know what you're --

4  Q.  So you're able to --

5  A.  Yes, sir.  Yes, I do.

6  Q.  Okay.  In your Answer you state, quote, "Counterclaim

7  Defendant Tonia Haddix admits that a chimpanzee also known as

8  Tonka is --"

9         THE COURT:  Mr. Goodman?

10        MR. GOODMAN:  Uh-huh.

11        THE COURT:  When you read, you can't read at the speed

12  of light.  The court reporter is still taking it down and she

13  doesn't have the text in front of her, so please -- and don't

14  start over but just slow down from where you are.

15        MR. GOODMAN:  Apologies.

16  Q.  "-- admits that a chimpanzee also known as Tonka is

17  approximately 28 years old."

18  A.  If I said that, yeah, that's what I said.

19  Q.  So you --

20              (*Off the record briefly due to*

21                 *technical difficulties.*)

22        MR. GOODMAN:  We've got our tech issues sorted out

23  here, so we're turning a laptop back on.

24        Thank you.  All right.  Here we go.  Thank you for your

25  patience.

41

1    Q.   (By Mr. Goodman)  You said you essentially recall submitting

2    the Answer, and if you said that Tonka was 28 at the time, you

3    said that Tonka was 28 at the time, right?

4    A.   Right.

5    Q.   If Ms. Casey had told you all along that Tonka was 40, why

6    did you say in your pleading that he was 28 years old?

7    A.   No, what I'm saying to you is calculating-wise -- Connie had

8    always told me she would give me the paperwork on them, on Tonka

9    and the couple that she had.  She never did.

10        So upon me guesstimating back then, that's what

11   I guesstimated them at per the USDA paperwork that Connie filled

12   out.  But after Connie and I -- because Connie and I did a lot

13   of chats about the chimps -- I later assessed that Tonka would

14   be late-30's into the 40's, per age.

15        And if you look back on a Center For Great Apes post

16   where they posted Tonka's dad and they tried to say he was in

17   his 30's, I corrected them on the post on Facebook, that there's

18   no way that that chimp could be that young because Tonka was

19   older than that himself -- you know, as old as that, so that

20   chimp had to be in its 50's.  And I corrected them on Facebook

21   because of that.

22        And it's my belief -- and I'm only going by my belief,

23   sir, because you've got to realize I was not there when Tonka

24   was born.  I was nowhere near that situation.  I came up here

25   five years ago and I can only tell you what my belief is per

42

1    what I see as far as documents are concerned.

2    Q.   So you testified just a couple of minutes ago that you

3    thought he was 40 years old because Casey had told you that all

4    along.

5    A.   Right.

6    Q.   Ms. Casey.  Excuse me.

7    A.   Right.  Per, per kind of what we kind of guesstimated

8    time-wise, because she got him at nine years old and then we

9    kind of guesstimated from when she had him.

10        So I'm only guesstimating that that's how old he is.

11   Do I know that?  Because, again, I've not seen any paperwork on

12   his birth.  I've not seen any paperwork on anything that she got

13   when she got him.  So I'm only saying in my opinion, and by me

14   calculating by what Mike Casey told me and by what Connie told

15   me, I'm guesstimating 40.  Is that a hundred percent accurate?

16   I'm not saying it is.  I'm just saying that per my calculating,

17   that's how old he is.

18   Q.   So it was not based on Ms. Casey telling you that Tonka was

19   40.

20   A.   Telling me when she got him and how long she's had him, I'm

21   guesstimating him at that age.

22   Q.   Okay.  If I told you that Ms. Casey also said in 2017, less

23   than four years before his supposed death, in her own Answer

24   that Tonka was approximately 22 years old at the time, does that

25   have any impact on your assertion that she provided you some

1    other information at some other point in time that led you to

2    believe that he was a different age than both of you had

3    asserted in your verified Answers?

4    A.   Yes, sir.  And the reason why is because she told me the

5    other two Gibbons that I got from her, that one was 14 and one

6    was like eight.  And guess what.  She was like 19 and the other

7    one is like 12.  So she loses track of time.

8         Just like her capuchin that she -- if you look at the

9    USDA form she signed to me giving me that capuchin, she put her

10   down like at 40-something.  She just died recently and she was

11   54.  So Connie is as bad as I am about not -- time doesn't mean

12   a lot to her and so ages get away from her.

13        Just like she tried to tell me back then Connor was 23

14   but he wasn't 23.  He was like 25.  So she loses track of dates

15   of birth and stuff.

16   Q.   Given Ms. Haddix's -- excuse me -- given Ms. Casey's

17   assertion four years ago that Tonka was 22 years old and your

18   own assertion just last year that Tonka was approximately 28

19   years old, please enlighten me as to what information you

20   received since you filed that pleading that enabled you to

21   change your estimate of his age.  Walk me through your

22   calculation.

23   A.   Again, I have spoke to a couple of trainers that trained

24   Tonka, and back then they said that they quit working him at

25   approximately 11 to 12 years old.  So if Connie got him at

1    12 years old and you figure up how long Connie's got him, he's

2    got -- I'm only guessing that he's got to be near 40 years old.

3    That's how I'm coming up with it.  Again, I don't have any

4    documentation of that.  I'm only telling you that's what --

5    that's my belief.

6    Q.   You said that you spoke with trainers that quit working with

7    him when he was 11 or 12 years old?

8    A.   Yes.

9    Q.   When was that?

10   A.   Well, one was whenever I met one in Georgia coming back out

11   of Florida because I had a sloth in my -- I was transporting the

12   sloth that did the movie *Clifford the Red Dog* and she actually

13   was -- it was funny.  Her friend that actually trained Tonka,

14   too, who works at Union Station in St. Louis, Missouri, actually

15   trained Tonka, too, and they both had talked to me about Tonka.

16          Just in that -- you know what?  That's why I said the

17   exotic world is small but it isn't small.  You run into people

18   all the time just coincidentally.  I just happened to be

19   stopping at a convenience store.  She happened to be going to

20   Florida, down to 'Gerald' Gero's, which owns Birds and Animals.

21   She's a trainer for them currently.  And she just happened to

22   stop at the same convenience store and she seen I had a sloth,

23   so she started talking.  And then we started talking about

24   chimps and then she said, Oh, well, I train chimps.  And come to

25   find out she trained Tonka.  It was just a small world.

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 46 of 132 PageID #: 6124
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

45

1   Incidental.

2        Then the lady at Union Station that bought the sloth

3   actually took care of Tonka, too, and trained Tonka.  And they

4   both --

5   Q.   Now, when did this --

6   A.   In conversations.  When did that happen?  I honestly don't

7   remember.  I know it happened, say, two years ago, three years

8   ago, when Union Station opened their aquarium.  Google it,

9   because they were collecting animals and that's whenever I took

10  the sloth to them.  I don't know the exact date.

11       To be honest with you, I don't keep up with that type

12  of stuff.  We just have conversations constantly about animals.

13  That's my job.  That's my life.

14  Q.   When you say that those conversations happened about two to

15  three years ago, can you give me an approximate date, or even

16  the year?

17  A.   No, I honestly can't.  I know it was, it was summertime

18  because I know it was warm.  I know that Union Station has been

19  open probably three years, so I'm going to say three years ago.

20  And I'm only guesstimating.

21  Q.   Okay.  So three years ago you have these conversations, and

22  then on May 12th, 2020, you asserted that Tonka was 28 years old

23  in your Answer, right?

24  A.   Because I took it off the USDA form from the year -- Connie

25  signed him over in '18 and I just rounded up their years, how

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 47 of 132 PageID #: 6125
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

46

1    old they are.

2    Q.   Who assisted you with drafting that motion?

3    A.   Drafted what motion?

4    Q.   The motion that you filed last week.

5    A.   What do you mean?

6    Q.   The motion that you filed last week is a motion to dismiss.

7    Are you asserting that you drafted that by yourself?

8    A.   Yeah, I am.

9    Q.   No input from anyone else?

10   A.   No input from anybody else?  No, not really, no.

11   Q.   And, and so -- okay.  We'll move on.

12        In your motion filed last week, you reiterate that you

13   offered to provide Plaintiffs with, quote, "Ashes for DNA

14   testing," right?

15   A.   Correct.

16   Q.   In our conference on December 1st, you describe these ashes

17   to us as a fine powder, is that right?

18   A.   And that's what they are, yes.

19   Q.   Okay.  And you confirmed that you could not discern any bone

20   fragments within that powder, right?

21   A.   Correct.

22   Q.   Also during that conference you stated that you took a

23   photograph of Tonka when you found him dead, right?

24   A.   Correct.

25   Q.   And you stated at that time that Tonka appeared to be

1   sleeping when you found him?

2   A.   Yes.  I thought he was sleeping.

3   Q.   And you didn't know he died until watching him for some

4   time, and then you probed him with something just to confirm?

5   A.   What happened was I went down like I always do because, you

6   know, my trailer was right next to the chimp enclosure.

7   I always wake up and I always -- usually Chloe and Mikayla would

8   be at the big enclosure and they would be hooting and panting

9   because they knew I was coming out of the trailer.  Connor and

10  Candy would usually be in the tunnel, and so they would greet

11  you, too.

12          Well, of course, Tonka didn't have access to outdoors

13  because of him not being able to climb because of the stroke

14  that he had a few weeks or a month, whatever it was, prior to

15  that.  So I went in, as I always do, I went in to greet

16  everybody and I went to go get oatmeal.  I made oatmeal or

17  applesauce every day to put Tonka's pills in, to give him his

18  pills in the morning.

19          So I went ahead and messed with all the kids like

20  I always did, and I went over to the cage where Tonka was,

21  (*witness crying*), and he was still sleeping.  Well, I flipped on

22  the lights thinking maybe he would just, you know, wake up

23  because sometimes Tammy was a sleepy-head, too, and you have to

24  kind of prompt them to get up.  (*Witness crying*)  And whenever

25  I went over to the cage, he was laying and he didn't move.  And

 1   I kept calling his name.  I call him Tonky-B, and so I'd say,

 2   Tonky-B, Tonky-B, and he didn't respond.  And I watched, because

 3   I'm a nurse, I watched for breathing.  He didn't breathe.  And

 4   I waited for a while.

 5          And then when he didn't breathe, we have PVC pipe down

 6   there, some small PVC pipe.  It's small in diameter but it's

 7   long.  And we went ahead -- and I just went ahead and poked him

 8   with that PVC pipe, and whenever he didn't respond and his arm

 9   just kind of flopped, I went ahead and I called.  And I wanted

10   somebody to come and nobody could come because nobody was there.

11   (*Witness crying.*)  And so I just went ahead and waited a few

12   more minutes, and then I went in and I opened the cage door and

13   he was dead.  (*Witness sobbing and crying.*)  He was dead.

14          THE COURT:  All right.  Hold on just a second.

15          Counsel, we're going to take a ten-minute recess at

16   this time.

17          Ms. Haddix, we're going to take a ten-minute recess so

18   you can compose yourself and take a break.  And so we will

19   resume in ten minutes.

20          THE WITNESS:  Okay.  Thank you.

21                  - RECESS AT 10:38 A.M. -

22   ZOOM VIDEOCONFERENCE PROCEEDINGS

23   RESUMED AT 10:51 A.M.:

24          THE COURT:  All right.  We're ready to resume.  Do

25   I have Mr. Goodman?

4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

49

1    MR. GOODMAN:  Yes, Judge.

2    THE COURT:  All right.  You may proceed.

3  Q.  (By Mr. Goodman)  Ms. Haddix, I'm sorry that we have to

4  continue talking about this but of course it is the subject of

5  the hearing.  I'll try to get through it as quickly as I can.

6    Who else saw Tonka in the condition you described?

7  A.  There was nobody else there that seen him dead.  And I mean

8  Jerry, of course, seen him dead when he came to get his body.

9  Q.  Ms. Casey didn't see him?

10  A.  No.  She was gone for the weekend.  She had went to, I think

11  it was a housewarming for her brother, or maybe it was a

12  family -- it was some kind of family thing because her brother

13  had just moved from Alaska to here, to -- oh, I can't think.

14    *(Off the record briefly*

15    *due to technical difficulties.)*

16    THE COURT:  So, Mr. Goodman and Ms. Haddix, we're going

17  to resume and, Mr. Goodman, you can start wherever you need, but

18  I would tell you that I think you are -- I think you should be

19  able to move this along a little bit.

20    I know there are more witnesses and so I don't know how

21  much longer you expect with this witness, but I would ask you

22  to, you know, please not repeat yourself or do other things that

23  aren't necessary, if you can do that.

24    All right.  Go ahead, Mr. Goodman.

25    MR. GOODMAN:  Absolutely.  And, Your Honor, we are

1   getting close to the end here with Ms. Haddix.

2   Q.   (By Mr. Goodman)  So before turning back to what we were

3   just discussing, just to circle back to Tonka's age for a

4   moment, you indicated that the age that you provided in your

5   Answer was based on what Ms. Casey told you, but that you

6   determined that he was a different age at some point before you

7   had filed your Answer.

8        Does that accurately summarize where we were with that?

9   A.   Not really.  Basically, she wrote down those ages when she

10  signed those chimps over to me, off of like maybe other USDA

11  paperwork.  Something that she had there.  I can't remember --

12  I mean there was something there at the table.

13       And then, again, after talking with people and with

14  like figuring out Bo and Joe's age and that type stuff, and

15  Tammy's age, I, in my belief system, believed that he's, you

16  know, late 30's/early 40's, just by what I've gathered through

17  information, yes.

18  Q.   And did you reach your personal conclusion before or after

19  you filed your Answer in May of 2020?

20  A.   It was after, you know, because I hadn't really thought

21  about ages or ...  You know, I didn't even care because -- you

22  know that situation.  It's just after talking to people and just

23  assessing the situation that even Connor was older and even

24  Carrie was older.  She thought he was like 13, 14.  He was 17.

25  And, you know, just everybody was older than what she thought

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 52 of 132 PageID #: 6130
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

51

1  they were.

2  Q.  I'll show you what we're going to mark as Exhibit 3.

3  A.  Okay.

4  Q.  Are you able to see that image on the screen?

5  A.  Uh-huh.

6  Q.  So this is an article from IndieWire titled, "Alan Cumming

7  Pleads for Better Life for His *Buddy* Co-Star, a Chimpanzee Named

8  Tonka."  And this was published in June, 2017.

9       About how old do you think Tonka appears?  Or do you

10  believe that to be Tonka in this photo?

11  A.  That is Tonka.

12  Q.  About how old do you think he was at the time?

13  A.  Nine or ten.

14  Q.  Nine or ten?

15  A.  Yeah, because that was one of the last showbiz stuff that he

16  did, and they stop at 11 and 12.  So I'm going to say nine or

17  ten.

18  Q.  That's not based on your assessment of his appearance; just

19  when -- just that you thought he wasn't being used any more when

20  he was 11 or 12?

21  A.  Right.  And that was one of his last things that he did,

22  uh-huh.

23  Q.  So if he was 11 or 12 in 1997, that means he was born in '85

24  or '86, is that right?

25  A.  Yeah.

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 53 of 132 PageID #: 6131
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

52

1    Q.   And that would put him at less than 40, right?

2    A.   What?  Pardon me?  Say that again.

3    Q.   If he was born in about 1986, he'd be about 35 now, right?

4    A.   Okay.  Sure.  Yeah.  So I overestimated him being 40.

5    Q.   Again, just quickly before we get back into the details of

6    what happened, I referenced the photograph of Tonka that you had

7    sent to us.

8             You sent that photograph earlier this week, right?

9    A.   I didn't know that I sent you one.  Yeah, I guess, yeah.

10   Uh-huh.

11   Q.   Well, rather, it's a screen-shot of an image of Tonka.  Do

12   you recall?

13   A.   No, I don't recall, but if you say I sent it to you, I sent

14   it to you.

15   Q.   Okay.  I'm happy to go with that testimony.  If you'd like

16   me to show it to you, I can.  But I'd like to avoid that just

17   because I don't want to take any more time.

18   A.   No, that's fine.  That's fine.

19   Q.   Okay.  So you had sent that earlier this week.  Is there any

20   particular reason why you didn't send that sooner, when the

21   Court -- when I had asked for evidence of Tonka's death back in

22   the very beginning of June and then the Court had ordered that

23   you provide evidence of his death by July 21st?

24   A.   I'm trying to think.  Timelines, as you know, timelines

25   don't mean a lot to me.  I probably didn't have that photograph

1   because I told you that my -- and I don't even know when my cell

2   phone got blown up but I told you it got power-surged at a

3   resort, and I didn't have possession of any of my photographs.

4   I didn't have any possession of anything because I just don't,

5   I'm not tech-savvy and I can't -- like I don't back things up to

6   the iCloud or any of that stuff, so I didn't have possession of

7   that photo.  And I didn't even think of that photo, to be honest

8   with you.

9   Q.   You obtained possession of the photo by getting it from your

10  husband, is that right?

11  A.   That's right.

12  Q.   And so you could have done that sooner, too?

13  A.   If I would have remembered that I took the photo.  But to be

14  honest with you, that day was pretty messed up.

15  Q.   Understood.

16  A.   It was messed up and I didn't even think that I had to,

17  because I remember him asking me, Are you sure he's dead?

18  Hello.  And I was pissed off that he would even ask that.  So

19  then I snapped the photo but, to be honest with you, did I

20  remember it?  No.  I didn't care at the time.

21  Q.   So you represented to Mr. Martin and I that your phone surge

22  that deleted the things on your phone or at least made them

23  temporarily inaccessible and still inaccessible occurred in

24  September.  Does that sound right to you?

25  A.   I don't remember.  I don't know, but I'm going to say if

4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

54

1    that's what I said, then, yes, that's -- yes.

2    Q.    Okay.

3    A.    I honestly don't know when it occurred.

4    Q.    Okay.  So we're going to get back into the details of what

5    happened.  Again, I'm sorry that we need to do that but it

6    really is important in this hearing today.

7    A.    No, that's okay.  It's okay.

8    Q.    So you were saying when we were, when we took a break

9    because of the court reporter's issue with internet -- actually,

10   I'm sorry, I believe where that was left off was you were just

11   explaining why Ms. Casey did not see Tonka.

12   A.    Right.

13   Q.    And we don't need to pick that back up.

14         After that you -- again, to talk about how you were

15   helping move Tonka, what do you mean?  You moved him from where

16   you found him to where?

17   A.    There he was on the floor in his cage.  We got the Gator and

18   backed it up to the doors of the facility.  You know, it's

19   double-doored and ramped.  And we went ahead and we have this,

20   it's a braided thing that you lay him on -- not a tarp, but it's

21   a -- I can't even think.

22         But anyway's, we laid him on that, we rolled him over,

23   got him positioned, carried him out on that and put him in the

24   Gator, and then bucked the Gator up to his truck.  But of course

25   he wrapped him in plastic, but I didn't want to see that.

1          And we let the chimps say good-bye to him, too, so we

2    took him around and let the chimps say good-bye.  (*Witness*

3    *crying.*)   Then we put him in the Gator and we bucked the Gator

4    up against the truck, the bed of the truck, the tailgate, and

5    then we put his body over into the truck and then he left.

6    Q.   He left without you?

7    A.   I'm not gonna go.  (*Witness crying.*)

8    Q.   Okay.  So what happened next after that?

9    A.   I stayed with the chimps and I took care of the chimps.  And

10   I waited for Jerry to call me, to let me know. (*Witness crying.*)

11   Q.   To let you know that he had completed --

12   A.   Yes.

13   Q.   -- his cremation?  Okay.

14                          (*Witness crying.*)

15   Q.   So obviously, what happened between then and when you were

16   called is pretty critical here.  Are you intending to present

17   any witnesses today about what happened between that moment and

18   when you next interacted with your husband about it?

19   A.   I don't have any because all I did was -- I mean you don't

20   understand.  It's such a fog I don't even, I don't even remember

21   words that I said or anything like that because I just can't

22   believe it.

23          And so the biggest thing is I just stayed with the

24   chimps because they needed to be cared for.  And I tried to get

25   ahold of Connie but it went straight to voicemail, so I don't

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 57 of 132 PageID #: 6135
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

56

1    know if she just didn't have signal or if she had her phone shut

2    off or what.  So I left her -- no, I didn't even leave a

3    message.  I had to think for a minute.  No, because I didn't

4    want to tell her on a message.  So I just left the,  where she

5    could call me back.  Because if she seen that I had called, a

6    missed call, she would call you back.

7            Well, she never did, so then I talked to her the next

8    day and I told -- but I didn't want to tell her on the phone so

9    I waited till she got home and I told her in-person that Tonka

10   passed away.

11           And I didn't talk to anybody.  I didn't tell anybody.

12   I didn't talk to anybody.  I don't even think I talked to

13   anybody except the chimps.

14   Q.   Okay.

15   A.   You don't understand.  They don't like it, either.

16   Q.   When you next were in contact with your husband about Tonka,

17   what did that entail?

18   A.   Nothing.  I mean you've gotta understand.  He knows me and

19   he knows that if I am upset, I just want to be left alone.  And

20   he really didn't want to talk about, to where I got upset.  So

21   we just didn't talk about it.

22   Q.   At some point --

23   A.   Except he did get me some ashes.

24   Q.   When did he give you those ashes?

25   A.   The next time I seen him.  And I'll be honest with you.  He

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 58 of 132 PageID
#: 6136
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

57

1  was doing petting zoo's at that point in time and so it may have

2  been two or three days later.  I, I honestly don't remember when

3  he came back up to St. Louis.  It wasn't that same day.  It was

4  like a couple days later.

5  Q.   We'll try to get through this quickly.  In your Pleadings

6  and Declarations that you have filed in this case, either

7  personally or through your attorney, it was first asserted that

8  Tonka was burned on a burn pile at 165 to 170 degrees, on

9  Mr. Aswegan's property, is that right?

10 A.   Correct.  I mean he filed that.  I didn't file it and

11 I didn't see it.  But since later I seen something in your

12 motion that said that so, but I've not ever seen his thing.

13 Q.   So this particular document that I'm referring to is an

14 email that he sent to you, that you forwarded to your attorneys.

15 A.   Okay.  Yeah, then I seen that, what he sent me, and

16 I forwarded it, yes.  Yes.

17 Q.   Where is the property to which he took Tonka?

18 A.   Peculiar, Missouri.

19 Q.   After the Plaintiffs noted in pleadings that cremation at

20 the temperatures that were asserted in Mr. Aswegan's email were

21 impossible to, you know, burn remains, he filed -- you filed a

22 new declaration or affidavit from Mr. Aswegan saying it was

23 actually a funeral pyre  and the temperature was 1,650 to 1,700

24 degrees for three or four hours, is that right?

25 A.   I don't know.  I didn't have anything to do with that.  My

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 59 of 132 PageID #: 6137
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

58

1   attorney contacted him directly, so I don't know.  And I don't

2   know that situation.  I really don't.

3           He was doing petting zoos up north, in Minnesota, and

4   so I didn't see him for a couple weeks.  So, you know, I don't

5   know what -- they were trying to get everything done in the time

6   that they were supposed to, so I don't know.

7   Q.   When you say "they" were trying to get everything done, who

8   were you referring to?

9   A.   The attorneys were trying to get all the stuff done that

10  needed to be, in the time it needed to be done in.  So I didn't

11  have nothing to do with that.

12  Q.   So you said the next time you saw him, he provided you with

13  ashes?

14  A.   Yes.

15  Q.   And those are the ashes that we had discussed earlier, that

16  you said is a powdery substance?

17  A.   That was the powdery substance, uh-huh.

18  Q.   Okay.  Did you have occasion to go back to the site of the

19  burn pile at some point?

20  A.   Yeah, I did.  I finally, weeks later, months later,

21  however -- months later I finally was able -- I was up there

22  because he had a USDA inspection and I was helping him get ready

23  for that USDA inspection, so I went over there.

24  Q.   And did you, in particular, look at the burn pile at that

25  time?

4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

59

1   A.   Uh-huh.  I did.

2   Q.   And how did that appear to you?

3   A.   It was like, you know -- and I explained this to you

4   before -- it was like a bonfire.  I mean just like a big fire

5   pit.  I mean just a big burn pit, just like where there's a lot

6   of ashes around.  You know, there's still a lot of ashes around.

7   Q.   And did you collect anything from that area?

8   A.   Uh-huh.  I did.  I collected another box about the size of,

9   like I told you, a shoe box full ashes that looked like it had

10  some fragments.

11          And that's because when you guys had asked for them,

12  you know, I hadn't been up there so I didn't have a chance to

13  look.  But then whenever -- after you guys had asked for them,

14  I had went up there and I just, you know, grabbed some ashes

15  that maybe looked like there was something that you could use,

16  because I was gonna try to do DNA, too.

17  Q.   What do you mean when you say it looked like it had

18  fragments in it?

19  A.   Well, it was bigger pieces of stuff.  It wasn't just

20  powdery.  That stuff wasn't powdery.

21  Q.   During our conference on December 1st, you indicated that

22  you went back to the property, as your saying now, and gathered

23  this additional box of ashes.

24  A.   No, that's the first time I had ever went to the property.

25  Q.   Uh-huh.  You went to the property in August, gathered

1    additional ashes and --

2    A.   I don't know if it was August.  I don't know what month it

3    was.

4    Q.   Okay.  As you just testified, weeks or months later after

5    the death.  And you indicated to us that the contents of both of

6    the boxes of ashes that you had were identical and contained a

7    powdery substance, is that right?

8    A.   No.  No, that's not what I said.  What I said is they're

9    identical in size.  You asked me what the size was of them.

10   I described the size and I told you they were identical in size.

11   Not formation, no.

12   Q.   Okay.  So your testimony today is that there are different

13   contents in terms of consistency in the two boxes of ashes you

14   have?

15   A.   Yes.  Yes.

16   Q.   And what you called, I believe, fragments in the second box,

17   describe what they looked like.

18   A.   Well, some of them are like maybe pieces of wood or pieces

19   of stuff.  You know, I tried to get anything that looked like it

20   had less than just ashes -- you know, like when you pick them up

21   that they just fall apart -- just so that around the center

22   where, you know, you would speculate his body is.

23        I wasn't there, so I'm only speculating.  I'm only

24   envisioning this in my mind, okay.  When you have a bonfire, or

25   you do a pig roast or anything, you put the object in the

1    middle.  And so I went around there.

2           There's tons of other stuff around there, like where he

3    had burnt other animals and that type stuff, but the thing of it

4    is, is I was trying to focus on the center because that's where

5    you would imagine you put all the stuff to burn ... to burn

6    Tonka's body.  So I went ahead and I just was trying to get

7    something in that area.  And like I said, there was more --

8    there's tons more ashes out there, I mean honestly, but I was

9    just trying to focus on that area.

10   Q.   How big were the pieces of wood or whatever, other debris

11   that you found there?

12   A.   Well, it varied, you know, from say, I don't know,

13   two inches to some of them, you know, being four or five inches

14   of stuff.

15   Q.   Okay.  And the ones that are four or five inches, what does

16   that appear to be?

17   A.   It looks like wood or like -- because you can see it and you

18   can kind of, when you scrape it -- you know how you rub things

19   when you are, you know, inspecting something?  You can see it's

20   like pieces of wood and pieces of stuff that you burned with.

21   Q.   Okay.  So you didn't identify anything there that you could

22   tell was a piece of skeleton, right?

23   A.   Not really.  I mean there's some white stuff in there so it

24   very well could be.  Like maybe -- but as far as like is there

25   whole pieces to where you could say, Oh, this is a bone?  No.

1    No.  No.

2    Q.   Now, when you say the white stuff, that could be, is that a

3    powder?  What white stuff are you referring to?

4    A.   Well, it's bigger than a powder.  Just say like a small

5    pebble or something.  But it isn't a rock because it's not

6    formed like a rock.  So it could be something, you know, like --

7    I don't know.  I don't know.  I just, I don't know, but it

8    definitely is not just pure black ashes.  Let's put it that way.

9    Q.   How many small white pebbles do you see there?

10   A.   If I'm guessing, you know, it's -- if you sifted it, like

11   put it through an sifter like you do sand and stuff, I don't

12   know, you might have the bottom of the sifter covered.  So

13   I don't, I don't know how many you would consider that.

14   Q.   You're familiar with Cassandra Fairbanks, or McDonald,

15   right?

16   A.   Oh, yeah.  She's a reporter that I met.  So, yeah, I'm

17   familiar with her.

18   Q.   Would you consider yourself friendly with her?

19   A.   Oh, she's my friend.  Well, she -- when you say "friend",

20   you know, that's a loose term.  But I've known her for the last

21   say six, seven months.

22   Q.   How did you come to know her?

23   A.   She was one of the people that contacted me, wanting to

24   do -- she works for this -- and I don't understand how these

25   things work because I'm not tech-savvy but some kind of --

1    I thought it was a newspaper but it's really not.  It's like a

2    blog or something on internet or social media that does, she

3    reports for that.  It's called The Proponent but it's based out

4    of St. Louis.

5    Q.  Does she write for the Gateway Pundit?

6    A.  There you go.  Yeah.

7    Q.  That's the one you're referring to?

8    A.  Yeah.  Sorry.

9    Q.  Did she connect you with Mr. Pierce, your former attorney?

10    A.  Yeah.  Well, yes, kinda sorta.  She did an article about the

11    chimps, and he was friends with her because he does like

12    different cases that she does, and he just offered to try to

13    help me because I wasn't being able to find an attorney, so

14    because I know her and because she did the article.  But did she

15    do it directly?  Not really.  I mean it was just indirect.

16    Q.  She came to your home after the Court ordered the

17    chimpanzees' transfer, right?

18    A.  She came to Connie's?

19    Q.  Scratch that.

20    A.  Yeah, because she never came to my home.

21    Q.  Thank you.  She came to Connie Casey's facility --

22    A.  Yeah, she did.

23    Q.  -- where the chimpanzees, your chimpanzees were held?

24    A.  Uh-huh.

25    Q.  And that was the weekend of July 17th?

1   A.   It was on a Sunday, so it very well could have been.

2   Q.   Do you know that Ms. Fairbanks then sent a camera crew to

3   attempt to film the transfer on July 28th?

4   A.   No, I did not know that, and I don't think she did.

5   Q.   You don't think she sent a camera crew?

6   A.   No, I think it was that guy that owns the Proponent or

7   whatever.  The Pundit or whatever you call it.  Gateway Pundit.

8   Sorry.  I call it Proponent.

9        And the reason why I think that -- no -- I almost know

10  that because we, I, he stayed at the same hotel I stayed at,

11  that I always stay at in Festus and I ran into him that morning

12  in the parking lot, and they tried to do an interview with me at

13  the hotel parking lot.  And he said he was going to try to go

14  over there and I told him nobody was supposed to be over there,

15  and he said he didn't care.  That he was gonna try.  So

16  I believe it was him that's -- it was him and a crew that he had

17  but I don't think Cassandra had anything to do with it.

18  Q.   If I told you that she tweeted, "We sent the camera crew,"

19  would that be -- would that change your testimony in any way?

20  A.   No, because -- well, now that you're telling me that, I did

21  not know that.  I truly did not know that.

22  Q.   Okay.

23  A.   Because like I said, I spoke to the man myself at the hotel

24  parking lot and he told me he was going to go over there, and

25  I told him nobody -- that Catherine Perry said that nobody was

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 66 of 132 PageID #: 6144
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

65

1  supposed to go there.  So, you know, and he said he was going to
2  try anyway.  Something about the press or something about
3  precedence of the press or something to where he thought he had
4  a right for freedom of, you know, freedom of the press or
5  something like that.  So ...
6  Q.  So you would agree that the Gateway Pundit knew when the
7  transfer would occur, then, right?
8  A.  Yeah, I do believe that but it was something about, to do
9  with some -- if I -- okay.  He said something about that there
10  was a lot of -- 'cause Chris Hayes told me the same thing.
11        There was a lot of speculating.  They didn't know a
12  hundred percent when it was going to take place, exactly what
13  day and what time, but they knew it was going to happen that
14  week and that Chris Hayes, and even the guy from the St. Louis
15  Post Dispatch got ahold of me.  All of them were trying to
16  figure it out at that point.  And if you'll ask any of them,
17  they asked me if I knew and I told them that we didn't even
18  know, and that basically nobody was supposed to know because of
19  the safety of the chimps.
20        So anyway's, long story short, but they said there was
21  a lot of speculating or a lot of stuff flying around.  So
22  I don't know who started the rumor or how that got started or
23  whatever, but it supposedly was a big social media thing.
24  Q.  So the Gateway Pundit was there to film, but your testimony
25  is that you did not provide them with that date?

1    A.   No, I guarantee I did not.

2    Q.   And the date was only available to the parties in this case,

3    their counsel, and court staff, right?

4    A.   I don't know.

5    Q.   Do you recall that it was filed under seal?

6    A.   Like I said, I assume that.  I don't know who gets all that.

7    But again, I don't know.

8          All I know is people were contacting -- they even

9    contacted Connie.  Connie even told you that.  Way before it had

10   anything to do with me, they were trying to -- they were telling

11   her that they knew it was going to be that week.  I don't know.

12   At that point I didn't care.

13          MR. GOODMAN:  We have no further questions for

14   Ms. Haddix on this direct exam.

15          THE COURT:  All right.  All right then.  So,

16   Ms. Haddix, if later on you want to add anything to provide any

17   further testimony, you can do that later on.

18          MS. HADDIX:  Okay.

19          THE COURT:  But we'll go ahead and hear the rest of

20   Mr. Goodman's evidence at this time.

21          So you may call your next witness.

22          MR. GOODMAN:  Okay.  Thank you.  We are going to call

23   Dr. Frederick Snow.

24          THE COURT:  All right.  Dr. Snow, the Clerk of Court

25   will administer the oath to you at this time.

1    DEPUTY CLERK:  Hold on one second.  Dr. Snow, I'm going

2  to ask you to unmute real fast just before we get started.

3                    (Witness Sworn.)

4    DEPUTY CLERK:  Thank you.

5    THE WITNESS:  Mr. Goodman, could I have just a moment

6  to get a drink before we start?

7    MR. GOODMAN:  Yes, absolutely.

8    THE WITNESS:  It will be just a moment.

9    MR. GOODMAN:  Your Honor, as we're waiting for Dr. Snow

10  to return, I'd just like to note that I see Ms. Haddix appears

11  to be talking.  I don't know if there is anyone else in the room

12  or if she is on a phone call during the hearing.

13    THE COURT:  Ms. Haddix, you're muted, but could you

14  tell us, is there someone else on the phone with you or are you

15  talking on the phone?

16    THE WITNESS:  (*No audible response.*)

17    THE COURT:  You're muted so we can't hear what your

18  answer is.

19    MS. HADDIX:  Okay.  There you go.  Sorry.

20    No.  What happened was I was talking to you but

21  I didn't know I was muted.  Jerry was back in the back and he

22  heard me say -- he thought I was calling him.

23    But basically I was trying to tell you that I had one

24  more thing to add because I just remembered something.  How

25  people were finding out about the social media thing is they

1   went door-to-door, because they went to Connie Casey's daughter

2   and they were leaving their cards with everybody and trying to

3   get everybody to, the neighbors and stuff to, for social media.

4   And social media had left numbers and stuff for them to call.

5           THE COURT:  You're talking about the Gateway Pundit?

6           MS. HADDIX:  Yeah, all of them were.  Not just them

7   but -- not Fox 2 but the other one.  Yolanda something.

8           THE COURT:  All right.

9           THE WITNESS:  Yeah.

10          THE COURT:  That's fine.  Thank you.

11          All right.  Mr. Goodman, you may proceed, then.

12          MR. GOODMAN:  Okay.  Thank you.

13          Just very briefly in that regard, I'd like to note that

14  the filmmakers for the -- or the camera crew for the Gateway

15  Pundit appeared to be present at the moment the Plaintiffs,

16  their representatives, and the Marshals arrived.  So it wasn't a

17  matter of someone alerting them to the fact that there was

18  activity.  They were there before it started.

19          But that is, of course, neither here nor there at this

20  very moment, and we can begin Dr. Snow's testimony.

21                      **FREDERICK SNOW, PHD**

22          having been first duly sworn, proceeds to testify via

23  Zoom videoconferencing, as follows:

24                      **DIRECT EXAMINATION**

25  **QUESTIONS BY MR. GOODMAN:**

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 70 of 132 PageID #: 6148
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

69

1    Q.   I hope you're feeling a little bit better.  Could you please

2    state your name for the record?

3    A.   My name is Frederick Snow.

4    Q.   And what is your profession?

5    A.   I'm a Forensic Anthropologist.

6    Q.   For how long have been a Forensic Anthropologist?

7    A.   Approximately 25 years.

8    Q.   Do you have any related degrees?

9    A.   I do.  I have a PhD from the University of Tennessee in

10   Anthropology.

11   Q.   Dr. Snow, who are your current employers?

12   A.   I am self-employed.  I am the President of Forensic

13   Anthropology Services, Incorporated, here in Knoxville,

14   Tennessee.

15   Q.   For how long have you run Forensic Anthropology Consulting

16   Services?

17   A.   I have been President since 2009.

18   Q.   And what is the scope of your work as President of that

19   entity?

20   A.   I primarily work with law enforcement, coroners and medical

21   examiners to locate, recover and analyze human skeletal remains.

22   Q.   I'd like to -- do have a resumé or CV, Dr. Snow?

23   A.   I'm sorry?

24   Q.   Do you have a resumé or a CV?

25   A.   Yes, sir, I do.

70

1   Q.   I'm going to show you a document here.  If you could confirm

2   that this is it.  Are you able to see the document on the screen

3   now?

4   A.   Yes, sir, I can.

5   Q.   Does this appear to be your CV?

6   A.   It does.

7          MR. GOODMAN:  I'd like to admit this into evidence as

8   Exhibit 4.

9          THE COURT:  Exhibit 4 is received in evidence.  Go

10  ahead.

11  Q.   (By Mr. Goodman)  So I see from this Exhibit 4 that before

12  starting Forensic Anthropology Consulting Services, you worked

13  for the Georgia Bureau of Investigation.  What position did you

14  hold there?

15  A.   I was a State Forensic Anthropologist for the Georgia Bureau

16  of Investigation.

17  Q.   And what were your responsibilities in that role?

18  A.   Essentially the same thing as I'm doing now.  I covered the

19  entire state of Georgia, working with coroners, medical

20  examiners and law enforcement, again, to locate, recover and

21  analyze human skeletal remains.

22  Q.   And when you say analyzing skeletal remains, what do you

23  mean by that?

24  A.   Primarily determine who this individual was and how did they

25  die.

1  Q.   What other experiences have you had analyzing or identifying

2  human remains?

3  A.   In 1999 I was sent to Kosovo as an agent of the United

4  Nations to recover ethnic Albanians killed in the Ethnic

5  Cleansing.

6       2001, I spent eight months in Bosnia working as a

7  forensic anthropologist for the International Commission on

8  Missing Persons, again, working mass graves over there.

9       2002, I was sent to the Tri-State Crematorium stunt in

10 Noble, Georgia, in which a crematory operator did not cremate

11 339 sets of remains and, instead, left them in woods, cars,

12 buildings and vaults.

13      2005, I went to Thailand to serve as the coordinator

14 for the Tsunami Victim Identification Unit, identifying the

15 victims of the 2004 tsunami.

16      2014, I spent two and a half months on the South

17 Pacific island of Taroa working for a non-profit organization

18 called History Flight, recovering some of the 1,100 Marines that

19 were killed in the battle of Taroa in 1943.

20      And on top of that, over the years I've given something

21 over 150 lectures to law enforcement, medical examiners and

22 coroners covering pretty much all aspects of forensic

23 anthropology.

24 Q.   Are you also a member of any professional associations?

25 A.   Yes, sir, I am.  I'm a member of the American Academy of

1    Forensic Sciences, the International Association for

2    Identification, the International Homicide Investigators

3    Association.

4         For the past ten years I've also been a consultant for

5    the National Center for Missing and Exploited Children.  I was a

6    member of the Disaster Mortuary Operation Response Team for ten

7    years and the Georgia Body Recovery Team for six years.

8    Q.   Has any of this experience that you've identified as a

9    forensic anthropologist involved identifying remains from

10   burn pits or funeral pyres?

11   A.   Yes, sir, numerous.

12   Q.   Can you describe some of those experiences and what they

13   entailed?

14   A.   Certainly.  I've had approximately 20 instances in which

15   I recovered remains, human remains, from burn pits, buildings,

16   car fires and the like.  Two of the most notable were in 2007 or

17   '08, I think -- no, just more recently than that.  Four or five

18   years ago.

19        I had two individuals that were killed in Missoula,

20   Montana, burned for between four and six days -- we don't know

21   exactly how long -- in an outdoor burn pit.  And in the

22   intervening five years they underwent five Missoula, Montana

23   winters.  And we went back in -- even after all that period of

24   time of burning and outdoor exposure to the elements -- and

25   recovered remains of both individuals.

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 74 of 132 PageID #: 6152
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

73

1          2008, in Port Wentworth, Georgia, the Imperial Sugar

2    Refinery exploded in a sugar dust explosion.  The sugar refinery

3    was old.  It was built in the early 1900's.  It was almost

4    entirely wood and burned for seven days.  It killed 14 people,

5    injured 38 more, and we went back in and recovered two

6    individuals that had burned for the entire seven days and

7    identified both of them.  Those are two that come to mind

8    immediately.

9    Q.  Thank you.  And with respect to -- I'll return to -- with

10   respect to the Missoula case that you just described, you said

11   you identified the remains of two different individuals after

12   those four or five years.  What do you mean by "remains"?

13   A.  They were fragmentary.  We found teeth.  We found certain

14   bones that were identifiable not only to which bone it was, but

15   which side it was, left or right.

16          So we did have individual bones that we could identify

17   even after four to six days of burning and exposure to the

18   elements for five years.  And they were fragmentary, yes, but

19   they were easily identifiable as human.

20   Q.  Then similar findings in the Imperial Sugar Refinery case

21   that you discussed?

22   A.  Yes, sir.  Pretty much the same thing.  Even after seven

23   days of burning, I was able to recover enough of the individuals

24   to identify both of them.

25   Q.  Now, this question is not limited to those experiences or

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 75 of 132 PageID #: 6153
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

74

1    outdoor burn pits.  About how many cases have you worked in your

2    career as forensic anthropologist?

3    A.   Something over 300 with the Georgia Bureau of Investigation.

4    If you want to consider the individuals that I've recovered in

5    Bosnia, Kosovo, in mass graves, probably seven or eight hundred,

6    at a guess.

7    Q.   Have you ever testified in court as an expert witness in the

8    field of forensic anthropology?

9    A.   I have.  I've testified 12 times previously.

10   Q.   About when was the most recent?

11   A.   The most recent was last year in Missouri.

12   Q.   Has a court ever declined to admit your testimony as an

13   expert?

14   A.   They have not.

15   Q.   If I could focus on this case for a minute?  So this hearing

16   involved the question of whether a chimpanzee was cremated in an

17   outdoor burn pit.  What is it about this case that a lay person,

18   with no background in forensic anthropology or a similar field,

19   might not understand?

20   A.   I think the one thing that would be most germane would be

21   the fact that most people think that you can completely destroy

22   a body in a fire and you simply cannot.  There are always going

23   to be recognizable bone fragments.  The body does not reduce

24   entirely to ashes or dust or particulate matter.

25         Even in a commercial cremation, which is the gold

1  standard for cremation, once the cremation is over, the retort

2  is emptied, you still have probably a half-bushel of easily

3  recognizable human remains, and these remains only become

4  unrecognizable once they are put in a processor, reduced to

5  dust.  And this is the ashes that are given to the family.

6       Prior to that, you have easily recognizable bone

7  fragments, and it's only after processing that the ashes are

8  given back to the family.  You often have individual bone

9  fragments that you can identify not only bone it is, but what

10 side of the body it came from.  And you almost always have teeth

11 fragments, especially crowns, because enamel is very resilient

12 in fire.

13       MR. GOODMAN:  Your Honor, pursuant to Federal Rule of

14 Evidence 702, I'd like to tender Dr. Snow as a qualified expert

15 witness in the field of forensic anthropology.

16       THE COURT:  I never declare anyone as a qualified

17 witness but I will hear this witness's opinions.

18 Q.  (By Mr. Goodman)  Dr. Snow, have you reviewed any materials

19 in connection with this case?

20 A.  Yes, sir, I have.  I've reviewed the affidavit, and also an

21 email from Jerry Aswegan, and emails between you and John Pierce

22 regarding genetic testing of the cremains.

23 Q.  You referenced an affidavit from Mr. Aswegan, right?

24 A.  Yes, sir.

25 Q.  What does that affidavit assert that Mr. Aswegan did with

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 77 of 132 PageID #: 6155
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

76

1  Tonka's body?

2  A.   Essentially, it talks about the death of Tonka.  That Jerry

3  Aswegan took the body of Tonka, built a funeral pyre, if

4  I remember right, 20 feet in diameter, stacked it five feet high

5  with wood, put Tonka's cremains in the -- or remains in the

6  center of it, doused it with ten gallons of diesel fuel and

7  another five gallons of gasoline and burned it, I believe for a

8  total of four hours.

9        It also said that once the fire was out, that he went

10  to the center of the pyre, recovered ashes, purportedly those of

11  Tonka, and these were given to Tonia Haddix.

12  Q.   Do any other documents that you reviewed elaborate on the

13  form of those ashes?

14  A.   Simply that they were particulate.  They were not

15  fragmentary; apparently all of essentially the same size and

16  consistency.

17  Q.   Did you rely on any other source of information in forming

18  your opinion, other than the documents from Mr. Pierce and

19  Mr. Aswegan that you've already identified?

20  A.   No, I didn't.

21  Q.   Having reviewed this information, do you have an opinion

22  about whether the alleged cremation of Tonka, as described in

23  those materials, is plausible?

24  A.   In my opinion it's inconceivable, at least as its described

25  in the information that I've read.

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 78 of 132 PageID #: 6156
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

77

1    Again, going back to what we expect in a typical

2   cremation, we expect bones to be fragmentary.  Not dust.  Not

3   ashes.  And it's only after they're processed that they become

4   ashes.

5    Prior to that, I would fully expect to see bone

6   fragments that we could identify not only which bone it is, but

7   usually what side of the body it came from, and absence of that

8   is glaringly obvious.

9  Q.  You touched upon this, but so if the fire had been burned as

10  described, what would you expect?  In detail, to the extent you

11  are able to, what would you expect to remain at the site of the

12  fire?

13 A.  Again, I would expect them to be fragmentary.  Cremation

14  burns out the organic component, which is why we can never get

15  DNA from cremated remains.  It will burn out the organic

16  component and you're left with about half a bushel of

17  fragmentary remains that are the actual mineral component, the

18  non-organic component, and these are the parts that give the

19  bone its strength.  It's crystalline.

20   And, again, going back to the absence of fragmentary

21  remains or, at least the non-description of them, it's just

22  inconceivable to me that this, these cremains recovered, as

23  described, are those of Tonka.

24 Q.  Can you describe in maybe other terms what you mean by

25  fragmentary?  Maybe something a little bit more descriptive?

1    A.    Sure.   Fragmentary simply means broken.   They can be parts

2    of a bone.   They can be, actually, most of the bone itself.   But

3    fragmentary simply means broken.

4    Q.    Okay.   So given the information that you reviewed in terms

5    of what happened, I understand you expect that there would be

6    broken remains.   Can you provide any more detail as to what you

7    would expect those to look like in terms of their size or

8    quantity?   In that regard?

9              I'm sorry.   I know this is two questions in one, but

10   I think you will probably address them together.   You mentioned

11   that there would be half a bushel.   Could you be a little more

12   descriptive?

13   A.    Yeah.   Well, as far as the size goes, it could vary.   I mean

14   we can actually get fully complete bones.

15             In a pyre like this, it differs from the crematory

16   itself because you're probably going to have ashes.   You're

17   going to have wood falling in on top of things.   The burn pile

18   itself is going to shift.   It's probably going to break things

19   more than you would expect in a commercial cremation but,

20   nevertheless, you should have fragmentary remains that can vary

21   from fractions of an inch to several inches long.

22   Q.    So would it be correct to say -- and I think this is a

23   summary of what you've just provided -- that in this particular

24   instance you would expect to see fragmentary remains several

25   inches long?

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 80 of 132 PageID #: 6158
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

79

1    A.    I would.  Very much so.  I'd be amazed if there weren't.

2    Q.    Is there any literature to support this opinion?

3    A.    Oh, yes.  One of the earliest is by Dr. William M. Bass,

4    whose father started the infamous Body Farm at the University of

5    Tennessee in 1984 and he wrote an article, *Is It Possible to*

6    *Completely Consume a Body in a Fire?*  His opening sentence

7    states empirically it is not, and for the same reason I've

8    stated; you're going to get fragmentary remains.

9          There is another book that came out in 2015, *The*

10    *Analysis of Burned Human Remains*, by Steve Symes.  Dr. Steven

11    Symes.  So this is a very well-known topic it's -- and we have a

12    number of books on it.

13          We have one by Scott Fairgreve, *Commercial Cremation*.

14    So, yes, there are -- the literature is replete with examples of

15    just what we've been talking about.

16    Q.    Do experts in your field generally consider these articles

17    to be authoritative?

18    A.    Very much so.

19    Q.    And books.  Excuse me.

20          In your opinion, would any of Tonka's body turn to what

21    Mr. Pierce described as a, quote, "Finely divided powder of

22    approximately uniform consistency?"

23    A.    I would expect to see some of it, certainly.  We're going to

24    have flaking of the exterior surfaces and, also, when the bones

25    break, yes, you're going to get a certain amount of particulate

1    matter; very small, powder-like and ash-like.  But by far and

2    large, most of it is going to be fragmentary and easily

3    recognizable as bone.

4    Q.   Forgive my ignorance but that also goes back to the question

5    that I had asked earlier.  What exactly is "half a bushel"?

6    A.   Um, I don't know.  I mean --

7    Q.   So you had indicated that you would expect about half a

8    bushel of skeletal remains.

9    A.   Yeah.  Uh-huh.

10   Q.   Is there a way you can -- is that a unit of weight or size?

11   A.   Oh, it would not be weight.  It would be volume.

12   Q.   Volume.  Can you compare something else that might be the

13   size of half a bushel?

14   A.   I don't know.  Half a bushel of apples.  You know, I don't

15   have any direct -- it's something that's frequently quoted but

16   as far as actually being able to describe it physically, in the

17   absence of a container of that size with me, I can't.

18   Q.   Are you familiar with a bankers box, for example?

19   A.   Yeah.  That would be in the ballpark, at least, yes.

20   Q.   Something that may be a little bit more uniform.  How about

21   a basketball?  A typical basketball?

22   A.   That would be pretty close, I would think.

23   Q.   Okay.  That's close enough.

24        Is your testimony the same as to whether you would

25   expect any of Tonka's body to turn to what Mr. Aswegan described

1  as ashes?

2  A.   Yes.  Again, a certain amount of it will.  We're going to

3  have flaking of the exterior surfaces.  We see that all time.

4  And then when you have bones that break, you're going to get,

5  along the break itself you're going to get particulate matter

6  like ashes.  But, again, that's going to be a small component of

7  it overall.  Most of it will be fragmentary.

8  Q.   In your opinion is there any evidence to show that Tonka's

9  body was burned at this location?

10  A.   I'm sorry?

11  Q.   In your opinion is there any evidence to show that Tonka's

12  body was burned at this location?

13  A.   Not from what I've seen.  I can't see any evidence that it

14  was.

15  Q.   And you spoke a few minutes ago about crystalline bone and

16  DNA.  I'm just going to turn back to that for a second so we're

17  very clear on the record.

18        So let's just assume for a moment that Tonka's body was

19  actually turned to ash on the burn pile.  Do you have an opinion

20  as to whether it would be possible to determine if those ashes

21  were Tonka's?

22  A.   From ashes itself?

23  Q.   Ashes.

24  A.   No, sir.  DNA does not survive typical cremation

25  temperatures.  So to get a positive ID as to whether it's Tonka

1  or not, no, that won't happen.

2          MR. GOODMAN:  Thank you, Dr. Snow.  We have nothing

3  further.

4          Judge Perry, if you have any --

5          THE COURT:  Just one moment, please.  Just a moment.

6                  (*Brief break off the record.*)

7          THE COURT:  I apologize for the delay.

8          All right.  Ms. Haddix, do you wish to ask any

9  questions by way of cross examination of this witness?

10         MS. HADDIX:  Yes, I would.

11         THE COURT:  All right.  Go ahead.

12                         **CROSS EXAMINATION**

13  **QUESTIONS BY MS. HADDIX:**

14  Q.  Mister -- is it Dr. Snow?  Is that correct?

15  A.  Yes.

16  Q.  Okay.  I know you've sat there and discussed your experience

17  with human bodies and you discussed a typical burn site.  Now,

18  with the different burn sites that you have gone to, does it

19  make a difference as far as like what substance was around there

20  that burned to cause more disintegration or less disintegration

21  of that remains of the bones?

22  A.  Not really.  The two things that determine primarily how

23  well bones survive are time and temperature.  And, again, if you

24  look at a commercial cremation, which is pretty much the gold

25  standard of efficiency in cremation, they cremate for three to

4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

83

1    four hours at 1,400 to 1,700 or 1,800 degrees, typically.

2    Q.    With what?

3    A.    But even at that, as efficient as commercial cremation is --

4    and there is nothing more efficient than commercial cremation --

5    bones are still easily detectible in the retort after it's

6    cooled.

7    Q.    So your -- so with your experience -- you keep going back to

8    a 'crematorial' but what I'm asking is like at different sites

9    that you went to where bodies were burned alive, did you see

10   different consistencies with how much bone was actually ashes

11   with the stuff that was surrounding those bodies, as far as like

12   environmental things that might have caused more ash-type bones

13   than in other incidents like the two that you were discussing?

14          The two different sites that you went to, did you see

15   more or less fine ashes with the different environmental things

16   that may have caused a higher heat, or a longer burn?

17   Afterburn?

18   A.    No, I can't think -- I don't think that's the case at all.

19   Again, bones survive high temperatures and long burn periods

20   quite nicely and there's really -- since there is really nothing

21   more efficient than a commercial cremation, even if it's burned

22   in wood or, in the case of the Imperial Sugar Refinery, the

23   explosion from the dust and burning for seven days, it really

24   makes no difference.

25   Q.    So you're saying that each case that you actually was an

4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

84

1  expert witness -- or not an expert witness but an expert to

2  resume those remains, that every one of those ashes were all the

3  same consistency per incident?

4  A.  No, not entirely.  Let me back up just a bit.  The size of

5  the fragments will depend on a lot of the circumstances itself.

6          In the case of the Imperial Sugar Refinery where the

7  wooden structure completely fell apart and exploded, a lot of

8  debris fell in on top of these individuals and the bone

9  fragments were very small.

10  Q.  Right.

11  A.  In a couple of other cases where there were not debris

12  that's fallen in, they can be quite large.  But, nevertheless,

13  even if they're small fragments, you know, they might vary in

14  size and, yes, they might vary in consistency.

15  Q.  Right.

16  A.  But they're still identifiable.

17  Q.  Okay.

18  A.  There will be a little bit more particulate matter in some,

19  a little less in some.

20  Q.  Okay.  Thank you.  And have you ever done or seen any animal

21  remains with your experience?  With your professional

22  experience?

23  A.  Yes, I have.  We see them all the time.  I've got several

24  articles.  As a matter of fact, I've got a PowerPoint

25  presentation on that, where animal bones have been identified by

1    coroners and medical examiners inaccurately as human.

2         I had one some years ago in North Georgia where a

3    coroner identified a set of remains, badly burned, as a human,

4    and we found out it was actually the pig that was burned at a

5    4th of July pig roast.

6         So, yes, I have identified and seen and worked animal

7    remains, as well.  It's quite common.

8    Q.   Okay.  Okay.  So you're saying that even like with

9    professionals such as yourself exploring a burn site, that

10   you -- that experts have actually confused animal remains with

11   human remains, is that correct?

12   A.   I wouldn't call them experts.  Coroners don't have the

13   training that I have as a forensic anthropologist, and even

14   medical examiners don't always get it right, either.

15        But since this is my specialty, I deal with strictly

16   skeletal remains, and badly-decomposed remains to a lesser

17   extent.  I'm the one that you really need to call, or at least a

18   forensic anthropologist, because coroners don't deal with this

19   and they don't always get it right.

20   Q.   Okay.  So basically a layman, somebody that is not as

21   educated as you are in your field, could explore a burn site and

22   not even know that there was bone fragments there.

23   A.   Yes.

24   Q.   And they wouldn't -- okay.  Thank you.

25        Did you ever explore that site?  Was you ever asked by

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 87 of 132 PageID #: 6165
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

86

1   PETA to ever explore that site?

2   A.   No, I didn't.

3   Q.   Okay.

4   A.   And I wasn't asked.

5   Q.   Okay.  Um, did you know -- do you know what a common

6   practice is for farmers and for exotic animal people, when it

7   comes to destroying like cows, or horses, or tigers, or bears,

8   or any large animal that might pass away in a typical farmer

9   setting or an exotic setting, do you know what their normal

10  protocol would be for destroying those remains?

11  A.   Exotic animals, no, I don't.  As far as farmers, I've dealt

12  with that before.  I can at least speak for what I've seen and

13  is done --

14  Q.   Right.

15  A.   -- typically in Georgia.  And usually it's a burn pit.  Or

16  at least it is in Georgia.  I can't speak for it everywhere

17  else.

18  Q.   Okay.

19  A.   But in Georgia it's typically a burn pit.

20  Q.   Exactly.  That's correct.  Do you know --

21       MS. HADDIX:  I guess, I guess after -- I guess that's

22  all I have for you.  That's it.

23       THE COURT:  All right.  Thank you, Ms. Haddix.

24       Mr. Goodman, any further questions for this witness?

25       MR. GOODMAN:  No, Your Honor.

1      THE COURT:  All right.  Then you may call your next

2  witness.

3      MR. GOODMAN:  Okay.  Calling Mr. Curtis Mills.  I'm

4  just going to take one minute to get the technology set up.

5      So, Mr. Mills, if you could please unmute and also make

6  the volume all the way up on your computer?  I'm just trying to

7  ensure there is no feedback with the computers.

8      THE COURT:  Okay.  We appreciate that.

9          (*Brief discussion off the record.*)

10      THE COURT:  Okay, I believe you turned off his video,

11  as well, Mr. Goodman.  We don't see him any more.  When you hit

12  the mute button maybe you also hit the video button.

13      MR. GOODMAN:  Thankfully I did not hit the button, but

14  I also couldn't turn it on.

15      THE COURT:  Okay.  Well, we had him until you were over

16  there.  So why don't you take a minute and see what you can do,

17  because we need to see the witness.

18      MR. GOODMAN:  It actually will not allow anyone to

19  click on that button.  We'll switch computers.

20      THE COURT:  We'll take a minute for you to figure out

21  how you want to proceed.  Just let us know when you're ready.

22          (*Off the record briefly

23          due to technical difficulties.*)

24      THE COURT:  Actually, while you're doing that I'm going

25  to take a short break.  This will about be a five to ten-minute

 1  recess.

 2        MS. HADDIX:  Okay.  I'd like to do that.

 3        THE COURT:  Anybody else who needs a break can do that,

 4  as well.

 5        MS. HADDIX:  Okay.

 6        MR. GOODMAN:  Thank you.

 7                    - RECESS AT 12:04 P.M. -

 8  ZOOM VIDEOCONFERENCE PROCEEDINGS

 9  RESUMED AT 12:10 P.M.:

10        THE COURT:  All right.  Mr. Goodman, are you ready to

11  proceed?  Actually, you just muted yourself.  You weren't muted

12  before.

13        MR. GOODMAN:  To eliminate the feedback I will stay

14  muted and my audio will be coming through Mr. Mills' computer.

15  Can you hear me okay?

16        THE COURT:  We can hear you, but you'll need to be

17  careful about how you speak because it's a little bit garbled.

18        MR. GOODMAN:  Okay.  I'm going to move.

19        I'm ready to proceed.

20        THE COURT:  Go ahead -- oh, let's see.  Sorry.

21        I need to have the witness please -- you'll be sworn

22  now by the Clerk.  Please raise your right hand for

23  administration of the oath.

24                    (Witness sworn.)

25        DEPUTY CLERK:  Thank you.

1      **CURTIS R. MILLS**

2           having been first duly sworn, proceeds to testify via

3      Zoom videoconferencing, as follows:

4      **DIRECT EXAMINATION**

5      **QUESTIONS BY MR. GOODMAN:**

6      Q.   Can you state your name for the record?

7      A.   My name is Curtis Mills.

8      Q.   Can you spell that?

9      A.   Yes.  C-u-r-t-i-s, M-i-l-l-s.

10     Q.   What is your occupation, Mr. Mills?

11     A.   I am Owner and Funeral Director and Embalmer of

12     Vansant-Mills Funeral Home in Clinton, Missouri, and also owner

13     and operator of the Over the Rainbow Bridge --

14                (Brief interruption by the court reporter.)

15     A.   It's Vansant, V-a-n-s-a-n-t, hyphen, Mills Funeral Home.

16     And I'm also owner/operator of the Over the Rainbow Bridge Pet

17     Memorial Services, also located in Clinton, Missouri.

18     Q.   How long have you owned Vansant-Mills Funeral Home?

19     A.   My wife and I have owned it eight years.

20                THE COURT:  Hold on a second.  Mr. Goodman, I don't

21     think we could understand anything you said.  The witness

22     obviously could.

23                Sorry.  I muted myself when I meant to undo it.  But

24     I don't believe we understood anything you said, Mr. Goodman, so

25     you're going to need to figure out a way to do it.

1  Q.   (By Mr. Goodman)   How long have you owned Vansant-Mills

2  Funeral Home?

3  A.   My wife and I have owned it eight years.

4  Q.   And did you work there before owning it?

5  A.   Yes.   My father opened it in 1977.   I was born and raised in

6  the building.

7  Q.   What is your -- what is the scope of your work at the

8  funeral home?

9  A.   The scope of the work is everything to include in the

10  funeral home business.   I do transfers of dead human remains,

11  I go on scenes, homes, hospitals, nursing homes.   I bring back

12  the remains into our care at the facility.   I do the embalming,

13  casketing, dressing.   I sit down with the families and make

14  arrangements.

15        I also do legal paperwork for the federal state/level

16  government, insurances.   Anything to do with calling cemeteries,

17  getting graves opened, monuments.   Anything to do with the

18  funeral service industry.

19  Q.   How long have you owned Over the Rainbow Bridge?

20  A.   We have owned Over the Rainbow Bridge one year and two

21  months.

22  Q.   What is the scope of your work there?

23  A.   Again, everything to do with taking into our care the

24  remains of animals that have passed away; doing the cremation

25  process and the paperwork process, placing them in the

1    crematory, doing, after the cremation take place, doing the

2    pulverization of the remains and giving back cremated remains to

3    the pet owners.

4    Q.   Do you have any related academic degrees?

5    A.   Yes, I have an Associates degree in Mortuary Science from

6    the Kansas City, Kansas Community College.  I also have about

7    another year of college in the business side of things after

8    that.

9         I also have been certified by Matthews International

10   Corporation, which is the owners of the company that

11   manufactures the crematories, both the human and the pet

12   crematory.  I'm also certified from CANA, which is the Cremation

13   'Society' of North America, as a certified operator of the

14   machines.

15   Q.   Is there also any sort of licensing in the field of funeral

16   services?

17   A.   Yes.  I am licensed in the state of Missouri as a Funeral

18   Director.  I'm also licensed as the Embalmer -- as an Embalmer

19   in the state of Missouri.  I'm also licensed as a Pre-Need

20   Funeral Director.

21   Q.   What is the process of getting the, for example, Funeral

22   Director license, incidentally?

23   A.   Funeral Director?  In the state of Missouri you're required

24   to be 18 years old and work in a funeral home for 12 months,

25   meeting with 25 families and submitting reports to the state

1    after those 25 families have been met with.  And then at the end

2    of that, you have to take a 250-question test.

3    Q.    And what about the process for becoming an Embalmer?

4    A.    Becoming an Embalmer in the state of Missouri requires an

5    Associates degree in Mortuary Science from an accredited school,

6    and then I have to pass the National Boards test, which is a

7    1,500-question test, and then I have to be employed by a funeral

8    home in the state of Missouri for 12 consecutive months, again,

9    embalming 25 dead human remains on my own, submitting reports to

10   the State and, at the end of that process, another I believe

11   1,500-question test I had to submit.

12   Q.    Are you a member of any professional associations in

13   addition to this?

14   A.    I'm a member of the National Funeral Directors Association.

15   I'm also a member of the Missouri Funeral Directors and

16   Embalmers Association and, also, we're members of the

17   International Pet Crematory and Cemetery Association.

18   Q.    You noted earlier that you were born and raised at the

19   funeral home you currently own, but how long have you actually

20   been working in this industry?

21   A.    I've been full-time since I was 21 years old, so around

22   28 years.

23   Q.    And can you tell us a little bit about your work history

24   before purchasing the funeral home?

25   A.    When I went -- after high school I did a year of college in

1  Sedalia, Missouri, and then went to Kansas City, Kansas to

2  finish up my college.  At that time I was employed by the

3  D.W. Newcomer Sons Funeral Homes in Kansas City, Missouri, in

4  Raytown, Missouri.

5          I started as a Night Embalmer Transfer Student

6  position.  I stayed with the company after I graduated from

7  mortuary school.  I stayed with the company and worked my way up

8  from the Night Embalmer position to a General Manager in charge

9  of six locations, including the cremation, and cemeteries,

10 funeral homes, and delivery on the Missouri side.

11 Q.   Okay.  About how many cremations would you say you have

12 conducted or overseen?

13 A.   I've probably overseen over 10,000 human cremations.

14 Q.   How about non-humans?

15 A.   Non-humans?  We opened the pet crematory, like I said, a

16 little over a year.  I think I'm at about 138 that I have

17 conducted personally.

18 Q.   What does the process of cremation entail?

19 A.   The process on either side, on the commercial side there is

20 a retort, or the machine, cremation machine or retort.  You

21 place the human or pet remains in that machine.  We calibrate

22 the machine by weight.  We have to weigh the individual, be it

23 either human or pet.  Then we calibrate the machine on the

24 length of time that it takes for the cremation process to

25 finish.  So we start the machine usually, on a human -- again,

1    depending on the weight -- it's hours.  It could be anywhere

2    from two hours to six, eight, ten hours, depending on the size.

3    At that point in time, after the machine cools down, after the

4    cremation takes place, is started, at that point in time we open

5    up the machine by the front and we remove the skeletal remains

6    that are left.  We place them in a processing unit and then we

7    process it into cremated remains that we give back to either the

8    human families or the pet families.

9    Q.   What is a processing unit?

10   A.   A processing unit?  We have, we have to use separate units

11   for the human and the pet by state law.  So it is a large steel

12   drum about four to five gallons in size.  We place -- at first

13   we put the cremated remains on the top of that.  We go through

14   and take out any metal or anything that's left over from the

15   process and then we place those bone fragments into this, into

16   this metal drum and at the bottom there is two-inch blades on

17   each side.  Metal blades.  Then we turn on the processing unit

18   for two and a half minutes and then that processes or takes what

19   bone fragments are left and turns them into a fine dust, or

20   cremated remains, as we call it, or what other folks maybe use

21   the term "ash".

22   Q.   So to back up a second, before you --

23                     (*Off the record briefly*

24                     *due to technical difficulties.*)

25   Q.   So to back up a moment, before the body is removed from the

Case: 4:16-cv-02163-CDP   Doc. #: 376   Filed: 06/09/22   Page: 96 of 132 PageID #: 6174
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

95

1  retort, what are the -- is the process the same for the humans

2  and non-humans?

3  A.   Yes, exactly the same.

4  Q.   And what is the difference between cremating humans and

5  non-human animals?

6  A.   The only difference is time and the size of the machines

7  that are used in that process.

8  Q.   Is there any difference on the effect of the burn on the

9  body itself?

10  A.   No.  None.

11  Q.   After the body is burned in the retort, what is the

12  condition of the skeleton?

13  A.   The skeletal remains lay in the position that it was placed

14  in the retort.

15  Q.   What does it look like in that position?

16                    (*Brief interruption*

17                    *due to technical difficulties*.)

18  Q.   (By Mr. Goodman)  What does it look like in that position?

19  A.   Well, whatever position it's placed in, it's skeletal

20  remains laying there on the floor of the crematory or retort.

21  Q.   The full range of the entire body?

22  A.   Yes, the entire body.

23  Q.   Let's change gears for a moment.  Do you also have a farm?

24  A.   Yes.

25  Q.   What kind of farm?

96

1   A.   We run a cow/calf operation.

2   Q.   How long have you had that?

3   A.   Eight years.

4   Q.   Can you tell the Court a little bit more about the farming

5   operation and what you do there?

6   A.   Yes, we have momma cows that every 365 days they will have a

7   baby calf, and we take the steer calves and grow them up to

8   sell-weight, which is between 500 to 700 pounds; and the heifer

9   calves or female calves we keep back to add to our herd.

10  Q.   What is the property like that the herd is held on?

11  A.   We have one farm of 70 acres that we own altogether, and we

12  rent two other 40-acre farms within a mile of that.  It's

13  pasture and wooded ground with a pond, barns, a small cabin.

14  Q.   Do you ever have any occasion to initiate burns on the farm?

15  A.   Yes.  We do a lot of -- especially with the wooded areas

16  around the pasture spots, we take out a lot of trees that we

17  have to, to get more pasture for more grass to grow.  So we cut

18  down a lot of trees.  Or trees that fall down, we cut them down

19  and put them in piles and then, again, burn them.

20  Q.   About how many controlled fires would you say you've set on

21  the farm?

22  A.   I'd say in the last five years, 25 or so.

23  Q.   How do you go about that process?

24  A.   We either physically manually pile up the wood or use a skid

25  steer or a loader on a tractor.  And then we let it sit for a

1   determined amount of time till we think it's dried, depending on

2   what type of tree or what type of material we're burning.  And

3   then I take a mixture of usually five gallons of gasoline and

4   five gallons of diesel fuel, I pour that on the fire to ignite

5   it, and then we burn it and let it burn.

6   Q.   About what size are these fires, generally?

7   A.   Some are ten feet wide, ten feet square, ten feet tall.

8   Right now I have a pile that's probably 25 feet long, ten feet

9   high, eight feet wide.  Each one of them depends.

10  Q.   And you can elaborate if it differs based on the size

11  because I appreciate there is some variability, but what factors

12  determine -- or, rather, how long do these fires burn for?

13  A.   It depends on the size of the burn pile.  We've had fires

14  that are burned up -- in dried kindling that burned up within a

15  few hours.  We've also had fires that burned up for days,

16  depending on the size of the tree, again, if it's a whole tree,

17  if it's wet, if it has not been down for a long time.  Outside

18  environmental factors take into that.  If it's dry.  Humidity.

19  There's all kinds of factors.  But we've gone from a few hours

20  to days.

21  Q.   You mentioned using both gasoline and diesel fuel as an

22  accelerant.  Would using more of it at the time the fire is lit

23  burn the fire for longer?

24  A.   No, it's all based on the materials that's burning.  We only

25  use that to start the fire.

1   Q.   Also, if you would add more gasoline or diesel fuel during

2   the fire, that wouldn't have an impact on the length of its

3   burn?

4   A.   No.

5   Q.   This hearing, if you know, ask the question of whether a

6   chimpanzee was cremated in an outdoor burn pit.  In your

7   experience as a professional in Funeral Science, what is it

8   about this case that a lay person with no such background might

9   not understand?

10   A.   They might not understand that there's always going to be

11   remains left, no matter -- human or animal remains left after a

12   fire or cremation process.

13   Q.   Do you think that there is anything else about this case

14   that a lay person with no experience with controlled outdoor

15   fires might not understand?

16   A.   I mean there is always going to be remains left over.

17   Q.   Have you reviewed any materials in connection with this

18   case?

19   A.   Yes, I reviewed some emails and an affidavit, I believe.

20   Q.   Do you recall who submitted that affidavit?

21   A.   I believe it was a lawyer, Mrs. Haddix's lawyer at the time,

22   about the consistency of the remains left over.

23   Q.   You're referring to an email from John Pierce.

24   A.   Right.

25   Q.   And so that was one of the emails.  You said there were a

Case: 4:16-cv-02163-CDP    Doc. #: 376    Filed: 06/09/22    Page: 100 of 132 PageID #: 6178
4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

99

1  few emails.  Do you recall what the other was?

2  A.  The size of the fire or funeral pyre, excuse me.  I believe

3  was 20 foot tall, or 20 foot wide and eight feet tall.

4  I believe there were some dimensions in there.  That the

5  temperature was only 165 to 170 degrees, and then came back to

6  say that the fire was 1,650 to 1,700 degrees for three hours,

7  I believe.

8  Q.  I think you're describing the email and affidavit from Jerry

9  Aswegan, is that right?

10  A.  Yes.

11  Q.  Okay.  Do these materials indicate what remained of Tonka

12  after the fire burned?

13  A.  In one email it just said a box was given back with

14  particulate matter all in the same consistent size.

15  Q.  It referenced the -- there were other references to these

16  remains and the same consistent size as "ash", right?

17  A.  Yes.

18  Q.  Did you rely on any other source of information informing

19  your opinion in this case other than this affidavit and the two

20  emails?

21  A.  No.

22  Q.  Having reviewed this information, do you have an opinion

23  about whether the alleged cremation of the chimpanzee Tonka, as

24  described in these materials, is plausible?

25  A.  It is not plausible that the cremation took place.

1  Q.   Why do you not believe that this cremation is plausible?

2  A.   Just with the evidence provided, that would have to be a

3  physically processed -- the remains would had to have been

4  physically processed in a processing unit to be given back by

5  what's described by Ms. Haddix, and that would not be the scene

6  of a funeral pyre.

7  Q.   Your testimony is that it would have to be mechanically

8  processed?

9  A.   Yes, it would have to be mechanically processed.

10  Q.   Can you do that with a hammer?

11  A.   No, sir.

12  Q.   A sledge hammer?

13  A.   No, sir.

14  Q.   There's no tool that one can use to turn a potential

15  amount -- or I withdraw that.

16       There is no tool that a person can physically use by

17  hand to turn bone into a finely divided powder of approximately

18  uniform consistency?

19  A.   No, it would have to be a mechanical process.

20  Q.   If that process was not done, what would you expect to

21  remain?

22  A.   It would be large bone fragments from the animal or human.

23  Q.   Based on your experience both with outdoor fires and in your

24  industry, how much bone do you think would remain?

25  A.   Again, depending on the size of the animal.  It's based on

1  the bone structure.  But on normal humans it's anywhere from

2  100 to 200 cubic inches after the process.  After the mechanical

3  processing is done.

4          On a pet, again, it's also based on the structure of

5  the pet.  It could be anywhere from a half-cup on up to

6  200 cubic inches, again depending on the size of the animal.

7  Q.  I'm sorry.  I think my question was unclear because you were

8  just now speaking about what would remain after mechanical

9  processing, right?

10  A.  Yes.

11  Q.  Before mechanical processing, assuming an individual of

12  200 to 250 pounds, what skeletal remains would you expect to

13  see?

14  A.  It would fill up the drum, which is about a four to

15  five-gallon drum, in the pieces before the mechanical processing

16  takes place.

17  Q.  Is there any sort of accepted calculation for the expected

18  weight of the skeletal remains after a cremation?

19  A.  I believe usually human remains come back between seven and

20  eight pounds on an average 200-pound human.

21  Q.  Having reviewed this information and testifying that you

22  think this cremation of Tonka in the manner described was

23  implausible, do you have an opinion about whether Tonka was, in

24  fact, cremated as described in those materials?

25  A.  I do not believe Tonka was cremated in those facts.

1  Q.   What you've stated is as to why you thought it was

2  implausible.  Is there any other reason why you believe it did

3  not happen in this particular instance?

4  A.   Just on the outside, in the commercial process of the

5  cremation process, it's all based on your fuel and your

6  temperatures and the air to make those cremations take place.

7           In an outside funeral pyre, an outside fire, there's

8  too many variables in those and to keep an outside fire between

9  1,650 and 1,700 degrees for a certain amount of time, in my

10  opinion there are too many outside factors; the day, the

11  humidity, the type of fuel that was used on the fire, what type

12  of wood was being burned.  There's too many factors on those to

13  say that you consistently did -- that the cremation took place

14  for that amount of time, with that amount of fuel, on that day.

15  Q.   What is involved in getting a temperature to 1,650 or

16  1,700 degrees in your professional experience in the crematorium

17  context?

18  A.   Usually in either crematorium the state laws require us to

19  have -- the minimum before the cremation actually can physically

20  take place, the crematory units have to be at 1,600 degrees and

21  have to keep between 1,600 and 1800 degrees for air quality

22  purposes.  And it takes an about an hour and 15 minutes for the

23  human retort to go from whatever temperature it's at -- usually

24  it's between 100 and 200 degrees to start -- to get it up to

25  that 1,600 degrees before the remains actually go in the

1    crematorium.

2           And also, on the pet side it's a little bit smaller but

3    I think it takes between 35 and 45 minutes for that machine to

4    reach the 1,600-degree temperature before the actual remains,

5    again, can be put into the retort for the cremation to start.

6    Q.   And you said that the temperature needs to be maintained

7    within, I believe you said it was 1,650 to 1,800?

8    A.   1,600 to 1,800 degrees.

9    Q.   1,600 to 1,800.  And how does the, how does the retort

10   maintain temperatures within that range?

11   A.   It's all technology on those.  It's timers.  It's fuel.  It

12   takes into consideration the burners.  There's two burners in

13   each machine; an afterburner which is an after-chamber burner,

14   and then, also, the actual cremation burner itself which is on

15   top of the remains.

16          It takes into consideration -- the machine is all used

17   with timers, usually from Honeywell.  They're computerized and

18   then it either adds more fuel, or more air, or less air, or more

19   gas.  We use natural gas as our fuel.  So it's all based on the

20   machine doing the work for that.

21   Q.   And to what extent do you think, in your professional

22   opinion, it would be feasible to maintain temperatures within a

23   range of about 50 degrees for three to four hours in an outdoor

24   fire?

25   A.   I don't think that's plausible.  I don't see that happening.

104

1   It's too tight of a time -- too tight of a temperature range.

2   Because even when using a computerized commercial crematorium,

3   they range, like I said, within a couple hundred degrees using

4   fuel, air, and I just, I don't think it's plausible for an

5   outside fire.

6   Q.   If Tonka had been burned as described, what would you expect

7   to remain at the site of the fire?

8   A.   It would be his whole -- his skeletal remains.  They could

9   be fragmented.

10  Q.   And by "fragmented" can you provide a little bit more

11  detail?

12  A.   Let's just say the femur bone, which is the leg bone, it'll

13  be laying there but it could be broken up into pieces, but it

14  would be laying in the same vicinity of where he was placed on

15  top of the fire.  It would be on the ground.

16  Q.   And would you have any expectations for the particular size,

17  approximate size of the skeletal remains?

18  A.   No.  It would just be whatever the size of his skeletal

19  remains were would be laying there in whole.

20  Q.   I think you just testified a moment ago that they might be

21  broken?

22  A.   They could be broken.  What I'm saying is the whole -- the

23  skeleton is going to be laying there on the ground.

24  Q.   You think the pieces, if broken, it would be easily

25  recognizable?

1    A.    Yes.

2    Q.    As bone?

3    A.    Yes.

4    Q.    In your opinion, would any of Tonka's body turn to what

5    Mr. Pierce described in the email you reviewed as, quote, "A

6    finely divided powder of approximately uniform consistency?"

7    A.    There could be, like I said, a very small portion of it with

8    the chipping of it, depending on the materials used, if it did

9    fall on his remains.  But for the most part they're going to be

10   in large pieces.

11   Q.    And this might be retreading a little bit, but in your

12   opinion what additional steps would be required to turn a

13   chimpanzee's body, after being burned on a pyre, to ashes?

14   A.    (*Inaudible response.*)

15   Q.    I also just wanted to add that I acknowledge your testimony

16   a moment ago that --

17                        (*Brief off-record discussion*

18                        *due to technical difficulties.*)

19            MR. GOODMAN:  I interrupted Mr. Mills.  He just

20   testified a moment ago that there would be some small amount of

21   ash involved, so I want to just clarify my question.

22   Q.    (By Mr. Goodman)  So what additional steps do you think

23   would be required to turn a full chimpanzee's body, or a

24   substantial portion of the chimpanzee's body, after being burned

25   on a pyre, to what's considered ash?

4:16-CV-2163 - Motion for Contempt Hearing - 1/5/2022

106

1  A.  His skeletal remains would have to have been collected and

2  then, you know, in some way mechanically processed into a

3  uniform consistency of cremated remains given back.

4          MR. GOODMAN:  No further questions for Mr. Mills on

5  Direct.

6          THE COURT:  All right.  Ms. Haddix, do you wish to make

7  -- cross examine this witness?

8          MS. HADDIX:  I do.

9                          CROSS EXAMINATION

10  QUESTIONS BY MS. HADDIX:

11  Q.  Mr. Mills, so my understanding is that you owned or you

12  currently own a funeral home and you've owned it for eight

13  years.  And then you own a pet -- in fact, I think you cremated

14  a couple of my capuchins, actually -- that you own a pet

15  crematorial, is that correct?

16  A.  Yes, ma'am.

17  Q.  Okay.  And you also are a cattle farmer?

18  A.  Yes, ma'am.

19  Q.  Okay.  Have you ever been to a burn pile where cattle or

20  larger farm animals have been cremated?

21  A.  No, ma'am.

22  Q.  So you've never seen a farmer cremate their remains?

23  A.  No, ma'am, we don't do that.  In our area we, we bury them.

24  Q.  Yeah, some do.  Some dig holes, you're right.  Absolutely.

25          Okay.  So you've never ever seen a crematorial remains

1  of an open pit fire of any larger animal, is that correct?

2  A.  No, ma'am.

3  Q.  Okay.  So you are saying that in a crematorial setting, like

4  when you have them in -- I forgot what you called them -- but

5  the crematory itself, that when you open it up you would find

6  pieces, and it would be basically the body laying there but it

7  could be in fragmented pieces or it could be dust or it could be

8  whatever.  It's a mixed consistency, is that correct?

9  A.  Yes, ma'am.

10  Q.  But you've never seen a pit fire so you have never seen what

11  it would look like at that point.

12  A.  No, ma'am.

13  Q.  So you're only speculating, per your educational -- how much

14  ever education that you have and what you've seen with your

15  experience, you've never actually seen a body that has been

16  burned at a fire pit, correct?

17  A.  Not -- no.  I've seen a human body being -- that has been

18  burned in a pit, yes, ma'am.

19  Q.  Okay.  But never an animal --

20  A.  Yeah.

21  Q.  -- is that correct?

22  A.  No, ma'am, I've never seen it.

23  Q.  Okay.  I just wanted to clarify that.

24       So you have not had the opportunity, nor has PETA hired

25  you or had you go to the actual burn site that Tonka's body was

1  cremated at, have you.

2  A.   No, ma'am.

3  Q.   Okay.  So nobody has ever gone, with their expertise, gone

4  to that site to see if possibly there is quite a few bone

5  fragments.  Is that correct or not correct?

6  A.   I have never been asked to go to the site, no, ma'am.

7  Q.   Okay.  So let's just take a step forward and say possibly

8  that because Jerry Aswegan is my husband and he's married to me,

9  that -- just say he collected some ashes for me to satisfy me,

10  to say that those were Tonka's remains at that site, and then

11  there was other pieces because other animals have been burnt

12  there, too.  So there's probably several bone, pieces of bone

13  fragments throughout that whole burn pit but he was being kind

14  to me in giving me something of his.

15          Have you ever -- like when you do cremations, do you

16  give the whole body to people?

17  A.   Yes, ma'am, that is correct.  We only do private --

18  Q.   After you process that, right?

19  A.   After they've been processed, yes, ma'am.

20  Q.   Okay.  Okay.  Okay.

21  A.   The laws are very clear.  We have to -- one human remains at

22  a time in the retort.  In the pet side we do a little bit bigger

23  step.  We only do private cremations.

24  Q.   Sure.

25  A.   Because the pet cremation laws are a little -- they don't

1    exist --

2    Q.    Right.

3    A.    -- in any quality, at times.  We have decided we only do

4    private cremations, is all we offer.

5    Q.    Okay.

6    A.    So, yes, one pet at a time in our retort.  We remove those

7    remains.  We manually process them or physically process them in

8    our processing unit for pets, and hand back the whole cremated

9    remains of that animal to that loved one.

10   Q.    So when you do, is there residual ashes left and then you

11   clean it out, or how does that work?

12   A.    Correct.  We have to clean it out, yes, ma'am.

13   Q.    Okay.  So there would be remains.  If you didn't clean it

14   out, you would have it compiled, compiled, and you would have

15   many, many types of ashes and many, many types of bone

16   fragments, is that correct?

17   A.    Yes, ma'am.

18   Q.    Okay.

19   A.    But that's against the law.

20          MS. HADDIX:  Okay.  Okay.  And -- I'm just trying to

21   think.  No, that's it.  That's it.

22          THE COURT:  Mr. Goodman, any redirect?

23          MR. GOODMAN:  No, Your Honor.

24          THE COURT:  All right.  So then that concludes the

25   testimony of Mr. Mills.

 1            All right.  Mr. Goodman, you may proceed.  Do you have

 2    any other witnesses or other evidence?

 3            MR. GOODMAN:  We do not.

 4            THE COURT:  All right.  Ms. Haddix, do you wish to

 5    present any additional evidence at this time?

 6            MS. HADDIX:  No, I don't.

 7            THE COURT:  For this hearing?

 8            MS. HADDIX:  No, I don't.  No.

 9            THE COURT:  All right.  So having heard all the

10    evidence, then I'll ask Mr. Goodman, would you -- you can make

11    any arguments you wish.  You said you wanted about ten minutes.

12    I think that's reasonable, and about the same for Ms. Haddix.

13    Whatever you think you need to proceed.

14            MR. GOODMAN:  Yes.  Thank you.  I'm just going to sort

15    out the audio briefly.

16            THE COURT:  Sure.

17                    (*Briefly off the record*

18                     *due to technical difficulties.*)

19            MR. GOODMAN:  Thank you for your patience, Your Honor.

20              **- COUNTERCLAIM PLAINTIFFS CLOSING ARGUMENT -**

21            MR. GOODMAN:  So we're here today to get the very --

22    the answer to a very simple question:  Where is Tonka?  In

23    negotiating the Consent Decree in this case, Ms. Haddix

24    specifically chose to keep Tonka.  She explained that she wanted

25    him to be, quote, "Loved by his own people," and that she felt

 1    they bonded from spending, quote, "Hours hanging out."  In the

 2    spirit of negotiation, Plaintiffs agreed to this arrangement.

 3          Ms. Haddix then defaulted on her obligations under the

 4    Consent Decree, including blatantly lying about the status of

 5    the land on which she would attempt to build a new enclosure,

 6    and sending photographs of that land with false descriptions of

 7    when they were taken and what had allegedly been completed.

 8    Ms. Haddix also stated in court that she wanted to get out of

 9    and cancel the Consent Decree.

10          Ms. Haddix failed to remedy her non-compliance with the

11    Consent Decree despite an extension, an alternative remedy

12    provided by this Court.  On June 1st, when Ms. Haddix did not

13    remedy her default, the Court found her in civil contempt and

14    ordered the transfer of all seven chimpanzees at issue to the

15    Center For Great Apes, of course, if Tonka was alive.

16          Almost immediately after the Court entered that order,

17    Ms. Haddix asserted to the press that she would not comply; that

18    she decided to keep all of the chimpanzees, and began to claim

19    that Tonka had died.  Plaintiffs requested more information

20    regarding Tonka's supposed death promptly at that time, but

21    Ms. Haddix refused to cooperate and refused to provide any

22    evidence then to support her assertion.

23          This failure to provide evidence of Tonka's death,

24    especially in light of Ms. Haddix's expressed intent to prevent

25    the negotiated and court-ordered transfer, led to Plaintiffs

1    reasonable concern that her assertion of Tonka's death in this

2    instance was part of a scheme to prevent his transfer to the

3    Center For Great Apes when the remainder of the chimpanzees were

4    moved to a sanctuary.

5         At the Contempt Hearing on July 14th, 2021 and in its

6    minute entry, the Court ordered Ms. Haddix to provide proof of

7    Tonka's death within seven days, or by July 21st.  Following the

8    hearing the Court entered the Transfer Order.  In relevant part,

9    again, the Court ordered that all of the chimpanzees, including

10   Tonka, be moved.

11        It is undisputed that Ms. Haddix failed to present

12   Plaintiffs with anything by her deadline of July 21st and that

13   Tonka was not present at the facility on July 28th.  Despite

14   Ms. Haddix's knowledge at the time of Tonka's alleged death on

15   May 30th, 2021 that he was to be transferred to the sanctuary

16   due to her failure to satisfy her obligations under the Consent

17   Decree, she took no steps to preserve evidence that he died and,

18   instead, claims to have caused his body to be illegally

19   destroyed in a fire without even informing Plaintiffs of his

20   supposed death.

21        To date Ms. Haddix has still provided no actual proof

22   that he died.  The purported proof that she has offered includes

23   only:

24        First, her and her husband's statements;

25        Second, her veterinarian's records and affidavits

1   stating in relevant part that Ms. Haddix called and informed me

2   that Tonka died;

3           Third, ashes in the form of a powder to be tested

4   despite that they could not be Tonka's remains because burning

5   Tonka's body in the manner she asserts, whether at 170 degrees

6   or 1,700 degrees, could not turn his body to powdery ash and

7   would leave nearly a complete skeletal remains and,

8   additionally, diagnostic testing of the ashes for identification

9   scientifically impossible;

10          Fourth, Ms. Haddix provided her willingness to take a

11  lie detector test, which of course is widely recognizable as

12  unreliable pseudo science; and

13          Fifth, she provided a screen shot of a non-original

14  photograph in which she acknowledged that Tonka appears to be

15  sleeping, that was sent to Plaintiff seven months after his

16  purported death and five months after Ms. Haddix had been

17  ordered to provide proof of his death.

18          Plaintiffs submit that the undisputed physical

19  impossibility of Ms. Haddix's assertions regarding Tonka's

20  cremation and remains, her own private admission to a friend

21  that Tonka is alive, and according to her numerous additional

22  such admissions, satisfy their burden of establishing that Tonka

23  is indeed still living and Ms. Haddix is again in contempt of

24  court.

25          Ms. Haddix now, at the very conclusion of this hearing,

 1  asserts there is some possibility that her husband, who

 2  submitted a sworn declaration that he collected Tonka's ashes

 3  from the middle of a burn pile, may not have done that, may not

 4  have actually provided her with Tonka's remains but, instead,

 5  just gave her some ash from the property.

 6          Mr. Aswegan is present right now with Ms. Haddix.  He's

 7  not been offered to provide testimony.  The Plaintiffs have not

 8  subpoenaed him because he has not been offered to present

 9  evidence on Ms. Haddix's behalf.  There is no sworn testimony

10  that this happened.  It's entirely speculation.

11          Dr. Snow testified that in these circumstances --

12          THE COURT:  Let me, let me just stop you here,

13  Mr. Goodman.

14          MR. GOODMAN:  -- to the extent skeletal remains --

15          THE COURT:  Mr. Goodman, may I interrupt?  May

16  I interrupt you?  I have a question.

17          MR. GOODMAN:  I'm sorry.

18          THE COURT:  Can you hear me?

19          MR. GOODMAN:  I'm sorry, Your Honor.  I see your mouth

20  moving but I think that's my --

21          THE COURT:  Okay.  Can anybody else hear me?

22          MS. HADDIX:  I can.

23          MR. GOODMAN:  Please go ahead.  I can now.

24          THE COURT:  Okay.  Now you can hear me?  All right.

25          I have a question for you.  And this came up with --

1    I mean you've said several times there's no proof, you referred

2    to bald assertions, and you just said that Mr. Aswegan's --

3    there was no evidence, actual evidence of Mr. Aswegan's

4    statement.

5            But there are Affidavits in the record.  I'm

6    considering all the record that's been made here.  You've

7    referred to things in the prior filings, as well.  And I do have

8    sworn Declarations from both -- I mean today I have Ms. Haddix's

9    sworn testimony but I also have Mr. Aswegan's Declaration.

10           So when you say there is no evidence, those things are

11   evidence, aren't they?

12           MR. GOODMAN:  Yes.  Forgive me, Your Honor.

13           THE COURT:  Thank you.

14           MR. GOODMAN:  It's not actual proof.

15           That's correct.  So Mr. Aswegan, in his Declaration,

16   notes that he collected ashes from the center of the pyre where

17   Tonka's body was located and gave them to Ms. Haddix.

18           Frankly, Your Honor, if this did occur as Ms. Haddix

19   provides or speculates at the very end of this hearing, she has

20   every opportunity to present the actual remains of Tonka, if

21   she's now asserting that the ashes are not, in fact, his

22   remains, and has not done so.  There could be no better proof of

23   Tonka's death than his skeletal remains.  There has been no

24   plausible evidence actually presented.

25           We have expert testimony from experts with decades of

1    experience in this field testifying unequivocally that the

2    evidence that has been presented, Mr. Aswegan's information, his

3    email and his Affidavit, Ms. Haddix's own representations, are

4    impossible.  It couldn't have happened.  This conclusion is even

5    further supported by Ms. Haddix's expressed intent to obstruct

6    the transfer for demonstrated express disregard for the Court's

7    orders previously and her previously-litigated fraudulent

8    conduct.

9          We're now expected to believe that what she has

10   represented as Tonka's ashes are not, in fact, Tonka's ashes.

11   We're also expected to believe that her admissions to a friend

12   that Tonka was alive were a lie.  If we cannot -- if Ms. Haddix

13   can come to court and say that all of the evidence that points

14   to Tonka being alive is not credible because she's lying,

15   because her husband is lying, then this is a mockery of a

16   hearing.  This was her opportunity to actually present plausible

17   evidence and respond to these concerns and she elected not to.

18         Virtually every argument supported by expert opinion in

19   this case had already been asserted repeatedly in motions before

20   this Court.  There have been no surprises that Plaintiffs

21   presented.  Ms. Haddix had every opportunity to have her husband

22   or other professionals testify on her behalf today to refute the

23   undisputed expert evidence that this did not occur as described,

24   and she elected not to do so.

25         Given all the misconduct, we believe that it is

1    absolutely appropriate at this stage of the case -- unless the

2    Court for some reason would like to give Ms. Haddix another

3    opportunity to present actual plausible evidence that this

4    happened -- to impose sanctions on Ms. Haddix yet again,

5    including potentially body attachment, until Ms. Haddix complies

6    with the Court's orders, including requiring her to identify the

7    specific location in which Tonka is held.

8          If she cannot prove -- as she has not today -- that he

9    died, as requested in Plaintiffs' motions, I also would ask for

10   costs and attorneys fees associated with our efforts to continue

11   to obtain compliance with these orders specifically after

12   Ms. Haddix failed to provide evidence except her email from

13   Mr. Jerry Aswegan indicating that Tonka was burned on a burn

14   pile at 165 to 170 degrees by the deadline that this Court

15   provided of July 21st.

16         THE COURT:  All right.  Ms. Haddix, do you wish to make

17   any Closing Arguments here today?

18         MS. HADDIX:  Yes, ma'am.

19         THE COURT:  All right.  Go ahead.

20            **- COUNTERCLAIM DEFENDANTS CLOSING ARGUMENT -**

21         MS. HADDIX:  First of all I want to say that -- first

22   of all I want to say that my attorney was the one who had me

23   write out the statement before the deadline that you set for me,

24   and I gave -- or actually Jerry gave him that email before the

25   deadline.  So what happened to it from there I'm not 100 percent

1    certainty because I was represented by an attorney which I ended

2    up firing because he wasn't representing me well.  So I did, in

3    good faith, turn it over to my attorney which I thought, in

4    fact, turned it over to you, you know, the courts before the

5    deadline to show that Tonka did die and that he was cremated.

6            We also had a sworn statement by my veterinarian

7    stating Tonka's health for like two or three, four weeks,

8    whatever it was prior to him having the stroke and prior to him

9    having congestive heart failure, how he had declined and how my

10   veterinarian swore in that statement that he asked me to

11   euthanize Tonka, and I just didn't feel like, in good faith,

12   that I could.  And he gave me a week to try to make him better

13   and then he died in the process.

14           So we did turn -- or I did have those for -- or the

15   attorney had them in the deadline that you set to give to you,

16   so what happened to them from there, I don't know.  But I did

17   try to be compliant and to provide those documentations.  So

18   that's -- I mean Mr. Goodman is representing me to be this rebel

19   but I wasn't trying to be.

20           So from there, we move forward to the fact of the

21   cremation.  I know for a fact that Tonka was cremated but even

22   the whole thing of it is it's whether or not Tonka died, because

23   I can't provide him to you guys if he died.  (*Crying.*)

24           And my whole thing of it is, is I know I talk big

25   whenever it comes to those chimps because I love those chimps,

1   but the fact of it is I didn't stand in the way of the court

2   order when you guys took them.  (*Crying*.)  I didn't -- I wasn't

3   even around.  I let you guys have them because it was

4   court-ordered by you and I knew I couldn't keep them even though

5   I wanted to, so I let them go.

6          And we -- the people that came and got them will even

7   tell you we were very, very cooperative.  We even segregated the

8   chimps the night before.  So weren't trying to stand in the way

9   of them going anywhere, and that would even include Tonka,

10  (*Crying*) because I would not want Tonka to be someplace without

11  his friends.  I loved those chimps so much that I would do

12  anything for them and, yes, I would have fought, come hell or

13  high water, for them.  But whenever it came to the time that

14  they had to go, I let them go.  (*Crying*.)  I tried to do

15  everything.  And I know that they don't understand when you love

16  them kids you love those kids.  But I would never ever let Tonka

17  go someplace else.

18         And I can't keep him, obviously.  I invited Jared to my

19  house and he refused that.  I offered him lie detector tests.

20  I even went out to that burn site and got more ashes and

21  I offered those ashes to him so he could try to sort through

22  them and, if there was bone fragments, do DNA.  I don't care at

23  this point, as long as he gives them back.

24         I just don't want Tonka to be disturbed and sent to

25  somebody else.  I want his ashes home.  That's it.  I offered

1    the picture.  I sent it to him.  What else have I done ...

2           THE COURT:  Let me just clarify something.  You didn't

3    actually give the ashes to Mr. Goodman, did you?

4           MS. HADDIX:  I offered to.  I offered.

5           THE COURT:  Okay.  Okay.  But when you say you want

6    them back, you've still got them, right?

7           MS. HADDIX:  Right.

8           THE COURT:  He doesn't have them.  Okay.

9           MS. HADDIX:  Right.  I do have them and I told him he

10   could have them.  I just want them back when he's done with

11   them.

12          THE COURT:  I understand.

13          Can you all hold on just one moment?  I have to deal

14   with something.

15                    (*Brief break off the record.*)

16          THE COURT:  All right.  I apologize for the break.

17          Ms. Haddix, are you able to continue?

18          MS. HADDIX:  Yeah.

19          And so, basically, I have tried to be compliant.  You

20   even stated in your statement that you weren't sure what kind of

21   evidence that I should provide or what I could provide.  So

22   I offered everything that I knew of that I could do to stop this

23   stuff because I, right now, at this point I have leukemia and if

24   I don't start treatment I have less than six months.  So at this

25   point I just don't care.  I just don't want to be terrorized any

1    more by these people.  I just want them to leave me alone.  And

2    if they want his ashes they can have them, as long as they give

3    them back.

4        I don't know -- I mean if they want to talk to Jerry,

5    they can talk to Jerry.  I don't care.  I didn't ask him to come

6    today -- or I mean he's here, of course, because we're at home

7    in our home but I didn't ask him because I didn't have any more

8    questions for him.  I thought he did a Declaration that

9    I thought covered everything, so I didn't feel like I needed to

10    ask him to, but if they need him for more, they're welcome to

11    him.

12        THE COURT:  All right.  I have a question -- I have a

13    question for you, Ms. Haddix.  And, actually, Mr. Goodman may

14    need to answer this if you aren't able to but -- actually, let

15    me ask you both you this.

16        You've made reference to this Affidavit from the

17    veterinarian about a stroke and some other things.

18        MS. HADDIX:  Yes, ma'am.

19        THE COURT:  I remember an affidavit from a veterinarian

20    saying you called and said he had died.  Can you tell me, did

21    you file that affidavit with the Court earlier?

22        MS. HADDIX:  Yeah, they were supposed -- my attorney

23    was supposed to have because they talked to my veterinarian, who

24    is the one that seen Tonka.  And Jared Goodman --

25        THE COURT:  Hold on a second.  Mr. Goodman may have the

1  answer to that.

2       Mr. Goodman, do you have this affidavit?

3       MR. GOODMAN:  It was filed with the Court.  It's

4  document number 317-2.

5       THE COURT:  Thank you.

6       MR. GOODMAN:  And it reflects, as both the parties

7  would agree, that Dr. Talbot saw Tonka on or about the 20th.  He

8  showed signs of heart disease or heart failure and put Tonka on

9  medication.  And I don't recall if the affidavit specifically

10 says that he began a discussion about whether, if he's not

11 responding to the medication after several weeks, if Ms. Haddix

12 wants to start considering euthanasia because of potentially

13 poor quality of life if he does not improve with the medication.

14      THE COURT:  Right.  Okay.  I do have that and

15 I appreciate you giving me the docket number.  I was looking for

16 it because I thought I had seen it before but the one that was

17 filed most recently didn't -- it wasn't that one.  But I do have

18 this and it was provided to me at the July hearing.

19      MS. HADDIX:  Right.  And he set a date for me to -- he

20 actually set a date for him to come out to euthanize him and

21 I postponed it because I wanted to keep trying to save Tonka if

22 I could.  But then he just died on his own, so there was no

23 saving him.

24      THE COURT:  Right.  And this affidavit does say that he

25 did discuss euthanasia with Ms. Haddix.

1          MS. HADDIX:  He did.

2          THE COURT:  All right.  I understand.  I just, I wanted

3     to clarify that bit of information for the record.

4          Now, Ms. Haddix, is there anything further you wish to

5     say at this time?

6          MS. HADDIX:  No, ma'am.

7          THE COURT:  Mr. Goodman, any further argument from you?

8          **- COUNTERCLAIM PLAINTIFFS FURTHER ARGUMENT -**

9          MR. GOODMAN:  I would like to just highlight again, in

10    light of Ms. Haddix's comments, that Plaintiff specifically did

11    not request the ashes to be tested because Ms. Haddix confirmed

12    that they did not contain any discernible bone fragments and we

13    knew, from published literature and consulting with our experts,

14    that there would be bone fragments remaining and that no testing

15    can be done on pure ash for identification purposes --

16         MS. HADDIX:  That's not true.

17         MR. GOODMAN:  -- so there was no reason to request

18    them.

19         THE COURT:  Ms. Haddix, do you have some different

20    information about testing?  Genetic testing?

21         MS. HADDIX:  At our conference -- you know, whenever

22    I lost I fired my attorneys and I told you I wanted to try to

23    negotiate.  We had a conference call and I told him that

24    I personally went out to that burn site and I got some more

25    ashes in another box and it did have some pieces.

1      Now, I don't -- I'm not an expert so I don't know if

2  they are bone fragments but they potentially could be bone

3  fragments and I offered both boxes to PETA at that time so that

4  they could.

5      I even called six places -- and I can go out to my

6  truck and get the names and numbers of the six people that

7  I called because when PETA didn't respond back to me -- they

8  said they would get back to me once they discussed it with PETA

9  and Angela Scott, collectively, what they would accept as

10  sufficient proof, so I offered both boxes of ashes and I said as

11  long as you return them --

12      THE COURT:  Hold on a second.  Hold on a second.

13          (*Brief discussion off the record.*)

14      THE COURT:  Okay.  We're good.  Okay.  Go ahead.

15      All right, Ms. Haddix, I do understand.

16      MS. HADDIX:  I did try, I did try to offer them that

17  second box that I collected.  Now, I don't know if it will be

18  any of Tonka's bones but I'm hoping it is so that they can do

19  it.  So I'm trying to do anything that will give them the

20  evidence that they want, just so that they'll go away and leave

21  me alone.

22      THE COURT:  All right.  Well, thank you all for all

23  your presentations here today.  I am going to just cut to the

24  chase here and tell you what my ruling is on this.

25          - COURT'S RULING -

1    THE COURT:  I am denying the Fourth Motion for Contempt

2 and the reason -- as well as all the requests for relief in

3 there -- and the reason is that based on all of the evidence

4 here that's been presented to me here today, as well as the

5 affidavits and other things that are part of the record already

6 from the prior hearings and the prior briefing, but looking at

7 affidavits, not just statements and briefs that aren't supported

8 by evidence, I certainly cannot say and do not believe that it's

9 been proved that Tonka is still living.

10    And although it was the Defendants' -- it was

11 Ms. Haddix's burden to provide proof and she did not do that at

12 the time directed earlier, I didn't tell her exactly what kind

13 of proof she had to provide and there was some evidence,

14 documentation, whatever, provided.

15    So to the extent this is an argument about the

16 technical violation -- and I will point out that your briefs,

17 both sides' briefs, spent way too much time arguing about the

18 technicalities of the contempt order and the technical violation

19 of did you do it on a Tuesday versus a Thursday, when what

20 I wanted to know is, is this chimpanzee alive or not.

21    And based on all the evidence I've heard here today,

22 I think that is the important issue and I cannot say.  I am

23 certainly not declaring that he is dead.  That is not my job and

24 there is certainly not enough evidence for me to do that.  What

25 I am saying is that I cannot find that he is still living and,

1    therefore, I cannot find that Ms. Haddix has violated the order

2    and is in contempt.  If I believed that she had secreted this

3    animal and, in fact, he was still alive somewhere, I would find

4    differently.  But based on this evidence, I don't have enough

5    evidence to cause me to believe that.

6            I know -- let me say some things that I want to make

7    sure everyone understands.  I am in no way questioning the

8    credibility of PETA's expert witnesses.  I actually did think it

9    was common knowledge that bones didn't get burned up in

10   cremations but maybe I've dealt more with cremations than other

11   people.  But I understand that a lay person, maybe a lot of lay

12   people wouldn't know that.  But I certainly do otherwise --

13   I mean I guess I have had prior experience with cremations,

14   which is entirely consistent with the experts.  But even trying

15   to set aside my personal experience -- which is not evidence --

16   I found them to be very credible witnesses and I have no

17   criticism at all of their testimony.

18           And I do conclude that Ms. Haddix's story in evidence,

19   there is a lot of inconsistent and implausible evidence

20   presented by Ms. Haddix, and that has been true throughout this

21   case.  I understand -- it's my belief that Ms. Haddix makes

22   things up to answer questions, and she has done that

23   consistently throughout this trial or this case and she's doing

24   it again here today, I believe; such as the suggestion, Well,

25   maybe my husband was being nice to me.  And I understand that.

1   It detracts from her credibility, absolutely, but does that

2   convince me that Tonka is alive and she has hidden him?  No, it

3   does not.

4          And so, you know, even though I find that -- you know,

5   even though I find that there's a lot that is inconsistent and

6   not plausible in the presentation from Ms. Haddix, and some of

7   it is just because it doesn't always make sense or it's

8   inconsistent, but I do think that -- and sometimes it's that

9   there's too many answers for every little issue which in my

10  experience is a sign that someone is making stuff up -- I still

11  don't find that -- I don't have evidence that convinces me that

12  she has -- that this chimpanzee is alive and she has secreted

13  him somewhere, which is the issue that I think is the important

14  issue in this hearing and in this case.  And so I am denying the

15  Fourth Motion for Contempt.

16         Ms. Haddix, I want -- I'm also denying, Ms. Haddix,

17  your Motion for Terminating Sanctions, which that's a pretty

18  meritless motion in many, many ways but, mostly importantly,

19  it's not relief that I would ever grant someone in this type of

20  situation.  I mean terminating sanctions is an odd thing to do.

21  And I understand the proposed order.  What you're asking me for

22  is to let you do all sorts of stuff that you were not allowed to

23  do under the Consent Decree and I am not doing that.  I'm

24  denying that motion.

25         And I also want you to know, Ms. Haddix, because you

1  did use -- in the most recent motion you asked for terminating

2  sanctions with prejudice or something to that effect.  And the

3  orders you are under are continuing orders, okay.  The Consent

4  Decree still exists.  The other orders I've entered still exist.

5  You are not absolved from anything in them.

6          If Mr. Goodman and his clients were to come up with

7  actual evidence that Tonka is still alive, then I will expect

8  they will be right back in front of me with another motion for

9  contempt, and there's nothing in my order here today that

10 precludes them from doing that.  I am not suggesting that I want

11 everybody to go off on a chase of things that, you know, are --

12 well, I don't know that you need to go to such extremes.  I'm

13 not suggesting that anything should be done.

14         But I want Ms. Haddix to understand that there is

15 nothing in my ruling today that means if it were later

16 determined that Tonka is living, that would preclude PETA from

17 coming back and seeking another motion for contempt.

18         And I'm not going to go through all the other things

19 that have led to the prior contempt hearings and findings.

20 I mean I think I've said enough about the credibility issues

21 that are pretty important here.

22         But all those credibility issues still don't make me

23 believe, based on the evidence presented to me, that Tonka is

24 living and, therefore, I'm denying the Fourth Motion for

25 Contempt and I'm denying the Plaintiff's Motion for Sanctions or

1   The motion to Dismiss, I think is the most recent thing that was

2   filed.

3           I will enter a written order setting forth those things

4   just so it's very clear in the docket that those are my rulings.

5   I will not include a long opinion.  I'm not including any

6   opinion.  I'm simply going to rule the motions for the reasons

7   stated on the record here today.  You have my reasons and,

8   obviously, a transcript would show what those are if it were

9   needed for future proceedings but I'm not going to write an

10  opinion on this.

11          So with that said, I know Mr. Goodman, I know you do

12  have a pending motion related to the other Defendant, the other

13  chimpanzee owner in this case, and I intend to deal with that.

14  I just, I was a little concerned during a pandemic of telling

15  the Marshals to go out and arrest someone in this case because

16  they're having a lot of trouble doing a lot of things.  But

17  I believe you're entitled to the relief you're seeking in that,

18  and so I will be ruling on that in the relatively near future.

19  I'm not pre-ruling it now by what I just said.  I shouldn't have

20  said that.  But it is under submission and I will pay attention

21  to it and we'll see where we go with regard to that.

22          But otherwise, with regard to this contempt motion

23  against Ms. Haddix, I have ruled it is concluded and I am

24  denying that motion.

25          All right.  That you all very much.  Court is in

1    recess.

2              MS. HADDIX:  Thank you.

3              MR. GOODMAN:  Thank you, Judge.

4                    - RECESS AT 1:16 P.M. -

- REPORTER'S CERTIFICATE -


          I, Linda C. Nichols, Registered Diplomate Reporter and

Certified Realtime Reporter, do hereby certify that I am a duly

appointed Official Court Reporter for the United States District

Court of the Eastern District of Missouri, and that the

foregoing is a true and accurate reproduction of the Motion for

Contempt Hearing held January 5th, 2022, in the matter of:


          MISSOURI PRIMATE FOUNDATION, et al.
                         vs.
     PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., et al.

                  No. 4:16-CV-02163-CDP



          I further certify that this transcript consists of

pp. 1-130 inclusive.



                    Dated this 9th day of June, 2022.



                     \s\  Linda Nichols
                    _____
                    Linda Nichols, RDR, CRR
                    Official Court Reporter
                    United States District Court
                    Eastern District of Missouri
                    linda_nichols@moed.uscourts.gov